1   JENNIFER KELLY (CSB No. 193416)
    jennifer@tyzlaw.com
2   RYAN TYZ (CSB No. 234895)
    ryan@tyzlaw.com
3   ERIN JONES (CSB No. 252947)
    ejones@tyzlaw.com
4   DEBORAH HEDLEY (CSB No. 276826)
    deborah@tyzlaw.com
5   CIARA MCHALE (CSB No. 293308)
    ciara@tyzlaw.com
6   SEAN APPLE (CSB No. 305692)
    sapple@tyzlaw.com
7   CHIEH TUNG (CSB No. 318963)
    chieh@tyzlaw.com
8   TYZ LAW GROUP PC
    4 Embarcadero Center, 14th Floor
9   San Francisco, CA 94111
    Telephone: 415.868.6900
10
    Attorneys for Plaintiffs
11  Moonbug Entertainment Limited and
    Treasure Studio, Inc.

12

13                   **UNITED STATES DISTRICT COURT**

14                  **NORTHERN DISTRICT OF CALIFORNIA**

15                     **SAN FRANCISCO DIVISION**

16

17
    MOONBUG ENTERTAINMENT                Case No: 3:21-cv-06536-EMC
18  LIMITED and TREASURE STUDIO, INC.,
                                         **PLAINTIFFS' OPPOSITION TO**
19              Plaintiffs,              **DEFENDANTS' MOTION FOR**
                                         **PARTIAL SUMMARY JUDGMENT OF**
20        v.                             **NONINFRINGEMENT**

21  BABYBUS CO., LTD and BABYBUS         **FILED UNDER SEAL**
    (FUJIAN) NETWORK TECHNOLOGY
22  CO., LTD,                            Date:        February 2, 2023
                                         Time:        1:30 pm
23              Defendants.              Courtroom:   5 – 17th Floor
                                         Judge:       Hon. Edward M. Chen
24

25

26

27

28

# **TABLE OF CONTENTS**

Page

I. COCOMELON'S WILDLY POPULAR SERIES AND CHARACTERS ..................... 2

II. DEFENDANTS FAIL TO REBUT THAT THE REGISTERED COCOMELON
WORKS ARE VALID AND ENFORCEABLE .............................................. 3

    A. The Court Can Conclude the CoComelon Works are Valid and
Enforceable ............................................................................ 3

    B. Defendants' Lack of Novelty Arguments Are Unavailing ................... 4

    C. The Argument that Human Characters are Not Copyrightable is Incorrect ......... 5

    D. Defendants' Attempts to Isolate or Simplify Protectable Elements
Misapprehends the Law ............................................................. 5

III. EVERY SUPER JOJO VIDEO INFRINGES BY COPYING JJ—AN
UNDENIABLY DISTINCT AND PROTECTABLE CHARACTER ........................... 7

    A. Defendants Do Not Use the Correct Test for Protectable Characters ................. 7

    B. JJ is a Distinct, Recognizable Character with Star Power ..................... 8

    C. Defendants Copied JJ, and Every Super JoJo Video Infringes ........................... 11

IV. MOONBUG SATISFIES THE EXTRINSIC TEST, ON WHICH DEFENDANTS
HAVE FAILED TO SUBMIT ANY EVIDENCE OR REBUTTAL ............................ 14

    A. Defendants Submit No Expert Testimony on Substantial Similarity ................. 15

    B. The Entire Super JoJo Series Is Substantially Similar to the CoComelon
Works ................................................................................... 16

        i. JoJo Is Substantially Similar to JJ ............................................ 16

        ii. JoJo's Family is Substantially Similar to JJ's Family ........................... 19

        iii. Super JoJo has Substantially Similar Plot/Themes, Sequence of
Events, Dialogue to the CoComelon Works ..................................... 20

        iv. Super JoJo has a Substantially Similar Setting ..................................... 22

        v. Super JoJo has a Substantially Similar Mood ........................................ 23

        vi. Super JoJo has a Substantially Similar Pace ........................................ 24

# <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

**CASES**

*Azaria v. Bierko*
   No. CV 12-9732 GAF (RZX), 2014 WL 12561611 (C.D. Cal. Feb. 21, 2014) ............. 8

*Bach v. Forever Living Prod. U.S., Inc.*
   473 F. Supp. 2d 1127 (W.D. Wash. 2007) ................................................................. 7, 8, 10

*Blizzard Ent., Inc. v. Lilith Games (Shanghai) Co.*
   No. 15-CV-04084-CRB, 2018 WL 1242053 (N.D. Cal. Mar. 8, 2018) ....................... 18

*DC Comics v. Towle*
   802 F.3d 1012 (9th Cir. 2015) ................................................................................. 8, 9, 11

*Desire, LLC v. Manna Textiles, Inc.*
   986 F.3d 1253 (9th Cir.) .............................................................................................. 4

*Dr. Seuss Enters., Ltd. P'ship v. ComicMix Ltd. Liab. Co.*
   983 F.3d 443 (9th Cir. 2020) ...................................................................................... 6, 7

*Ehrenberg v. Walt Disney Co.*
   No. 2:22-CV-01136-SB-SK, 2022 WL 17080142 (C.D. Cal. Sept. 16, 2022) ............. 25

*Ets–Hokin v. Skyy Spirits, Inc.*
   225 F.3d 1068, 1075 (9th Cir. 2000) .......................................................................... 3

*Feist Publications, Inc. v. Rural Tel. Serv. Co.*
   499 U.S. 340, 111 S. Ct. 1282 (1991) ........................................................................ 3, 4

*Folkens v. Wyland Worldwide, LLC*
    882 F.3d 768 (9th Cir. 2018) ..................................................................................... 5

*Harper & Row Publishers, Inc. v. Nation Enterprises*
   471 U.S. 539, 565, 105 S. Ct. 2218, 2233, 85 L. Ed. 2d 588 (1985) .......................... 13

*Hoff v. Walt Disney Pictures*
   No. EDCV1900665AGKKX, 2019 WL 6329368 (C.D. Cal. Aug. 19, 2019) ............. 18

*Ideal Toy Corp. v. Kenner Prod. Div. of Gen. Mills Fun Grp., Inc.*
   443 F. Supp. 291 (S.D.N.Y. 1977) ............................................................................. 18

*ITC Textile, Ltd v. J.C. Penney Co., Inc.*
   No. CV1202975DMGFFMX, 2014 WL 12567142 (C.D. Cal. Feb. 7, 2014) ................. 3

*L.A. Printex Indus., Inc. v. Aeropostale Inc.*
   676 F.3d 841 (9th Cir. 2012) ..................................................................................... 18

*Malibu Textiles, Inc. v. Label Lane Int'l, Inc.*
   922 F.3d 946 (9th Cir. 2019) ..................................................................................... 6

*Mattel, Inc. v. MGA Ent., Inc.*
   616 F.3d 904 (9th Cir. 2010) ........................................................................ 18

*Metcalf v. Bochco*
   294 F.3d 1069 (9th Cir. 2002) ............................................................ 6, 7, 14

*Metro–Goldwyn–Mayer, Inc. v. Am. Honda Motor Co.*
   900 F. Supp. 1287 (C.D. Cal. 1995) ............................................... 5, 10, 14

*Moonbug Entertainment Limited et al., v. HappyKidsTV, et al.*
   Case No. 22-cv-03203-TLT, Dkt. No. 39 (N.D. Cal Dec. 15, 2022) ............................. 4

*Paramount Pictures Corp. v. Axanar Prods., Inc.*
   No. 2:15-CV-09938-RGK-E, 2017 WL 83506 (C.D. Cal. Jan. 3, 2017) ........................ 6

*Rice v. Fox Broad. Co.*
   330 F.3d 1170 (9th Cir. 2003) ...................................................................... 10

*Satava v. Lowry*
   323 F.3d 805 (9th Cir. 2003) ......................................................................... 5

*Shaw v. Lindheim*
   919 F.2d 1353 (9th Cir. 1990) ............................................................... 14, 17

*Sid & Marty Krofft Television v. McDonald's Corp.*
   562 F.2d 1157 (9th Cir. 1977) .............................................................. 7, 14

*Skidmore v. Led Zeppelin*
   952 F.3d 1051 (9th Cir. 2020) ...........................................................passim

*Summit Kaiju LLC v. Legend Pictures, LLC*
   No. CV 21-9779 PA (ASX), 2022 WL 2235460 (C.D. Cal. Apr. 12, 2022)................... 9

*Thomas v. Walt Disney Company*
   No. C-07-4392 CW, 2008 WL 425647 (N.D. Cal. Feb. 14, 2008)............................. 8, 9

*United Feature Syndicate, Inc. v. Koons*
   817 F. Supp. 370 (S.D.N.Y. 1993)........................................................... 12, 18

*Walt Disney Prods. v. Air Pirates*
   581 F.2d 751 (9th Cir. 1978) ...................................................................... 5, 8

**STATUTES**

17 U.S.C. § 410...................................................................................................... 3

This case began with Defendants swearing under oath to the Court that they independently developed Super JoJo.  *See, e.g.,* Dkt. No. 22 at 3:3-6; No. 23, ¶4.  That was false.  Discovery revealed that Defendants painstakingly copied the CoComelon Works[1] to create their infringing Super JoJo series.  Recognizing the star power of CoComelon's main character JJ, Defendants studied and used him to make JoJo, copying JJ's physical features, personality, signature moves, and supporting cast.  Defendants copied many of the most popular CoComelon Works frame-by-frame, building an arsenal of reusable models for use throughout the infringing Super JoJo series.  While Defendants exclude the most egregious examples of copying from their Motion, the evidence points to only one conclusion:  every Super JoJo video infringes Moonbug's registered copyrights in CoComelon and its star character JJ.

Defendants lack any plausible defense to infringement and cannot genuinely dispute they copied CoComelon.  Forced to abandon their independent development story, Defendants are left to argue that Moonbug cannot satisfy the extrinsic test because the CoComelon Works themselves are not protectable—in essence, Defendants posit that the *entirety* of the CoComelon Works must be filtered out as part of the extrinsic test, leaving nothing remaining to compare for substantial similarity. When framed properly, however, it is clear that Defendants are attacking copyright validity and not infringement.  Indeed, rather than attempt to show Defendants have not copied protectable elements of the CoComelon Works, Defendants recycle lack of originality arguments—arguing that certain elements of the CoComelon Works, in isolation, are not protectable because they are generic.  But this Court already rejected Defendants' "focus on the copyright protectability of individual features of Moonbug's artworks and characters in isolation," holding that it "fail[s] to consider that a copyright infringement claim can be based on a selection, arrangement, or combination of such features."  Dkt. No. 71, at 16.

On the key issue of infringement, Defendants tellingly submit no evidence or expert testimony on substantial similarity—*despite having retained three separate technical experts*. When Defendants' rebuttal expert was asked whether she performed any analysis to assess

---

[1] Terms in this opposition have the same meaning as those used in Plaintiffs' Motion for Summary Judgment.  Dkt. 162, 162-1 ("Moonbug's Motion").

1    whether Super JoJo copied any original expression from the CoComelon Works, she followed

2    defense counsel's instruction not to answer.[2]   Conversely, Moonbug's expert applied the extrinsic

3    test, demonstrating that the entire Super JoJo series—including every video—is substantially

4    similar to the CoComelon Works in its characters, plot, themes, sequence of events, setting, mood,

5    pace, and dialogue.  Dkt. 162-1, § IV.c. With this evidence, coupled with the direct evidence of

6    copying, the Court should deny Defendants' Motion and grant summary judgment for Moonbug.

7    I.    **COCOMELON'S WILDLY POPULAR SERIES AND CHARACTERS**

8         CoComelon is a preschool entertainment juggernaut and was an instant success, rising to

9    billions of views on YouTube by mid-2018.  Reese Decl., ¶3.  Now, with over 140 billion views

10   on YouTube, CoComelon is in the top two most-viewed YouTube channels of all time, and is the

11   most viewed YouTube channel in the United States.  *Id.*, ¶5.  To date, the main CoComelon

12   YouTube channel boasts 149 million subscribers and over 146 billion views.  *Id.*  CoComelon (of

13   which there are currently over 350 episodes) is on many platforms and streaming services,

14   including Netflix, Hulu, Amazon, AppleTV, Roku, and Peacock.  *Id.*, ¶¶6, 8.  CoComelon

15   licensed merchandise is sold via Amazon, Target, Walmart, Macy's, and Kohl's.  *Id.*, ¶9.

16        CoComelon centers around its main character JJ.  He is the undisputed central character

17   of the CoComelon series, its shining star, and most beloved character, and the core of the show

18   around which all the other characters and videos revolve. The series follows JJ on his journey as

19   he learns about the world as he experiences it, like overcoming fear of water as he learns to swim,

20   and pretending to be a doctor and a bus driver.  *See* Dkt. 164 (Krause Decl.), Ex. 1, ¶¶168, 176.

21   JJ's personality stands out as unique in preschool programming—although he appears to be a

22   young baby, gurgling, wearing a bib and eating in a highchair, he also walks, dances, speaks in

23   full sentences, and sings with ease, understanding all that is said to him.  *Id.*, ¶176.  Indeed, while

24   JJ's visual expression is that of an animated cartoon baby, many of his conceptual qualities are

25   combined and expressed as an older toddler. Reese Decl.¶2.   JJ's wild popularity in early

26

27   _____
     [2] Hedley Decl., ¶2, Ex. A (Seiter 106:14-22; 105:13-109:7, 159:1-166:14). Moonbug objects to
28   the testimony of Dr. Seiter in support of Defendants' motion because of her refusal to answer
     and counsel's instruction in violation of this Court's Standing Order for Civil Discovery, § 3.c, e.

CoComelon videos led Plaintiffs to focus on him as the star character of the series. *Id.*

## II.   DEFENDANTS FAIL TO REBUT THAT THE REGISTERED COCOMELON WORKS ARE VALID AND ENFORCEABLE

### A.   The Court Can Conclude the CoComelon Works are Valid and Enforceable

As explained in Moonbug's Motion, Plaintiff Treasure Studio is the author and owner of the registered copyrights in the CoComelon Works; Plaintiff Moonbug Entertainment is the exclusive licensee of the right to distribute the CoComelon Works. *See* Dkt. 163 (Chubb Decl.) ¶ 3; Dkt. 165 (Apple Decl.) ¶ 60, Ex. 561.  Moonbug's copyrights in the CoComelon Works were each registered within five years of first publication and are thus self-authenticating and *prima facie* evidence of the validity of the copyrights and of the facts stated in the certificates.  *See* 17 U.S.C. § 410(c); *Ets–Hokin v. Skyy Spirits, Inc.*, 225 F.3d 1068, 1075-1076 (9th Cir. 2000); *see* Dkt. No. 165 (Apple Decl.), ¶¶ 3–4, Exs. 2-147 (all CoComelon Registrations and Deposits), Dkt. No. 163 (Chubb Decl.), ¶¶2-3.  Moonbug's copyright registrations create a rebuttable presumption of validity.  *See Ets-Hokin*, 225 F.3d at 1076. Defendants have the burden to prove, via admissible evidence, that the registrations are invalid, which they have not done.  *See id.*

Nor could Defendants prove they are invalid. The threshold for copyrightability is "originality," which is a low bar.  "Original, as the term is used in copyright, means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity." *Id.* (citations omitted); *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 111 S. Ct. 1282, 1287–88 (1991) ("The vast majority of works make the grade quite easily, as they possess some creative spark, 'no matter how crude, humble or obvious' it might be.") (citations omitted).  Here, there is no dispute that Treasure Studio independently created the CoComelon Works.  Defendants have not shown otherwise.

Additionally, to rebut the presumption of validity, Defendants must provide evidence that Treasure Studio failed to "add something original to [the] expression."  *See ITC Textile, Ltd v. J.C. Penney Co., Inc.*, No. CV1202975DMGFFMX, 2014 WL 12567142, at *5 (C.D. Cal. Feb. 7, 2014) (citations omitted).  Defendants fail to do so, as Defendants' expert *conceded* that each of the CoComelon Works, including the 2D registration of JJ, contains original and protectable

expression:



```
22        Q.   So just so the record is clear:  You agree
23    that there is original visual expression in each of
24    the CoComelon registered works in this case; correct?
25        A.   I agree.
```

Hedley Decl., ¶2, Ex. A (Seiter Tr. 158:22-25). Because there is no genuine dispute on this issue, the Court should find that the CoComelon Works are valid and enforceable.

**B.      Defendants' Lack of Novelty Arguments Are Unavailing**

Defendants nonetheless argue that CoComelon and its popular characters are not protectable because there are other animated babies in addition to CoComelon's JJ, and many features of JJ are naturally present in babies. Dkt. No. 180, at 2-3, 5-23. But Defendants conflate the idea of "novelty" with "originality" when they put forth examples of other baby characters that they claim predate JJ to argue that he is not protectable. *Id.*, at 2-3. Indeed, this argument "misapprehend[s] the appropriate standard" because the "similarity of one design to another has no bearing on whether" the CoComelon Works are protectable. *Desire, LLC v. Manna Textiles, Inc.*, 986 F.3d 1253, 1259–60 (9th Cir.), cert. denied, 142 S. Ct. 343 (2021).  As the Supreme Court explains: "Originality does not signify novelty; a work may be original even though it closely resembles other works so long as the similarity is fortuitous, not the result of copying." *Feist*, 499 U.S. at 345. Again, Defendants' expert has conceded that all of the CoComelon Works contain original expression.  Hedley Decl., ¶2, Ex. A (Seiter Tr. 158:22-25).

The Northern District recently rejected the argument Defendants make here, when another infringer of CoComelon attempted to avoid liability by arguing that Moonbug did not create the first 3D-animated baby character. The Court held this argument was "insufficient to support a defense that Plaintiffs' copyrights are invalid due to lack of originality, which would instead require factual allegations that Plaintiffs copied from another" – allegations which were not present in that case, or this one, or possible here based on the facts of Treasure Studio's independent creation. *See Moonbug Entertainment Limited et al., v. HappyKidsTV, et al.*, Case No. 22-cv-03203-TLT, Dkt. No. 39, *8 (Dec. 15, 2022). The existence of other animated babies does not shelter Defendants from liability for their willful copying of the CoComelon Works.

### C.   The Argument that Human Characters are Not Copyrightable is Incorrect

Defendants next argue that JJ and his family, as animated versions of humans, are not copyrightable because they only express characteristics found in nature and humankind.  Dkt. No. 180 at 9:6-11.  Setting aside that this argument is irreconcilable with Defendants' position that the 2D depiction of the JoJo character (and family of characters) is copyrightable (Hedley Decl., ¶9, Ex. H), Defendants' cited authority also undermines this argument.  In *Satava v. Lowry*, the Ninth Circuit explained that while copyright protection does not cover ideas as expressed in nature, an artist retains the right to "protect the original expression he or she contributes to [those] ideas."  323 F.3d 805, 813 (9th Cir. 2003).  Also, in *Folkens v. Wyland*, the Ninth Circuit explained that "[a]n artist may obtain a copyright by varying the background, lighting, perspective, animal pose, animal attitude, and animal coat and texture" in works focusing on nature, even where the Court refused to find liability for copyright infringement for the competing depictions of natural creatures (2D images of dolphins) at issue.  882 F.3d 768, 775 (2018).

More importantly, Defendants provide no authority comparable to the facts of this case, regarding a 3D-animated cast of fictional characters.  Of course, the expression of fictional characters derived from the natural world, like mice or men, are protectable in copyright.  *Walt Disney Prods. v. Air Pirates*, 581 F.2d 751, 755 (9th Cir. 1978) (finding Mickey Mouse a protected character); *Metro–Goldwyn–Mayer, Inc. v. Am. Honda Motor Co*., 900 F. Supp. 1287, 1295–96 (C.D. Cal. 1995) (finding James Bond a protected character).  Under Defendants' simplistic logic, Mickey Mouse is not copyrightable, because, stripped of all artistic choices, Mickey's core characteristic is that he is a mouse, which exists in nature.  Likewise, Defendants' arguments regarding dolphins and jellyfish would render both Fred Flintstone and Charlie Brown unprotectable because they are fictional animated *humans*.  This is absurd.

### D.   Defendants' Attempts to Isolate or Simplify Protectable Elements Misapprehends the Law

Defendants next argue that certain elements of the CoComelon Works, in isolation, are not protectable because they are generic or *scènes à faire*.  But these arguments fail to address the controlling law.  As noted above, this Court previously rejected Defendants' "focus on the

copyright protectability of individual features of Moonbug's artworks and characters in isolation," holding that this "fail[s] to consider that a copyright infringement claim can be based on a selection, arrangement, or combination of such features."  Dkt. No. 71, at 16:25-27.  As this Court stated when Defendants previously made this argument:

> The Ninth Circuit has acknowledged that even where individual similarities might be unprotectable, such as generic or *scènes à faire* elements, "[a] combination of unprotectable elements" can support an infringement claim "if those elements are numerous enough and their selection and arrangement original enough that their combination constitutes an original work of authorship." *Malibu Textiles, Inc. v. Label Lane Int'l, Inc.*, 922 F.3d 946, 952 (9th Cir. 2019).

*Id.* at 16:28-17:4. "Babybus's attempt to isolate, focus only on certain aspects of Moonbug's infringement allegations, and recast those allegations at a high degree of generality" was inappropriate then and is inappropriate now.  *See id*. at 17:14-16.

The Ninth Circuit sets forth a completely different analytical framework than Defendants' Motion deploys. The applicable law is "cautious not to overzealously decompose visual expression into its abstract, and thus unprotectable, units, because that would mean that any amount of taking by [infringers] would be permissible." *See Dr. Seuss Enters., Ltd. Partnership v. ComicMix Ltd. Liab. Co*., 983 F.3d 443, 456 n.5 (9th Cir. 2020); *see also Metcalf v. Bochco*, 294 F.3d 1069, 1074 (9th Cir. 2002) ("protectable expression includes the specific details of an author's rendering of ideas, or 'the actual concrete elements that make up the total sequence of events and the relationships between the major characters'") (citations omitted), o*verruled in part on other grounds by Skidmore v. Led Zeppelin*, 952 F.3d 1051 (9th Cir. 2020); *Paramount Pictures Corp. v. Axanar Prods., Inc*., No. 2:15-CV-09938-RGK-E, 2017 WL 83506, at *5 (C.D. Cal. Jan. 3, 2017) *overruled in part on other grounds by Skidmore*, 952 F.3d 1051 ("Although each of these elements may not be individually original and … protectable, they are 'numerous enough and their selection and arrangement original enough that their combination constitutes an original work of authorship'") (citations omitted).

In *Metcalf*, for example, the Ninth Circuit analyzed two movies with many similarities including that both (1) were set in overburdened county hospitals in inner-city Los Angeles with mostly black staffs, (2) dealt with issues of poverty, race relations and urban blight, (3) had main

characters that were both young, good-looking, muscular black surgeons who grew up in the neighborhood where the hospital was located, with similar struggles and romantic relationships, and (4) saw the hospital's bid for reaccreditation vehemently opposed by a Hispanic politician. *Metcalf*, 294 F.3d at 1073–74 (9th Cir. 2002).  While the Ninth Circuit found that each of these similarities were general plot ideas that were not protected by copyright law individually, it held that the cumulative weight of these similarities went beyond the necessities of the theme and belied any claim of literary accident. *Id.* at 1074 (reversing summary judgment for defendant).

Here, Defendants' focus on elements in isolation (Dkt. No. 180, at 7-23) is improper.  It is the unique combination and arrangement of these elements in CoComelon and then copied in Super JoJo that matters.  *See Dr.* Seuss, 983 F.3d at 456 (differentiating the taking of "a shape here and a color patch there" from taking "particular arrangements of visual components" or "swatches of well-known illustrations").  When looking at the combination of protectable and generic elements, the "[t]he totality of the similarities [between Super JoJo and CoComelon] ... goes beyond the necessities of the ... theme and belies any claim of literary accident," and shows that Defendants infringe protectable expression.  *Metcalf*, 294 F.3d at 1074 (citations omitted).

## III.    EVERY SUPER JOJO VIDEO INFRINGES BY COPYING JJ—AN UNDENIABLY DISTINCT AND PROTECTABLE CHARACTER

### A.    Defendants Do Not Use the Correct Test for Protectable Characters

Defendants urge the Court to dissect CoComelon's characters into individual physical and conceptual elements to decipher which elements of the characters may be protectable.  However, in cases involving animated characters (unlike literary characters) courts examine the "unique combination of elements that makes up a protected character" instead of dissecting the work looking for protectable elements.  *Bach v. Forever Living Prod. U.S., Inc.*, 473 F. Supp. 2d 1127, 1134 (W.D. Wash. 2007), *overruled by Skidmore*, 952 F.3d 1051.  As the Ninth Circuit makes clear: "while many literary characters may embody little more than an unprotected idea (*see Sid & Marty Krofft v. McDonald's Corp.*, 562 F.2d 1157 (9th Cir. 1977)), a comic book character, which has physical as well as conceptual qualities, is more likely to contain some unique elements of expression."  *Walt Disney Prods. v. Air Pirates*, 581 F.2d 751, 755 (9th Cir. 1978).

Characters in audiovisual works—like CoComelon's JJ and his family—are protectable when they have (1) "physical as well as conceptual qualities"; (2) are "sufficiently delineated" to be recognizable as the same character whenever they appear; and (3) are "especially distinctive" and "contain some unique elements of expression." *See DC Comics v. Towle*, 802 F.3d 1012, 1021 (9th Cir. 2015) (holding that the Batmobile is a character that qualifies for copyright protection). Courts look at the character's many elements—visual depictions, name, dialogue, relationships with other characters, their actions and conduct, personality traits, and written descriptions—to determine whether they are sufficiently delineated as a unique expression deserving of copyright protection. *See Bach,* 473 F. Supp at 1134.

Defendants' reliance on *Olson* and *Thomas*, addressing literary characters, is thus misplaced. *See Olson v. Nat'l Broad. Co*., 855 F.2d 1446, 1452–53 (9th Cir. 1988) (holding that characters from a screenplay, who were depicted only by 3-4 line summaries, were insufficiently delineated to achieve copyright protection but acknowledging the more ready copyrightability of *visually depicted* characters in television series, movies and cartoons); *Thomas v. Walt Disney*, No. C-07-4392 CW, 2008 WL 425647, at *5 (N.D. Cal. Feb. 14, 2008) (analyzing the copyrightability of a character in a literary work and not a cartoon character like JJ).

Additionally, apart from the character delineation test above, characters qualify for copyright protection under the "story being told" test where a character's development is so central to the story being told that it dominates the story. *See Azaria v. Bierko,* No. CV 12-9732 GAF (RZX), 2014 WL 12561611, at **4-5 (C.D. Cal. Feb. 21, 2014); *see Bach*, 473 F. Supp. 2d at 1133 (discussing protection or characters who are the "central focus of the work"). CoComelon's JJ meets both tests.

### B.   JJ is a Distinct, Recognizable Character with Star Power

Defendants' attempt to castigate JJ as a "stock" character with a thin copyright is wrong. JJ is a clearly delineated, recognizable, popular character with a distinctive personality who has driven billions of views and millions in revenue. Reese Decl., ¶¶2-5. Defendants' own expert agrees that JJ is clearly delineated and recognizable, and acknowledges that he is the main character, which takes him out of being a stock character. Hedley Decl., ¶2, Ex. A (Seiter Tr.

257:24-258:6); *see Bach*, 473 F. Supp. 2d at 1133 (collecting cases).

<u>First</u>, unlike the flat literary characters in *Olson* and *Thomas*, JJ cuts a unique figure with at least twenty-nine original physical and conceptual elements Treasure Studio artists chose in making the *audiovisual* expression of the character JJ as developed throughout the CoComelon Works. Dkt. No. 164 (Krause Decl.), Ex. 1 ¶¶ 165-176, App'x 4, part 1, elements 1-29; Decl. of Fran Krause in Support of Plaintiffs' Opposition ("Krause 2d Decl.") ¶3, Ex. A; *see also Towle*, 802 F.3d at 1021. JJ's physical qualities are originally expressive and distinct including because of artistic choices that accentuate his chubby-cheeked design. *See* Dkt. No. 164, Ex. 1, ¶174 (listing JJ's unique traits, opining "[t]he way these features are expressed in JJ's design is entirely unlike all the examples in the defendant's list."). Because JJ is a 3D animated character, many of his physical and conceptual elements (large, rounded head, distinctive hair style, facial features, disproportionate body, fine motor control, ability to move and pose in certain ways) are coded into his reusable 3D "model" and "rigging" to enable the animated character to be posed, rotated, and moved in certain ways to create animations. *See, e.g., id.* ¶¶ 28, 49, 57, 169, 174, 236.

Further, JJ's combined conceptual qualities have been developed in the CoComelon Works, as JJ encounters new challenges and tackles them with aplomb, "which taken together provide the audience's understanding of the character." *Id.*, ¶176. JJ is a toddler who has the motor skills, expression, and behavior of a much older child. *See id.* He does not typically act like a toddler by having tantrums, but rather has a small range of positive emotions. *Id.* Defendants try to cull out JJ's characteristics individually to argue they are not protectable characteristics. But this analysis is incorrect as explained above.[3]

<u>Second</u>, JJ is sufficiently delineated to be recognizable as the same character wherever he appears. Again, Defendants' expert agrees. Dkt. No. 172-7 (Seiter Report) ¶165 ("I agree with Mr. Krause that CoComelon's JJ has physical and conceptual qualities, and that JJ is recognizable

---

[3] While the name "JJ" alone may, on its own, not be protectable in copyright, the name JJ attached to this character of a baby with many other physical and conceptual characteristics is, of course, in combination protectable. Defendants' cases merely stand for the idea that a name alone, *without more* protectable expression, is not. *See e.g., Summit Kaiju LLC v. Legend Pictures, LLC*, No. CV 21-9779 PA (ASX), 2022 WL 2235460, at *2 (C.D. Cal. Apr. 12, 2022).

as the same character when he recurs within CoComelon videos.")  Defendants rely on *Rice v. Fox Broad. Co*., which is inapposite.  *See* Dkt. 180 at 11.  In *Rice*, the Ninth Circuit held that an *unnamed* magician, who appeared in "only one home video that sold approximately 17,000 copies," "dressed in standard magician garb," and whose role was limited to simply "performing and revealing the magic tricks," was not sufficiently delineated as a character that differed from an "ordinary" magician.  *Rice v. Fox Broad. Co*., 330 F.3d 1170, 1175 (9th Cir. 2003), *overruled by Skidmore,* 952 F.3d 1051. As *Rice* explains, however, copyrightable characters "have displayed consistent, widely identifiable traits," which JJ has.  *Id.*  Unlike the unnamed magician in *Rice*, JJ has a name, full-blown personality, signature moves, dialogue with other characters, and his character has been developed in the CoComelon Works and throughout his oeuvre of over 350 videos, seen over 140 billion times.  Dkt. No. 164, Ex. 1, ¶¶ 165-176; Krause 2d Decl. ¶3, Ex. A (elements 11-29 and related cites); *id*. ¶12 (discussing timestamps in CoComelon Works where JJ's traits were developed);  *id.*, ¶10, Ex. F (attaching gif file showing JJ's signature move comparing JoJo's use of the *same* move); Reese Decl., ¶¶2-5; *see e.g.,Metro-Goldwyn-Mayer, Inc. v. Am. Honda Motor Co.*, 900 F. Supp. 1287, 1296 (C.D. Cal. 1995) (holding James Bond was a protectable character where his character traits had been developed throughout the sixteen films in which he had appeared).

JJ is such a compelling character that he has spawned millions of dollars in merchandise sales as the star of the most popular show on YouTube.  Reese Decl., ¶4. It is undisputed that JJ is recognizable as the star of CoComelon, and his centrality in the overall series entitles him to copyright protection.  *See Bach*, 473 F. Supp. 2d at 1133.  JJ's character is developed throughout the CoComelon Works, in which his inquisitive learning style and positive attitude are further developed as the series focuses on *how* JJ confronts life's obstacles as a toddler with the help of his supporting cast.  *See* Dkt. No. 164, Ex. 1, ¶176 ("JJ is the core of the CoComelon world and a key element that draws viewers to CoComelon."). JJ's character is thus akin to "those character driven movies where audiences watch more for the character – Tarzan, Superman, Sherlock Holmes, or James Bond – than the story" and meets both the character delineation and story being told tests.  *See Azaria,* 2014 WL 12561611, at *5.

Third, JJ is especially distinctive and contains unique elements of expression, including his name, his consistent visual depictions, his unique personality that combines behaviors of a young baby and an older child (wearing a bib and being fed in a highchair, but walking on two legs with ease, dancing, speaking in full sentences, singing, and being able to understand all that is said to him), the way he lovingly interacts with his family, and the way he positively and inquisitively interacts with his world, often using a signature "Wow" move made by circling his arms, and learning with the help of his stuffed animals, older siblings, and parents. *See* Dkt. No. 164 (Krause Decl.), Ex. 1, ¶¶165, 167-68, 181; *see also Towle*, 802 F.3d at 1021.

Defendants' expert admitted that a unique feature of JJ is that he is visually depicted as a baby but has the abilities of an older child and that she could not locate a single character in the genre that contained all of the visual and conceptual qualities of JJ. Hedley Decl., ¶2, Ex. A (Seiter Tr., 267:17-23, 245:17-21). These key features are hardly generic or dictated by nature. She also conceded that the other characters she relied on in her analysis do not bear the same characteristics as JJ. *See e.g. id.* at Seiter Tr. 254:4-8 (**Q**. Now, LooLoo Kids that you identify in your chart does not contain all of the physical characteristics that CoComelon's JJ character has; correct? **A**. That's correct.); 193:21-23 ("**Q**. There are really no similarities in the visual expression between Fitzy and CoComelon; right? **A**. That's correct."). Further, she conceded that JJ constitutes original expression, including in the registration of his 2D visual expression, and in each of the CoComelon Works in which he appears. *Id.*, at 158:22-25. JJ is indisputably a protectable character in copyright.

**C.    Defendants Copied JJ, and Every Super JoJo Video Infringes**

All of Defendants' Super JoJo Videos infringe CoComelon because, at a minimum, they include JoJo as a main character, who is a copy of CoComelon's JJ character. Fictional characters—including toddlers—can be expressed physically and conceptually in different ways through artistic choices, as Defendants expert concedes (Hedley Decl., ¶3, Ex. B (Saperstein Tr. 98:13-99:4), and Defendants chose to copy JJ and the way he is uniquely expressed. Defendants' JoJo character looks, talks, acts, moves, and dresses like JJ. He is the same gender and age as JJ and is depicted visually as a baby but conceptually as an older child just like JJ. He is also

supported by a family of identical make up as JJ – including an older brother and sister who guide him through life lessons. *See id.* at ¶4, Ex. C (Xue Tr. 38:15-23, 39:12-40:4, 43:21-45:21) (acknowledging that the main character JoJo walks, dances and sings, has a cast of a mother, father, older brother and sister, and dog named Bingo, and the motor skills of an older child).

This is not by accident but by design. Defendants' plan from the outset was to produce a competing series that both focused its visuals on CoComelon's JJ character and replicated the overall look and feel of the CoComelon series, and they implemented that plan by instructing their team to make Super JoJo videos "as identical as possible" to CoComelon, even *tracing* over an image of JJ to make JoJo. Dkt. No. 162, at 4-12; Dkt. No. 165, ¶¶22-47, 53; Exs. 527-548, 554 (Xue Tr.) 57:1–10 (testifying that Super JoJo wanted "to create a look and feel similar to CoComelon's); *see United Feature Syndicate, Inc. v. Koons*, 817 F. Supp. 370, 377 (S.D.N.Y. 1993) (granting summary judgment for plaintiff based on unauthorized copying where, like here, defendant admitted attempting to make his work "as close as possible" to plaintiff's).

Prior to making Super JoJo, Defendants planned to copy CoComelon in their "Super JoJo Specifications." Dkt. No. 165, ¶¶14-17, Ex. 524 at 18-19. In it, Defendants instructed their team to "focus [] the visuals" on CoComelon's JJ character—not any other baby, animated or human—listing the attributes that make CoComelon a huge success and which Super JoJo should copy:



*Id.* Defendants proceeded to execute this plan methodically to make Super JoJo, copying JJ's ability to inspire children, JJ's "expression, gesture and mood," CoComelon's slow scene and camera transitions and visuals that are close to the world of a child. Krause 2d Decl. ¶¶7-11, 25-

27, Exs. E-F. While Krause's Declaration lays out in detail how Defendants implemented this plan, one does not need to be an animation expert to see that Defendants intended to copy CoComelon's JJ, down to his most minute expressions, and succeeded in doing so.

| Image from Super JoJo Specifications, Dkt. 165, Ex. 524 (Dkt. 172-10) at BB_00046109. | Image from Super JoJo "This is the Way We Get Dressed," BB_00047333 at 2:23 |
|---|---|

 

*See* Krause 2d Decl., ¶11. Defendants' Motion ignores the most egregious examples of copying and asks the Court to examine the 336 Super JoJo videos they allege *copy somewhat less*. This ignores that all of the 336 videos contain directly copied assets, and are the result of Defendants' focusing the visuals on and tracing over CoComelon's characters and videos. *See e.g.,* Dkt. No. 165 (Apple Decl.), ¶¶27, 34. Defendants admit that once they had copied Moonbug's characters and settings in their initial videos, Defendants *reused* that library of copied assets in creating all the other Super JoJo videos. *Id.*, ¶52, Ex. 553 (Yan #1) 181:15-182:7, 182:14-23, 184:15-186:7 (admitting reuse of drawings and models made for prior episodes); *id.* ¶51, Ex. 552 (X. Lin) 116:1-8 (admitting reuse of models); *id.* ¶56, Ex. 557 (Zhang) 72:1-21 (admitting reuse of resources), 77:8-78:21 (admitting reuse of scenes, sets, props, facial poses).

Defendants' arguments that a video like "London Bridge Is Falling Down" does not infringe because none of the CoComelon Works includes the same song, *see, e.g.,* Dkt. 180 at 4, 20, ignores that the focus of that video is JoJo, a character created through copying the core character of the CoComelon's Works – JJ. *See Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 565 (1985) ("[A] taking may not be excused merely because it is insubstantial with respect to the infringing work.") Because all Super JoJo videos use the copied JoJo character (among other copied characters), they infringe and are substantially similar to the CoComelon Works. *See* Dkt. No. 164, ¶¶233-234; Krause 2d Decl. ¶¶ 7-13.

## IV.  MOONBUG SATISFIES THE EXTRINSIC TEST, ON WHICH DEFENDANTS HAVE FAILED TO SUBMIT ANY EVIDENCE OR REBUTTAL

Apart from direct evidence, copying is also established by showing that Defendants had access to the CoComelon Works, and that there is substantial similarity between the Infringing Works and the CoComelon Works.  *See Metcalf v. Bochco*, 294 F.3d 1069, 1073 (9th Cir. 2002), *overruled on other grounds by Skidmore*, 952 F.3d at 1051.  There is no dispute on access— Defendants admit they watched and studied the CoComelon Works during the development of Super JoJo, and the CoComelon Works are littered throughout Defendants' development files. *See e.g.*, Dkt. No. 165, ¶52, Ex. 553 (Yan Tr. 313:13-317:5, 322:10-18; 323:23-328:1, 332:9-15, 334:24-337:4, 339:18-347:3, 350:10-353:8, 358:5-360:24, 362:1-21, 378:11-20, 385:11-21).

To determine substantial similarity, the Ninth Circuit employs a two-part test, the extrinsic and intrinsic test.  *Metcalf,* 294 F.3d at 1073. "The extrinsic test is an objective one that focuses on "articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events." *Id.* (citations omitted).  A plaintiff who satisfies the extrinsic test survives summary judgment.  *See id.*  The extrinsic test essentially asks whether "[t]he totality of the similarities [between the works] . . . goes beyond the necessities of the  . . . theme and belies any claim of literary accident." *Metcalf*, 294 F.3d at 1074 (*quoting Shaw*, 919 F.2d at 1363). "Evidence is usually supplied by expert testimony comparing the works at issue. Because the extrinsic test relies on objective analytical criteria, 'this question may often be decided as a matter of law.'" *Metro-Goldwyn-Mayer, Inc. v. Am. Honda Motor Co*., 900 F. Supp. 1287, 1297 (C.D. Cal. 1995) (*citing Krofft*, 562 F.2d at 1164).  Given the direct evidence of copying exposed in this case, a claim of "literary accident" is not credible and it should not be necessary to additionally prove infringement through indirect evidence.  *See Koons*, 817 F. Supp. at 377 (holding direct evidence of copying, including where infringer instructed the artisan that a sculpture should be made "as close as possible" to pictures of copyrighted work, was sufficient to grant summary judgment for plaintiff on unauthorized copying).  Nevertheless, Moonbug has done so, both here and in its own Motion, offering unrefuted expert testimony that satisfies the extrinsic test (and intrinsic test) and shows that the Super JoJo series is substantially similar to CoComelon.

Defendants' experts have not offered any opinions otherwise.

A.      **Defendants Submit No Expert Testimony on Substantial Similarity**

Moonbug's Expert Fran Krause has offered testimony supporting each factor of the extrinsic test, describing how the Infringing Works are substantially similar in characters, plot, themes, dialogue, mood, setting, pace, and sequence of events to CoComelon Works.  Krause 2d Decl., ¶¶2-4.  He identified a selection of 121 elements of expression that were selected, arranged and developed in the CoComelon Works.  *See id*. ¶3 (providing high-level textual descriptions of the 121 elements of audiovisual expression and cites to examples of each of these elements in registered CoComelon Works). Mr. Krause then reviewed each of the Infringing Works, and identified the elements of CoComelon's audiovisual expression that were copied.  *See id*. ¶4.

For example, Mr. Krause's analysis shows that Super JoJo's "This Is the Way We Brush Our Teeth" video (Dkt. No. 180-2 (Huddle Decl.), ¶26 Exhibits T-1(BB_00012949) and T-16 (BB_00047321)) uses more than ninety of these elements of expression from CoComelon, through use of the main JoJo character and family characters, whose selection and combination of physical and conceptual characteristics are copied from CoComelon (about forty-four overlapping expressive elements), and through use of a selection and combination of look and feel and cinematography elements taken from CoComelon (about forty-nine overlapping expressive elements).  Krause 2d Decl., ¶¶14-18, Exs. B-C (including a video comparison of Defendants' video to CoComelon Works they infringed).  Krause provides this detailed analysis regarding each of the Infringing Works in his report.  *See* Dkt. 164-1, Appendix 4 (PDF pages 246-368); *see also id*. ¶¶ 190, 194, 234, 236-40.  As this expert testimony and analysis shows, every Infringing Work copies a multitude of CoComelon expressive elements, and the entire Super JoJo series infringes the CoComelon Works.  *See* Dkt. 164-1 ¶¶190, 233.

Defendants do not genuinely dispute this analysis.  Instead, Defendants' expert focused on the question of whether Moonbug's identified expressive elements are individually protectable in copyright; however, she did not analyze whether the JoJo character is substantially similar to JJ or whether the Infringing Works are substantially similar in plot, themes, dialogue, mood, setting, pace, characters, and sequence of events to CoComelon.  Dkt. No. 172-7, §II-5.  When

asked at deposition "whether BabyBus videos copied protectable content from any CoComelon registered work," Dr. Seiter admitted: "That wasn't a question that I took up."  Hedley Decl., ¶2, Ex. A (Seiter Tr. 106:14-22).  Asked whether she reviewed the Infringing Works and assessed "whether any of the original expression in the CoComelon registered works is in the Super JoJo accused videos," Dr. Seiter repeatedly dodged the question and ultimately was instructed by Defendants' counsel not to answer it (in violation of this Court's standing order).  *Id.* (Seiter Tr. 106:14-22; 105:13-109:7, 159:1-166:14) ("**Q**: My question is: Did you assess whether any of the original expression in the CoComelon registered works is in the Super JoJo accused videos? **Mr. LaFond**: Objection. Asked and answered. This is harassment. I'm instructing the witness not to answer . . . move on. **Q**. Are you following your counsel's instruction? **A**. Yes.").  Tellingly, her report lists only one Super JoJo video considered, confirming she did not perform the extrinsic test.  Dkt. No. 172-7, 7-12; ¶2, Ex. A (Seiter Tr. 108:3-10).

Defendants' Motion, at most, skims the surface of the extrinsic analysis, relying on inadmissible testimony of counsel[4] to argue that certain of their videos do not infringe the CoComelon Works. Dkt. No. 180, 20:1-8. Without anything to dispute it, Moonbug's identification of myriad elements of overlap between each Infringing Work and the unique combination of elements developed in the CoComelon Works satisfies the extrinsic test.

**B.    The Entire Super JoJo Series Is Substantially Similar to CoComelon Works**

i.    JoJo Is Substantially Similar to JJ

JoJo and JJ are substantially similar.  As described above, Defendants deliberately modeled JoJo on JJ, and JoJo copies JJ's combination of physical and conceptual qualities. Astoundingly, Defendants created JoJo from a purchased model they altered to mimic JJ's physical mold, the only explanation for which was to capitalize on the success of CoComelon's JJ.  *See* Krause 2d Decl., ¶8, Ex. E.  JoJo is substantially similar to JJ in at least his (1) large, rounded head with prominent cheeks and a slight flattening above the ears, (2) monolithic,

---

[4] The closest Defendants come to performing a substantial similarity analysis is through the testimony of counsel.  Dkt. No. 180-2 (Huddle Decl.), Paragraph 25, Ex. S. Moonbug objects to counsel's testimony comparing CoComelon Works to the Infringing Works as hearsay, and lacking personal knowledge, foundation, and authentication.

monocolor tuft of hair above forehead, that is sculpturally shaped with a pronounced curl, (3) thin rounded opaque eyebrows, (4) extra-large eyes with rounded top lid and flattened bottom lid, large irises and pupils, (5) a button nose with no bridge, (6) two front upper teeth, (7) thin lips on a mouth that is often a half-moon smile, and (8) a comparatively small body in relation to the head. Dkt. No. 164-1 (Krause Decl.), Ex. 1, ¶236. These similarities could not be more apparent, even just based on this small set of *physical* traits.  Krause 2d Decl. ¶¶ 8-9.

Defendants' JoJo character also bears the same unusual selection of *conceptual* traits Mr. Krause identified in CoComelon's JJ character, including simultaneously presenting as both a baby and a more mature child—gurgling and being fed like a baby but also walking on both legs with ease, dancing, speaking in full sentences, singing, behaving as an ideal child who is challenged and frustrated occasionally but generally exhibits a narrow range of positive emotions. Dkt. No. 164 (Krause Decl.), Ex. 1, ¶¶ 176, 236; Krause 2d Decl. ¶¶3, 12, Ex. A (identifying a list of 19 conceptual characteristics of JJ and citing to examples of those elements).  Defendants conceded that JoJo is depicted visually as a baby with the conceptual characteristics of an older child, just like JJ.  Hedley Decl., ¶4, Ex. C (Xue Tr. 38:15-23, 39:12-40:4, 43:21-45:21).  JoJo also copies JJ's poses and expression, most notably, appropriating JJ's signature move of raising both arms with a circular or hands waving motion to express excitement or joy.  Krause 2d Decl. ¶10, Ex. F (GIF file comparing JJ's signature move to JoJo's infringement of it), ¶¶11-12 (testifying as to JJ's unique expressions JoJo copied).

Defendants do not dispute that JoJo's conceptual qualities are substantially similar to JJ's. Nor could they.  Defendants do not dispute that JoJo shares JJ's physical characteristics, either, but rather argue that JoJo and JJ are "not similar in their expression."  Dkt. No. 180 at 9:12-15. They argue that JoJo has different colored hair, eyes, eyebrows, and a slightly different nose color, and that the design of both JoJo's hair shape and onesie are different than JJ's.  *See Shaw v. Lindheim*, 919 F.2d 1353, 1362 (9th Cir. 1990), *overruled on other grounds by Skidmore*, 952 F.3d 1051 (explaining secondary differences between two works do not shield a defendant from infringement).  Defendants cannot defend themselves by explaining the minor changes made *after* they copied JJ, for it "is well established that 'no plagiarist can excuse the wrong by showing how

much of his work he did not pirate.'"  *United Feature Syndicate, Inc. v. Koons*, 817 F. Supp. 370, 377 (S.D.N.Y. 1993) (citations omitted).  Rather, the "relevant inquiry is not whether a substantial portion of the defendant's work was derived from the plaintiff's work but whether protectable material in the plaintiff's work was substantially appropriated." *Blizzard Ent., Inc. v. Lilith Games (Shanghai) Co.,* No. 15-CV-04084-CRB, 2018 WL 1242053, at *6 (N.D. Cal. Mar. 8, 2018) ("that the [] Defendants may not have appropriated 133 other characters from one of Plaintiffs' games does not mean Plaintiffs have failed to plausibly allege that the [] Defendants copied protectable expression . . . .")

Superficial differences, such as Defendants' changing of JoJo's hair color, after they traced JoJo from JJ and modified a purchased 3D animation rig to mimic JJ's 3D mold, do not compel the conclusion that Defendants' JoJo is not substantially similar to JJ when the objective similarities in the expressive elements of JoJo and JJ are obvious and pervasive.  Dkt. No. 164 (Krause Decl.), Ex. 1, ¶236; *L.A. Printex Indus., Inc. v. Aeropostale, Inc.*, 676 F.3d 841, 851-852 (9th Cir. 2012) (holding matter had to go to the jury where a comparison between a copyrighted and allegedly infringing design showed "objective similarities" in protectable elements).

The cases relied upon by Defendants are inapposite.  Unlike the unnamed magicians in *Rice*, JoJo and JJ are fully fleshed out, named characters with physical and conceptual characteristics which are substantially similar.  Likewise, Defendants' cases focusing on the difficulty comparing different media (comparing sketches to 3D dolls, or movie characters to allegedly infringing toys), have no applicability here, where both works are preschool animated series.  *See Ideal Toy Corp. v. Kenner Prod. Div. of Gen. Mills Fun Grp., Inc.* 443 F. Supp. 291, 302 (S.D.N.Y. 1977) (noting difficulty in comparison of extremely dissimilar media like toys and characters from movie); *Mattel, Inc. v. MGA Ent., Inc.*, 616 F.3d 904, 915-917 (9th Cir. 2010) (holding dolls were not substantially similar to prior sketches).  Defendant's sole authority addressing animation is also far afield from the facts here.  *See Hoff v. Walt Disney Pictures*, No. EDCV1900665AGKKX, 2019 WL 6329368, at *4 (C.D. Cal. Aug. 19, 2019).  In *Hoff*, the court explained the characters were not substantially similar where they had different personalities, roles and were entirely different species – facts not present here.  JoJo is a carbon copy of JJ, who

looks and acts just like JJ and plays the same role in his family and the series.

Again, this was no accident.  The undisputed evidence shows that Defendants *intended* these substantial similarities between JoJo and JJ.  In addition to the direct and indirect evidence of copying, Defendants considered using multiple different versions of JoJo, but they eschewed alternative designs time after time, opting instead to use the JoJo copy of JJ.  Dkt. No. 165 (Apple Decl.), Ex. 524 at 10; ¶56, Ex. 557 (Zhang) 66:13-67:1, 67:15-68:4); ¶ 51, Ex. 552 (X. Lin) 61:11-15.  It also bears repeating that although Defendants have engaged three technical experts in this matter, not one has been willing to opine that JoJo is not substantially similar to JJ.

### ii.   JoJo's Family is Substantially Similar to JJ's Family

Defendants' Super JoJo videos are also substantially similar to CoComelon Works with regard to the characters of JJ's supporting family of characters, including their visual depictions, actions and conduct, personality traits, and relationships.  Dkt. No. 164 (Krause Decl.), Ex. 1, ¶237.  Defendants chose to copy the exact makeup of JJ's family—JJ's mom, dad, older brother, and older sister—and even the family dog, right down to its name, Bingo.  *Id.*  The Super JoJo family characters, like the CoComelon family characters, depict a family of light-skinned characters with similar general color and range and similar shapes (e.g., mostly rounded edges with the notable exception of hair).  *Id.*

There are also substantial similarities between the conceptual qualities of the characters, with overall similar family dynamics (with both families engaging in extreme cooperation in performing repetitive tasks centering around helping and encouraging JJ), and with the individual family characters. *Id.* (listing similarities among the two families).  For instance, both sisters are older and quick-witted, and both brothers are older and considerate, and all of the siblings are unusually patient and kind with JJ.  *Id.; see also* Krause 2d Decl. ¶ 3, Exhibit A.

Once again, these physical and conceptual similarities jump off the page when CoComelon's expression of the family characters is juxtaposed next to Defendants' copying of that expression.  For example, below are images from the CoComelon Work, "Swimming Song," compared to images from Super JoJo's "Swimming Song," which Defendants remarkably ask the Court to find non-infringing (despite Mr. Krause's unrebutted analysis finding that the Super JoJo

video contains 100 elements of expression overlapping with CoComelon Works).  Krause 2d Decl., ¶¶13, 19-20, Ex. G. These images show that the family characters are similar in their physicality, as well as in their expressions, behavior, and relationship to each other.  Super JoJo's family's actions and behavior, such as encouraging JoJo to swim are copied, down to the thumbs up the older brother gives to encourage JoJo to swim, and to the semi-circle of five floating family members with arms out celebrating their success in swimming (from the same camera angle):



Defendants do not and cannot refute this compelling evidence of substantial similarity.

   iii. <u>Super JoJo has Substantially Similar Plot/Themes, Sequence of Events, Dialogue to the CoComelon Works</u>

  CoComelon is known for its distinctive and original look and feel, comprised by its use, selection, arrangement, and expression of elements such as color, mood, theme, set design, plots, animation and movement style, and its use of music and dance, as developed through the

1    CoComelon Works.  Dkt. No. 164 (Krause Decl.), Ex. 1, ¶179.

2            Mr. Krause opines that even where Super JoJo videos do not entirely copy CoComelon

3    videos frame by frame, many copy "CoComelon expression by copying specific plots, settings,

4    sequence of events, character posing, shot composition, song structures and titles from other

5    CoComelon videos." *Id.*, ¶232.  Krause details the substantial similarities in plot/theme/sequence

6    of events seen in the Infringing Works.  *See id.,* Ex. 1, Appx. 4, Part 1 (listing elements 74, 85-

7    89, 95-96, which relate to CoComelon themes and predictable patterns in CoComelon visuals,

8    songs and their focus on JJ's daily life activities and challenges, and elements 115-121, which

9    refer to specific CoComelon subject matter, visuals, titles, plots and sequences copied by specific

10   Infringing Videos) and Part 2 (identifying the combination of these elements present in each

11   Infringing Work).  This evidence of substantial similarity is unrebutted by Defendants.  Nor could

12   Defendants rebut this evidence—their own witnesses testified that they set out to copy the "look

13   and feel" of CoComelon, and that is precisely what Defendants did.

14           While CoComelon may tackle plots or themes about quotidian experiences, like brushing

15   one's teeth, or swimming with one's family, the way such plots and themes are expressed is

16   unique and copyrighted.  Defendants' videos do not contain merely generic *scènes à faire* that

17   "naturally flow from the idea of a pro-social cartoon aimed at toddlers" as Defendants argue.  *See*

18   Dkt. 180 at 16.  Rather, Defendants purposefully copy the CoComelon Works' positive focus on

19   family life and the main character's daily activities, and like CoComelon, use plots and sequences

20   that highlight the close relationships between the main character and his clever mom, goofy dad,

21   and unusually supportive older siblings.  Many of the Infringing Works go further, copying

22   CoComelon's expression of plots, dialogue, themes, and sequence beat by beat.

23           One example is the "Swimming Song" shown above.  Nothing about the high-level "idea"

24   of a child learning to swim with his family required Defendants to appropriate so much from

25   CoComelon's Work.  An entire family is not necessary to teach a small child to swim, and in a

26   more realistic family, the older children would likely play by themselves rather than closely

27   cheering on the baby character (including by giving a "thumbs up" gesture) like they do in both

28   works.  These types of plots flow from the unique characteristics of the CoComelon characters

and themes, which Super JoJo copies.  There is no explanation except copying for Defendants'

reproduction of multiple plot points and images (in the same order no less) from CoComelon's

Swimming Song.  Krause 2d Decl., ¶¶19-20, Ex. G.

As another example, nothing about the high-level "idea" of children getting ready in the

morning necessarily required Defendants to copy from CoComelon's copyrighted video, "This is

the Way."  But Defendants studied this video extensively to define the vision and style of their

Super JoJo series, and then proceeded to copy multiple plot points and sequences of events from



it in their own video with the same title
"This is the Way."  *Id*., ¶¶11, 14-18.
Among others, Defendants copied images
involving the baby being taught to brush his
teeth by his older sibling, starting by
putting too much toothpaste on his brush,
foaming up his mouth, and a sibling

demonstrating to the baby how to apply toothpaste properly.  *Id*., ¶16, Ex. B (comparing images

in Infringing Work to planning document), ¶17, Ex. C (demonstrating via video comparison the

numerous plot points/sequences Defendants copied).

Nothing about the high level "idea" of this video necessitated such a scene – the only

explanation is copying.  Similarly, Super JoJo videos show evidence of copying CoComelon

lyrics, and methods of song-structuring, even when they simultaneously alter the songs and

melodies to not fully copy CoComelon songs.  For example, although Super JoJo's "Sick Song"

video does not use the same song as CoComelon's video, it uses CoComelon's "not feeling well"

lyric, even though this lyric makes no grammatical sense when divorced from CoComelon's

rhyming lyrics – it is copied for copying's sake.  *Id*., ¶23.  The Infringing Works consistently use

such systematic copying of CoComelon's plots, themes and scenes, and the results are uncanny

similarity.  *See, e.g., id.* ¶¶27-28, 30-32.

iv.   Super JoJo has a Substantially Similar Setting

Super JoJo has a substantially similar setting to the CoComelon Works.   Both are

primarily set in the family home and yard, or a local playground. Even though Defendants considered other settings for JoJo (e.g. a city or a farm), they opted to target CoComelon's setting. Dkt. 165 (Apple Decl.), ¶13, Ex. 523; *see also* Hedley Decl., ¶3, Ex. B (Saperstein Tr. 167:16-23). Further, the animated families' homes and yards have substantially similar layouts and designs. *See* Dkt. No. 164, Ex. 1 ¶¶ 238, 248; *see also id*. App'x 4 Part 1 (identifying elements 58, 62-71, 82-84, relating to animation color and shape design and the design of specific CoComelon rooms) and Part 2 (identifying overlapping expressive elements in the Infringing Videos). This substantial similarity is not an accident. Defendants expressly directed their team to "[u]se the kids' channel Cocomelon as the target setting." Apple Decl. ¶¶ 12-13, Exs. 522-523.

Further, Defendants created the sets and models for the Super JoJo house, yard and playground for early Super JoJo episodes, instructing their team to "make the scenes as identical to CoComelon as possible." *See, e.g.,* Apple Decl. ¶¶ 31-32, Ex. 533. To do so, Defendants made the layout of the house, rooms, yard and playground (copying decorative and design features) substantially similar to CoComelon so the scenes could be as identical to CoComelon as possible. *See* Dkt. No. 164-1, ¶238(b); ¶248(f); Krause 2d Decl. ¶ 24, Exhibit H. Additionally, both homes have bathrooms with blue tile and nautical designs with white-rimmed clawfoot tubs with cool exterior colors, and both babies' bedrooms have white cribs, blue patterned sheets, oversized stuffed animals, cool walls with cloud designs, a wind-up mobile, and a whale motif as a wall decoration. *See e.g.* Dkt. No. 164-1, Ex. 1, ¶238.b; Krause 2d Decl. ¶ 24, Exhibit H. Once Defendants made these models copying CoComelon scenes for the frame-by-frame knock off videos (on which they do not move for summary judgment), they reused the same settings, including layouts, throughout all the Infringing Videos (including the videos upon which they seek summary judgment). *See, e.g.*, Dkt. 165 ¶ 56, Ex. 557 (Zhang) 77:8-78:21.

v.   <u>Super JoJo has Substantially Similar Mood</u>

The Infringing Works are also substantially similar to CoComelon in mood. As Mr. Krause testified, the characters in Super JoJo, like CoComelon, are highly idealized, peaceful and calm, are mainly happy or neutral in mood, never mad, mean-spirited, scared or overly agitated, and their discontent is always mild and passing, connected to a particular narrative. Dkt. No. 164,

Ex. 1, ¶238(k). Both video series reflect this mood in their overall animation style that is observational, gentle, and playful in style, and are focused on realistic, precise, yet generally non-exaggerated visuals and high-quality character modeling, shape language, textures, rigging, and high-quality of movement (unusual in preschool entertainment) that will draw the attention of and resonate with children. *Id.*, ¶¶181, 238(i); Krause 2d Decl. ¶¶ 30-33. Mr. Krause analyzed all the Infringing Videos and tabulated the expressive elements relating to these mood elements copied from CoComelon in each of them. *See* Dkt. No. 164, Ex. 1 ¶¶ 238, 248; *see also id.,* App'x 4 Part 1 (identifying elements 59-61, 76-80, 91-93), and Part 2 (identifying presence of elements in Infringing Works). This similarity in mood was intentional, as explained in the Super JoJo Specifications, Defendants directed their team to focus Super JoJo visuals on "details that can draw children's attention" like "expression, gesture, and ***mood*** of the main character" JJ. Dkt. No. 165 (Apple Decl.), ¶¶14-17, Ex. 524. (emphasis added). Defendants did so, and the Infringing Videos are replete with copies of JJ and his family's expressions, gestures, and moods.

### vi.   Super JoJo has Substantially Similar Pace

Defendants' Super JoJo videos are also substantially similar to CoComelon Works with regard to pace and pacing, including because they generally are two to three minutes long, with scenes matched to verses of songs. Dkt. No. 164-1 ¶ 238(k). The Infringing Works also copy CoComelon's distinctive cinematography style – unusual to preschool entertainment – which includes a distinctive pacing of edits (shots generally of short or medium length), composition (heavily featuring low subjective angles, and very rarely going above eye-level), distance of shots (mostly close-ups, some medium shots, and very rarely long shots), predominant use of wide-angle camera lenses, soft indirect lighting and frequent use of camera movement, incorporating camera movement in most shots. Dkt. No. 164-1, ¶¶ 184-186; Krause 2d Decl. ¶ 25. Most Infringing Works copy CoComelon's use of slow camera moves and other "pacing" devices. Krause 2d Decl. ¶¶ 26-29; Dkt. 164-1, App'x 4 Part 1 (elements 75, 94, 103-114), and Part 2 (identifying the use of these elements in each Infringing Work).

Defendants' "Doctor Check-Up" video, which they ask the Court to find non-infringing is an example of the substantial similarity in pacing, style, and framing of shots. Comparing this

video to CoComelon's "Doctor Check-Up" shows near identical shots at nearly the same timestamps in both videos, including a shot of the baby dressed as a doctor, taking notes on a green clipboard in front of an eye chart at about a minute and a half in, and an identical ending composition shot at about two and a half minutes, in which the camera pulls away as the kids laugh in a semi-circle next to a round table.  Krause 2d Decl. ¶¶ 21-22, Exs. J, K.



Given that each Infringing Work is only a short episode 2-3 minutes long, the inclusion of so many elements of expressive similarities to CoComelon makes each piece of evidence of copying even more compelling.  *See Ehrenberg v. Walt Disney Co.*, No. 2:22-CV-01136-SB-SK, 2022 WL 17080142, at *3 (C.D. Cal. Sept. 16, 2022) ("The combination of so many specific elements in a short children's program . . . could support a finding of substantial similarity under the extrinsic test applicable on a motion to dismiss.").  And again, none of Defendants' experts dispute substantial similarity or deny that Super JoJo is an unabashed knock-off of CoComelon on each factor of the extrinsic test.  The Court should find the that the extrinsic test is met.


                                            Respectfully submitted,
                                            TYZ LAW GROUP PC

Dated: January 3, 2023                      */s/Deborah Hedley*
                                            Deborah Hedley