UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MOONBUG ENTERTAINMENT LIMITED, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>BABYBUS (FUJIAN) NETWORK TECHNOLOGY CO., LTD, et al.,<br><br>Defendants. | Case No.  21-cv-06536-EMC<br><br>**FILED UNDER SEAL**<br><br>**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, AND DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Docket Nos. 162, 180 |

## I.      INTRODUCTION

Plaintiffs Moonbug Entertainment Limited and Treasure Studio, Inc. (collectively, "Moonbug") hold copyrights in the CoComelon franchise, including their works on the CoComelon Nursery Rhymes YouTube Channel.  Defendants BabyBus Co., Ltd. and BabyBus (Fujian) Network Technology Co., Ltd. ("BabyBus Tech.") (collectively, "BabyBus") offer a competing YouTube channel under the "Super JoJo" brand.  Moonbug alleges copyright infringement by Babybus's Super JoJo videos.

Pending before this Court are the parties' cross summary judgment motions and certain miscellaneous motions.  Moonbug moves for summary judgment on the ownership and validity of its copyrights, as well as copyright infringement by all 368 accused BabyBus videos.  Meanwhile, BabyBus seeks summary judgment of non-infringement for 336 of the accused videos.  For the following reasons, the Court grants in part and denies in part Moonbug's summary judgment motion and denies BabyBus's summary judgment motion.  The Court also rules on the miscellaneous motions as detailed in the order below.

## II.     FACTUAL BACKGROUND[1]

A.     The Parties

Treasure Studio, Inc. owns, and exclusively licenses to Moonbug Entertainment Limited, the registered copyrights to the asserted CoComelon works (the "CoComelon Works"). (Docket No. 165 ("Apple Decl.") Exs. 2-147.) CoComelon is a popular series of pre-school animation shows. (Docket No. 163 ("Chubb Decl.") at ¶ 2.) Its YouTube channel is the most watched in the United States, and the second-most watched in the world, of any genre. (*Id.*) The series also is available on many other platforms, including Netflix, Cartoon Networks, and Roku. (*Id.*) To date, CoComelon has aired more than 350 episodes. (Docket No. 189 ("Reese Decl.") at ¶ 8.) Nearly all episodes feature a cast of characters led by baby "JJ" and his family, including his mother, father, older sister, older brother, and the family dog named "Bingo." (*Id.*; Chubb Decl. at ¶ 2.) Licensed CoComelon merchandise featuring JJ is available through online and brick-and-mortar stores, such as Amazon and Target. (Reese Decl. at ¶ 9.)

Founded in 2009, BabyBus has made multiple series of original children's videos, including its popular Baby Panda series that won Google Play's "Best of Kids" award in 2016 and 2017. (Docket No. 194-15 ("Yan Decl.") at ¶ 2.) It currently has over 1,100 employees. (*Id.*)

B.     The Asserted and Accused Works

The registered copyrights in the CoComelon Works include the following categories:

- Copyrights in the JJ character (the "JJ Registrations"),
- Copyrights in the CoComelon family characters (the "Family Registrations"),
- Copyrights in the "Yes Yes" and "No No" series of videos (the "Yes Yes Registrations"), and
- Copyrights in certain CoComelon video works that BabyBus allegedly copied frame-by-frame (the "Frame by Frame Registrations").

(Docket No. 162-1 ("Moonbug MSJ") at 3; Docket No. 162 ("Moonbug Ntc.") at 2–4.)

Moonbug alleges infringement by 368 BabyBus videos. (Docket No. 162-2.) The accused

---

[1] The facts recited in this section are undisputed unless otherwise noted.

videos are part of BabyBus's pre-school animated video series. The videos feature baby "JoJo" and his family that—like that in CoComelon—consists of JoJo's mother, father, older sister, older brother, and the family dog also named "Bingo." (*See, e.g.*, Apple Decl. Ex. 180.)

C. BabyBus's Development of the Super JoJo Video Series

    1. Competitive Intelligence Gathering

    In 2018, BabyBus decided to launch a new series of videos targeting toddlers and preschoolers. (Docket No. 194-1 ("Lin Decl.") at ¶ 3.) To that end, it began gathering competitive intelligence about video series in the pre-school animated video subgenre (the "Genre"),[2] including CoComelon, Dave and Ava, Chu Chu TV, Pinkfong!, and LooLoo Kids. (*Id.* at ¶ 4, Exs. A-B.) In its December 2018 competitive intelligence report, for example, BabyBus summarized some competitor videos' characters and themes of competitor videos, embedded their screenshots, and included certain viewership information. (Apple Decl. Ex. 553 ("X. Lin Dep. Tr.") at 17:18-21, 19:24-20:4; Apple Decl. Ex. 522; Lin Decl. at ¶ 7, Ex. B.)

    Through its research, BabyBus concluded that CoComelon was the top competitor channel on YouTube. (X. Lin Dep. Tr. at 385:11-21.) In another BabyBus December 2018 competitive intelligence report, the "References" section discusses "[u]s[ing] the kids' channel Cocomelon as the target setting." (Apple Decl. Ex. 523 at 3; Lin Decl. ¶ 8.) The report then goes on to analyze CoComelon's strengths and "[s]hortcomings." (*Id.*) It also lays out the settings of the series to include a "family (baby, father, mother, older brother, and older sister), pets, toys (immersive), and animals." (*Id.*)

    BabyBus contends it to be typical in the industry to study competitors' works for inspiration. Moonbug's animator acknowledges that he has examined "other kids content" in the marketplace for that purpose. (Docket No. 194-20 Ex. V ("Lee Dep. Tr.") at 112:16-114:4.) BabyBus's film and media expert, Ellen Seiter, identifies many elements, themes, and features common among all the video series in the Genre. (*See* Docket No. 180-2 Ex. R ("Seiter Decl.") at

---

[2] The parties' experts agree that the video series at issue in this case are part of the Genre. (Docket No. 194-20 Ex. Y (Seither Dep. Tr.) at 237:14-19; Docket No. 190-2 Ex. J (Krause Dep. Tr.) at 60:21-23.)

¶¶ 8, 10-30.) Its children's TV producer expert, Frank Saperstein, finds YouTube channels in the Genre tend to use stock concepts—such as a five-member nuclear family, public-domain nursery rhymes, and stock expression for their settings. (Docket No. 194-16 ("Saperstein Decl.") at 9–11, 14–15.) That is the case because, according to BabyBus's third expert, Denise Denson, preschoolers are attracted to animated videos with simple themes and familiar songs. (Docket No. 194-17 ("Denson Decl.") at 2–7.)

Following its research, BabyBus began developing its Super JoJo series in January 2019. (Lin Decl. at ¶¶ 9, 11.) Two sets of teams worked in parallel. (*Id.* at ¶ 12.) The drawing and 3D teams created drawings and designs for the characters, while the planning team developed video ideas. (*Id.*)

2.    Designs for the Characters

On the characters side, BabyBus claims to have developed JoJo from Doudou—an earlier BabyBus 2D character. (Docket No. 194-9 ("Chen Decl.") at ¶¶ 6-7.) Doudou, in turn, was based on a traditional Chinese New Year Doll. (*Id.* at ¶ 7.) CoComelon disputes BabyBus's narratives on design of characters.

In early January 2019, BabyBus assembled an "inspiration board" that included characters from other works in the Genre (apparently none from CoComelon), as well as early sketches for JoJo and his family. (*Id.* at ¶¶ 8-9, Ex. A.) After multiple iterations of sketches (*id.* at ¶ 10, Ex. B), BabyBus began creating 2D color drawings for JoJo and his family (*id.* at ¶ 11). It included such drawings[3] in a January 25, 2019 presentation regarding the Super JoJo series, although it

---

[3] These JoJo drawings, certain family sketches, Doudou's images, and a video named the "Barber" featuring Doudou are subject to Moonbug's pending motion for sanctions and for exclusion. (Docket No. 211.) Moonbug argues that (1) BabyBus produced some of the documents late, after Judge Westmore imposed deadline for their production, and (2) BabyBus has failed to identify these images in BabyBus's response to interrogatory requesting the identification of development documents for each Super JoJo video, in violation of Judge Westmore's order to do so. Moonbug seeks to exclude all late-produced Doudou images/videos and the undisclosed development drawings. BabyBus responds that images of Doudou were first produced in September 2021 in a declaration filed with the Court at Docket Entry 23. And it did not have to identify the documents in its interrogatory response because they relate only to development of the Super JoJo *characters*, not any Super JoJo *video* in which those characters appear. Given the delayed trial date and the fact that this order does not rely on the documents at issue, the Court believes that any prejudice could be remedied by additional depositions. The Court hereby orders that BabyBus make the relevant custodian(s) available for deposition(s) regarding the images/videos at issue in

4

ultimately did not use that design.  (*Id.*; *id.* Ex. C at 9, 10; X. Lin Dep. Tr. at 61:11-15.)  Also included in the presentations were slides describing the "[f]ocus of the visuals" accompanied by images from multiple CoComelon Works prominently featuring JJ.  (*Id.* at 18–19.)  The presentation, which included screenshots of the CoComelon Works, was circulated widely within BabyBus, including its upper management.  (X. Lin Dep. Tr. at 48:20-50:20; Apple Decl. Ex. 553 ("Yan Dep. Tr.") at 394:14-25.)  By February 1, 2019, BabyBus has finalized the colored 2D drawings for JoJo and his family.  (Chen Decl. at ¶ 12, Ex. D.)

After the drawing team finalized the 2D design, BabyBus's 3D team began developing a 3D model for the characters.  (*Id.* at ¶ 13.)  It licensed a 3D animated baby model as a starting point and modified various modifications, including its proportions and hair, among other features.  (*Id.* at ¶¶ 14-15; Docket No. 191 ("Krause Decl. 2") at ¶ 8.)  The 3D team also generated 3D models for JoJo's family.  (Chen Decl. at ¶ 12.)  After releasing dozens of Super JoJo videos, BabyBus explored a major redesign of JoJo but eventually decided against it.  (Apple Decl. ¶ 56, Ex 557 (Zhang) 66:13-67:1, 67:15-68:4.)

### 3.  <u>Video Planning</u>

Each Super JoJo video developed in 2019 started as a planning document that listed the theme, locations, characters, and the length of the video, as well as the accompanying songs.  (Lin Decl. at ¶ 13.)  The planning document then went to a separate team that planned animation by creating a storyboard.  (*Id.*)  Babybus's animators subsequently used those storyboards to create the finished videos.  (*Id.*)

BabyBus's earliest planning documents date back to January 2019.  (*See, e.g.*, Lin Decl. Ex. D (dated Jan. 21, 2019).)  Sample documents between January and April 2019 show that they contained storylines and descriptions of video frames to accompany different segments of lyrics.  (*Id.* at Exs. D-G.)  Sprinkled in the descriptions are images of real babies, bookshelves, onesies, highchairs, food, pages from children's books, as well as video images from competitors such as CoComelon and Little Angel.  (*Id.*; Apple Decl. Exs. 527, 538.)  The images from CoComelon are

---

Moonbug's motion by March 31, 2023.

part of the registered CoComelon Works at issue in this suit.  (Apple Decl. at ¶¶ 24, 37.)

Between May and July of 2019, Super JoJo's planning team's supervisor went on extensive business trips and was absent from her team over two thirds of each month.  (*Id.* at ¶¶ 19-21.)  At least four out of the over 30 planning documents generated during those three months contain instructions to make Super JoJo videos "as identical," or "as similar," "as possible to CoComelon" videos.  (Apple Decl. Ex. 529 at 1; *id.* Ex. 533 at 1; Docket No. 217-3 ("Jones Decl.") Ex. T; *accord* Apple Decl. at Ex. 531 at 1 ("The scenes should be as similar as possible to Cocomelon.").)  BabyBus also appeared to have downloaded copies of at least two of the CoComelon Works and marked them up to convert them into Super JoJo videos.  (Apple Decl. Exs. 535, 547.)  BabyBus's 30(b)(6) witness on SuperJoJo's development acknowledged that the scenes and scene progression of CoComelon's and Super JoJo's versions of one of the songs are the same.  (Apple Decl. Ex. 555 ("Sun Dep. Tr.) at 105:5-116:13.)

In September 2019, BabyBus reorganized its planning team, adding new supervisors and planners.  (Yan Decl. at ¶ 4.)  BabyBus continued to reference CoComelon in its development of Super JoJo videos.  (*See, e.g.*, Apple Decl. Ex. 549 (internal message stating, "It should work if we do fake cut just like what COCO [CoComelon] did."); *id.* Ex. 550 (internal message stating, "The storyboard drawn is the same as COCO's cut. It doesn't matter.").)  Later in Super JoJo's development, BabyBus reused models and assets from Super JoJo's earlier episodes.  (Yan Dep. Tr. at 181:15-182:7, 182:14-23, 184:15-186:7 (admitting reuse of drawings and models made for prior episodes); X. Lin Dep. Tr. at 116:1-8 (admitting reuse of models); Apple Decl. Ex. 557 ("Zhang Dep. Tr.") at 72:2-21 (admitting reuse of resources), 77:8-78:21 (admitting reuse of scenes, sets, props, facial poses made for prior episodes).)

Throughout the relevant period, although no planning documents from outside the May to July time frame include instructions to make Super JoJo resemble CoComelon, these documents generally contain images from the CoComelon Works as well as links and downloaded copies to them.  (*Id.*; Apple Decl. Exs. 527, 538-546, 548, 559.)  Recognizing the extensive referencing by some Super JoJo videos, BabyBus's 3D drawing team leader recommended that his colleagues "not let people see so obviously that the reference video(s) are copied with no change made to

them at all." (*Id.* Ex. 551 (internal message); *id.* Ex. 556 ("Chen Dep. Tr.") at 46:1-47:9.) "Cocomelon and others are all in here now, [and] even some originals appeared here and there in here," he continued, "[w]hat would viewers perceive BabyBus as then?" (*Id.*)

BabyBus released the Super JoJo video series on its YouTube channel in English as well as other languages. Besides the similarities in certain videos, the promotional thumbnail images for those videos also resemble each other. (*Compare* Apple Decl. Exs. 6 (CoComelon Work) *with* 155 (BabyBus Work).)

### III.    PROCEDURAL BACKGROUND

Moonbug brought this action against BabyBus Tech. on August 24, 2021. (Docket No. 1.) About a month later, BabyBus Tech. filed an answer, counterclaims, and motion for a temporary restraining order (TRO) based on its allegation that Moonbug misrepresented infringement in its DMCA notices. (Docket Nos. 20, 22.) Following Moonbug's opposition briefing, BabyBus Tech. withdrew its request for TRO. (Docket No. 30.)

Moonbug then moved to dismiss and strike BabyBus Tech.'s counterclaims and affirmative defenses. (Docket No. 31.) After briefing, BabyBus Tech. amended its pleadings. (Docket No. 36.) Moonbug renewed the motion against the new pleadings. (Docket No. 40.) The Court struck BabyBus's fair use defense as none of the four factors tipped in its favor. (*Id.* at 10.) The Court also struck BabyBus's copyright misuse defense because it "turn[ed] on its incomplete and implausible characterization of the bases of Moonbug's DMCA notices." (*Id.* at 13.) The Court dismissed the counterclaim under 17 U.S.C. § 512(f) because BabyBus Tech. failed to plausibly allege material misrepresentations by Moonbug in its DMCA takedown notices or bad faith. (*Id.* at 14–19.) Finally, under California's anti-SLAPP statute, the Court struck BabyBus Tech.'s state law counterclaims that focused on Moonbug's DMCA takedown notices and awarded attorneys' fees. (*Id.* at 26; Docket No. 84.) Moonbug subsequently amended its complaint to add BabyBus Co. Ltd. as a co-defendant to this action. (Docket No. 87.)

### IV.    LEGAL STANDARD

"To prevail on a copyright infringement claim, a plaintiff must show that (1) he or she owns the copyright in the infringed work, and (2) the defendant copied protected elements of the

copyrighted work." *Williams v. Gaye*, 895 F.3d 1106, 1119 (9th Cir. 2018) (citation omitted).

As to the first prong of copyright infringement analysis—the ownership of valid copyrights ("Prong 1")—this case concerns copyrightability of characters in animated videos. "Although characters are not an enumerated copyrightable subject matter under the Copyright Act, *see* 17 U.S.C. § 102(a), there is a long history of extending copyright protection to graphically-depicted characters." *Daniels v. Walt Disney Co.*, 958 F.3d 767, 771 (9th Cir. 2020). The Ninth Circuit has "establish[ed] a three-part test for determining whether a character in a comic book, television program, or motion picture is entitled to copyright protection." *DC Comics v. Towle*, 802 F.3d 1012, 1021 (9th Cir. 2015). "First, the character must generally have physical as well as conceptual qualities"; second, "the character must be sufficiently delineated to be recognizable as the same character whenever it appears; third "the character must be especially distinctive and contain some unique elements of expression." *Id.* (quotations omitted). "'Whether a particular work is subject to copyright protection is a mixed question of fact and law.'" *Id.* at 1022 (quoting *Societe Civile Succession Guino v. Renoir*, 549 F.3d 1182, 1185 (9th Cir. 2008)) (alteration in original). JJ meets each element of the test as explained below.

The second prong of copyright infringement analysis—whether the defendant copied protected elements of the copyrighted work ("Prong 2")—"contains two separate components: copying and unlawful appropriation." *Skidmore v. Led Zeppelin*, 952 F.3d 1051, 1064 (9th Cir. 2020) (en banc) (internal quotation marks and citation omitted).

A copyright plaintiff may prove copying either through direct evidence or "by showing that the defendant had access to the plaintiff's work and that the two works share similarities probative of copying." *Id.* As to the latter, "[t]his type of probative or striking similarity shows that the similarities between the two works are due to copying rather than . . . coincidence, independent creation, or prior common source." *Id.* (quotation omitted). "A finding of such similarity may be based on the overlap of unprotectable as well as protectable elements." *Id.* (citation omitted).

"[T]he hallmark of 'unlawful appropriation' is that the works share substantial similarities." *Id.* But similarities must be based on protected elements of the work. Elements that

8

constitute "[s]cenes-a-faire, or situations and incidents that flow necessarily or naturally from a basic plot premise" are unprotected. *Benay v. Warner Bros. Entm't, Inc.*, 607 F.3d 620, 624-625 (9th Cir. 2010). "Similarity only as to unprotected aspects of a work does not result in liability for copyright infringement." *Corbello v. Valli*, 974 F.3d 965, 974 (9th Cir. 2020) (citations omitted). "To determine whether similarities result from unprotectable expression, analytic dissection of similarities may be performed. If this demonstrates that all similarities in expression arise from use of common ideas, then no substantial similarity can be found." *Id.* (citation omitted).

Under the "unlawful appropriation" component of Prong 2, "[t]he substantial-similarity test contains an extrinsic and intrinsic component." *Funky Films, Inc. v. Time Warner Ent. Co., L.P.*, 462 F.3d 1072, 1077 (9th Cir. 2006), *overruled on other grounds by Skidmore*, 952 F.3d 1051. "The 'extrinsic test' is an objective comparison of specific expressive elements." *Cavalier v. Random House, Inc.*, 297 F.3d 815, 822 (9th Cir. 2002). It "compares the individual features of the works; it looks to find specific, articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events." *Berkic v. Crichton*, 761 F.2d 1289, 1292 (9th Cir. 1985). The test "requires a three-step analysis: (1) the plaintiff identifies similarities between the copyrighted work and the accused work; (2) of those similarities, the court disregards any that are based on unprotectable material or authorized use; and (3) the court must determine the scope of protection ('thick' or 'thin') to which the remainder is entitled 'as a whole.'" *Corbello*, 974 F.3d at 974 (citation omitted). "If there's only a narrow range of expression (for example, there are only so many ways to paint a red bouncy ball on blank canvas), then copyright protection is 'thin' and a work must be 'virtually identical' to infringe." *Mattel, Inc. v. MGA Entm't, Inc.*, 616 F.3d 904, 914 (9th Cir. 2010).

"Only if the extrinsic analysis succeeds does the so-called 'intrinsic' analysis take place." *Id.* (citing *Funky Films*, 462 F.3d at 1077). The intrinsic test focuses on subjective impression. *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 485 (9th Cir. 2000). It "'examines an ordinary person's subjective impressions of the similarities between two works,' and involves questions of fact determined by the jury under instructions as to the level of protection applicable." *Corbello*, 974 F.3d at 974 (quoting *Funky Films*, 462 F.3d at 1077). Generally, "[f]or summary judgment,

only the extrinsic test is important." *Kouf v. Walt Disney Pictures & Television*, 16 F.3d 1042, 1045 (9th Cir. 1994). "[A] plaintiff who cannot satisfy the extrinsic test necessarily loses on summary judgment, because a jury may not find substantial similarity without evidence on both the extrinsic and intrinsic tests." *Id.*

"Summary judgment is appropriate 'if the court can conclude, after viewing the evidence and drawing inferences in a manner most favorable to the non-moving party, that no reasonable juror could find substantial similarity of ideas and expression.'" *L.A. Printex Indus. v. Aeropostale, Inc.*, 676 F.3d 841, 848 (9th Cir. 2012) (quotation omitted). "Where reasonable minds could differ on the issue of substantial similarity, however, summary judgment is improper." *Id.*

## V. MOONBUG'S MOTION FOR SUMMARY JUDGMENT

Moonbug moves for summary judgment on two issues: (1) it owns registered copyrights to its CoComelon works (the "CoComelon Works"); and (2) BabyBus has infringed the CoComelon Works as set forth in the table in Moonbug's notice of motion (Docket No. 162).

A.   Moonbug Holds Valid Copyrights in the CoComelon Works

BabyBus does not address Moonbug's *prima facie* case for copyright validity of the CoComelon Works. The issue is thus conceded, and the Court grants partial summary judgment for Moonbug and finds that the CoComelon Works are valid and enforceable. *See Hodges v. Hertz Corp.*, 351 F. Supp. 3d 1227, 1238 (N.D. Cal. 2018) (An argument not addressed is conceded for summary judgment).

B.   Moonbug Is Entitled to Summary Judgment on the "Frame by Frame" Registrations

BabyBus conceded willful infringement of the "Frame by Frame" Registrations by six of the accused videos as well as four compilations that include them. (BabyBus Opp. At 8 n.4; Moonbug Reply App. 4; 2/2/23 Hrg. Tr. At 32:5-7.) It created the six videos between May and July 2019 during which time some planning documents contained explicit instructions to emulate CoComelon videos. Moonbug has accused the videos of frame-by-frame copying. The Court grants summary judgment on willful infringement by these videos and compilations. Since the parties have stipulated that "a liability adjudication as to the English language version shall

constitute a binding liability adjudication as to the equivalent and corresponding foreign language videos" (Docket No. 93), the Court orders the parties to meet and confer regarding the scope of the foreign language videos corresponding to the conceded videos and compilations.

C.    Summary Judgment Is Denied on the Remaining Registrations

As to the remaining 362 accused Super JoJo videos, Moonbug argues that (1) direct evidence of copying warrants summary judgment on infringement, and (2) it has shown both copying and unlawful misappropriation, including both the extrinsic and intrinsic tests.

The Court rejects Moonbug's first argument. While Moonbug has shown strong evidence of copying, that alone is insufficient for summary judgment as it also needs to show the unlawful appropriation component in the infringement analysis. *Skidmore*, 952 F.3d at 1064 ("The second prong of the infringement analysis contains two separate components: copying and unlawful appropriation."). "[E]ach of the two requirements needs to be independently satisfied." 4 Nimmer on Copyright § 13D.02 (2022). "Proof of unlawful appropriation—that is, illicit copying—is necessary because copyright law does not forbid all copying." *Rentmeester v. Nike, Inc.*, 883 F.3d 1111, 1117 (9th Cir. 2018), *overruled in part on other grounds by Skidmore*, 952 F.3d at 1069. Moonbug's own authority rejects its very argument. "[E]ven where there is evidence of direct copying, 'copying as a legal proposition must still be established; hence, substantial similarity remains an indispensable element of plaintiff's proof, even in cases . . . in which defendant does not contest factual copying.'" *Bach v. Forever Living Prod. U.S., Inc.*, 473 F. Supp. 2d 1127, 1138 (W.D. Wash. 2007), *overruled on other grounds by Skidmore*, 952 F.3d 1051 (quoting 4 Nimmer § 13.01[B]). Moonbug's only authorities supporting its argument relate to undisputed counterfeit or virtually identical copies. *Symantec Corp. v. Logical Plus, Inc.*, No. C 06-7963 SI, 2009 WL 3416178, at *6 (N.D. Cal. Oct. 20, 2009) (counterfeit copies of plaintiff's software); *M. Kramer Mfg. Co., Inc. v. Andrews*, 783 F.2d 421, 445 (4th Cir.1986) ("virtually identical" computer programs). They also predate the Ninth Circuit's clarification that copying of protected expression entails two separate components, copying *and* unlawful appropriation. *Rentmeester*, 883 F.3d at 1117 ("Although our cases have not always made this point explicit, the second element has two distinct components: 'copying' and 'unlawful appropriation.'") (quotation

omitted).

The Court analyzes below Moonbug's second argument—that it has shown unlawful misappropriation—for each category of asserted registrations.

### 1. The JJ Registrations and the Family Registrations

Moonbug contends that the characters of JoJo and his family characters are substantially similar to those of JJ and his family under both the extrinsic and intrinsic tests under the unlawful misappropriation component. Since each accused video features JoJo and/or his family, all accused videos infringe the JJ Registrations and the Family Registrations. BabyBus argues that the CoComelon characters are stock characters and thus not copyrightable. It also argues that, in any event, the Super JoJo characters are not substantially similar to the CoComelon characters at least under the extrinsic test.

To determine whether BabyBus has unlawfully misappropriated Moonbug's characters, the Court needs to first determine the threshold question whether those characters are protected under the copyright. If so, the Court then analyzes whether BabyBus has infringed those characters. 1 Nimmer on Copyright § 2.12 (2022) ("In determining whether any given appropriation of another's character constitutes an infringement, the problem is twofold. First was the character as originally conceived and presented sufficiently developed to command copyright protection? Second, if so, did the infringer copy that development itself, rather than merely a broader and more abstract outline?"). The analysis below addresses each question for JJ and his family characters.

### a. JJ Is a Copyright Protectible Character

JJ, the central character of the CoComelon animated video series, is a protectable character.

First, JJ meets the requirement that "the character must generally have physical as well as conceptual qualities." *DC Comics*, 802 F.3d at 1021. The parties do not dispute that JJ has physical and conceptual qualities. Moonbug's expert, Krause, has identified 29 traits belonging to JJ (and shared by JoJo), including 10 physical and 19 conceptual characteristics. The physical elements include "(1) his name, (2) shape of his large rounded head, with prominent cheeks and a

12

slight flattening above the ears, (3) the one-color curling tuft of hair above is forehead hair, (4) thin rounded opaque eyebrows (5) extra-large eyes with rounded top lid and flattened bottom lid, large irises and pupils, (6) button nose with no bridge, (7) two front upper teeth, (8) thin lips on a mouth that is a half moon smile, (9) comparatively small body in relation to head, (10) and his characteristic yellow and turquoise pajama onesie at home or tan shorts and a t-shirt when outside." (Krause Rpt. At ¶166.) JJ's conceptual elements include: walks; dances; gurgles; laughs; claps hands; hands up "Wow!"; ability to talk and sing like an adult, fine motor control, diction, and pronunciation; almost always happy, positive, eager, curious; does not crawl or throw tantrums; excited to learn new things; excited to help others; easily coaxed into upbeat emotions and learning; unusually mature and inquisitive; responds to stuffed animals that help him learn and play; empowered, has agency; thoughtful, problem solver, spirit of cooperation; vulnerable, shows frustration, then grows; resilient, never discouraged/defeated by challenges." (*Id.* At ¶ 176, App. 4.) BabyBus's expert agrees "that CoComelon's JJ has physical and conceptual qualities[.]". (Apple Decl. Ex. 148 ("Seiter Rpt.") at ¶ 165.) JJ therefore satisfies the first part of the test.

Second, JJ, as an animated character, is "sufficiently delineated to be recognizable as the same character whenever it appears." *DC Comics*, 802 F.3d at 1021. He "has a distinctive-looking design, with large eyes, a chubby round head, and a small swooping tuft of hair above his forehead." (Krause Rpt. At ¶ 166.) "He often wears a signature onesie at home or shorts and a t-shirt when outside, and frequently wears blue." (*Id.*; *accord* Docket No. 180-2 Ex. E ("Lee Dep. Tr.") at 178:4-8 (Moonbug's animator testifying that he could recognize JJ "[b]ased on his general appearance, head shape, color of his head twirl, color of his onesie, the pattern, and his mannerisms.").) BabyBus does not contest this part of the test either. (BB Reply at 10; Seiter Rpt. At ¶165 ("JJ is recognizable as the same character when he recurs within CoComelon videos.").)

Finally, "the character must be especially distinctive and contain some unique elements of expression." *DC Comics*, 802 F.3d at 1021. Based on the evidence in the record, there is no genuine dispute that JJ has some distinctive elements of expression not apparent in any other works in the Genre. Such elements, when combined with his other traits, render JJ especially

distinctive.

JJ's blond twirl is one such element. Moonbug's animator has identified it as one of the features that distinguishes JJ. (Lee Dep. Tr. At 178:4-8.) BabyBus expert, Seiter, opines that "representation of infants with a singular, monocolored tuft of hair above their forehead predates CoComelon by decades." (Seiter Decl. at ¶ 6, Ex. R-2 at 6.) But, as shown below, none of the examples that Seiter has collected from 1913 to 2007 shows the same distinctive blond twirl that JJ has. (*Id.* At 6–7.)








JJ (Moonbug MSJ at 10)

JJ's signature onesie is another distinctive element. BabyBus contends JJ is "a baby in standard baby garb" just like the "magician in standard magician garb" that the Ninth Circuit has found to be a stock character. (Docket No. 194 ("BB Opp.") at 16 – 17.) But JJ's literal "baby garb" that he often wears is far from standard. It has a pattern and color scheme that Moonbug's animator considers unique and not found in other works in the genre. (Lee Dep. Tr. At 187:6-8.). BabyBus's expert, Seiter, responds that blue and yellow color choices flow naturally "from the

depiction of a happy male child" because those colors are socially associated with boyhood and happiness, respectively. (Seiter Decl. at ¶ 6, Ex. R-2 at 13.) Even if so, there are many different shades of blue and Seiter does not explain why JJ onesie's particular turquoise color is scènes à faire for boys. In fact, none of the seven children's programs that Seiter opines to share most of the Identified Elements features a character in yellow and turquoise onesie. (Seter Decl. at Ex. R-4.) The same is true as to the particular pattern. This problem is underscored by Seiter's own example purporting to show turquoise and yellow onesie as commonplace. As shown below, the Baby Mickey onesie clearly differs from JJ's in both color and pattern, and Seiter also offers no comment on the distinctive fish dotted on JJ's onesie.

| Mickey Mouse Onesie (Seiter Decl. at ¶ 6, Ex. R-2 at 13) | JJ's Onesie (Moonbug MSJ at 10) |
|---|---|
|  | |

JJ's signature "Wow" move is a unique element of expression. JJ makes that move by circling his arms while making an exclamation. (Krause Rpt. At ¶ 181; Identified Element No. 16.) Moonbug's expert opines that "Wow" is "a single syllable word easy for infants and toddlers to understand and use," so "it flows naturally" and "might be one of the few words a baby character could say." (Seiter Decl. at ¶ 6, Ex. R-2 at 16.) Even if true, that opinion says nothing about JJ's unique arm movement accompanying the "Wow." Tellingly, none of the seven children's shows that Seiter opines to share most of the Identified Elements contains JJ's signature move. (Seter Decl. at Ex. R-4.)

JJ is especially distinctive when his unique and distinctive elements are *combined* with other traits, such as his name and his personality that combines behaviors of a young baby (*e.g.*, being fed in highchair) and an older child (*e.g.*, speaking in full sentences). Although some of JJ's

traits (*e.g.*, name "JJ"), standing alone, may not be unique, the combination of those with a few unique traits crosses the binary threshold of copyrightability. (Krause Rpt. At ¶ 166 (JJ is especially distinctive because of "the way [he] expresses" his traits and "the way [his] traits combine into a whole.").) That combination of elements, even if some are not unique, can qualify for copyright protection. In *DC Comics*, the Ninth Circuit noted, for instance, that "[t]he character 'James Bond' qualifies for copyright protection because, no matter what the actor who portrays this character looks like, James Bond always maintains his 'cold-bloodedness; his overt sexuality; his love of martinis shaken, not stirred; his marksmanship; his license to kill and use of guns; his physical strength; [and] his sophistication.'" 802 F.3d at 1020 (quoting *Metro-Goldwyn-Mayer, Inc.* v. Am. Honda Motor Co., 900 F. Supp. 1287, 1296 (C.D. Cal. 1995)). A character with a subset of these traits—such as being cold-blooded, having a license to kill, and using guns—may not merit copyright protection. But when combined with some unique traits, such as his particular preference for martinis, the elements render James Bond copyright protectable. *See Carroll Shelby Licensing, Inc. v. Halicki*, No. 8:20-cv-01344-MCS-DFM, 2021 U.S. Dist. LEXIS 258417, at *16 (C.D. Cal. Dec. 29, 2021) (proper analysis of character copyright protectability "is whether there is originality in the combination of the elements"); *Bach*, 473 F. Supp. 2d at 1134 (looking to combination of elements and finding an anthropomorphized, ambitious seagull with an ordinary physical appearance but extraordinary name to be a protectable character). Similarly here, JJ distinguishes himself from a stock character particularly because of the combination of the unique and non-unique qualities.

The characters in BabyBus's cited authorities are far less distinctive than JJ. *See Rice v. Fox Broad. Co.*, 330 F.3d 1170, 1175 (9th Cir. 2003), *overruled by Skidmore*, 952 F.3d 1051 (unnamed magician dressed in standard magician garb who appeared in only one home video and whose role was limited to simply "performing and revealing the magic tricks"); *Olson v. Nat'l Broad. Co.*, 855 F.2d 1446, 1452–53 (9th Cir. 1988) (screenplay characters depicted only by three to four-line summaries).

In sum, there is no genuine dispute of material fact that JJ satisfies each of the Ninth Circuit's three-part test. He is a copyright protectible character.

16

b.      Genuine Issues of Material Facts Remain as To the Copyright Protectability of JJ's Family Characters

Reasonable minds may differ as to the copyright protectability of each of JJ's family characters, *i.e.*, mom, dad, older brother Tom Tom, older sister YoYo, and family dog Bingo.[4] BabyBus does not contest the first two parts of the test for the family characters, *i.e.*, they "generally have physical as well as conceptual qualities," and they are "recognizable as the same character whenever it appears." *DC Comics*, 802 F.3d at 1021. BabyBus, however, argues that the family's physical and personality traits are not distinctive. The analysis below thus focuses on the third part of the Ninth Circuit's test, *i.e.*, whether the family characters are "especially distinctive and contain some unique elements of expression." *DC Comics*, 802 F.3d at 1021.

Moonbug's expert opines that JJ's family are distinctive. Physically, they are "light-skinned characters with rounded faces and body shapes, eyes, lips, noses and other facial features, chunky hair and hairstyles." (Krause Rpt. at ¶ 177.) Conceptually, they are "tightknit," "engage[] in extreme cooperation in performing repetitive tasks," and "fully support JJ's development in various videos by helping him learn and perform new tasks." (*Id.*) Specifically, each family member has the following traits:

- Older sister (YoYo): quick-witted, never gives up, unusually patient and kind, often functions as caregiver to JJ;

- Older brother (Tom Tom): considerate and thoughtful, happy to make funny faces, unusually patient and kind, often functions as caregiver to JJ;

- Mom: a constant source of clever and creative activity, a passionate and cheerful caretaker of the family, crafty and inventive at teaching kids, realistic and relatable;

- Dad: goofy, playful, loving, attentive and kind, at times functioning in similar roles and actions as the children;

- Dog (Bingo): dances and plays with other family members, helps the parents instruct the children in life lessons.

---

[4] Neither party has made any argument regarding the copyrightability of the characters as a group, and the Court has no opinion on that issue.

(*Id.*)  Additionally, JJ's parents' affection for each other is "realistic, sweet, and often absent in other preschool entertainment."  (*Id.*)  Together, the family is "wholesome and idealistic."  (*Id.*)

BabyBus's expert opines that none of JJ's family characters' traits is especially distinctive.  For example, JJ's mom and dad bear notable resemblances to Mrs. Incredible from Disney-Pixar's 2004 *The Incredibles* and Woody from Pixar's *Toy Story*, respectively.  (Seiter Decl. R-2 at 23–24.)  Their "healthy and supportive relationships flow[] naturally from the concept of a children's television show focused on education and healthy development of prosocial values."  (*Id.* at 32.)  And the characters' "conceptual elements, appearing in combination with each other, is a natural and common occurrence within the genre, and is commonly included in children's entertainment for the purpose of supporting prosocial messaging and educational content."  (Seiter Rpt. at ¶ 177.)

The competing expert opinions on the uniqueness of character traits which present closer questions distinguish the family character from JJ.  As explained above, uncontroverted evidence establishes that JJ has a few unique elements of expression (*i.e.*, blond twirl, favorite pajama, and hands-up "Wow") that, when combined with other traits, render him especially distinct.  For the family characters, in contrast, a reasonable jury could conclude differently on whether each has any unique element.  On one hand, they may credit BabyBus's expert and determine that the characters' traits, either standing alone or in combination, are common to educational children's entertainment, rendering the family characters stock characters.  On the other hand, they may side with Moonbug's expert and find some elements unique, such as the parents' affection for each other.  Those elements, when combined with the characters' other traits, could confer copyright protectability to the characters.  Because a reasonable jury could arrive at different conclusions on whether JJ's family characters are especially distinctive, the Court declines to find JJ's family characters protectable as a matter of law.  *Cf. Direct Techs., LLC v. Elec. Arts, Inc.*, 836 F.3d 1059, 1068 (9th Cir. 2016) (where a reasonable jury could conclude differently, leaving it to jury to determine whether derivative work "meets the 'low' standard for originality" and merits copyright protection).

c.     <u>Genuine Issues of Material Facts Remain on the Extrinsic Test Regarding JJ and His Family Characters</u>

Applying the Ninth Circuit's three-step analysis for the extrinsic test, the Court finds triable issues for all the characters.

i.     <u>Step One</u>

At step one of the three-step analysis of the extrinsic test under the unlawful appropriation component of Prong 2 of the infringement analysis, Moonbug must identify "similarities between the copyrighted work and the accused work." *Corbello*, 974 F.3d at 974. Between JJ and JoJo, Moonbug's expert has identified 29 shared physical and conceptual elements. Between JJ's and JoJo's family characters, he has identified 28 shared elements.[5] (Krause Rpt. at Appt. 4; *id.* at ¶ 162.) Moonbug has satisfied the first step of the extrinsic test for the characters.

ii.     <u>Step Two</u>

At step two, the court must dissect the work and disregard any similarity that is "based on unprotectable material or authorized use." *Corbello*, 974 F.3d at 974. "[P]rotectable expression includes the specific details of an author's rendering of ideas, or . . . 'the relationships between the major characters.'" *Metcalf v. Bochco*, 294 F.3d 1069, 1074 (9th Cir. 2002) (quoting *Berkic v. Crichton*, 761 F.2d 1289, 1293 (9th Cir. 1985)), *overruled in part on other grounds by Skidmore*, 952 F.3d at 1069. Unprotectable elements include "primarily ideas and concepts, material in the public domain, and scènes à faire (stock or standard features that are commonly associated with the treatment of a given subject)." *Rentmeester*, 883 F.3d at 1118 (9th Cir. 2018) (citing *Cavalier*,

---

[5] The physical elements are: Mom; Dad; Older Sister (YoYo); Older Brother (TomTom); Dog (Bingo); Light-skinned; Rounded faces and body shapes, eyes, lips, bridgeless noses and other facial features; Chunky hair and hairstyles. (Krause Rpt. App. 4.) The conceptual elements are: Extreme cooperation in performing repetitive tasks; Family teaches baby to do things; Shows general family dynamic in detail; Healthy and supportive relationships; Trusted by parents; Wholesome and idealistic; Caring; Not commercial; Not patronizing; Always available to play and dance together; Patiently instructs children in necessary life skills; Similar, narrow range of positive emotions; Siblings are unusually patient and kind; Sister is quick-witted; Brother is considerate; Father is goofy, playful, and loving; Father often functions in similar roles as children rather than more serious parental figure; Mother is source of clever and creative activity; Mother is passionate and cheerful caretaker of family; Mother is realistic and relatable. Since Moonbug's expert expressed these elements in "shorthand" (Krause Decl. 2 at ¶ 3) and BabyBus's expert has interpreted the elements with the family characters' names to be referring to the characters' physical appearance, the Court does the same.

297 F.3d at 822–23).

The parties do not dispute that many of the characters' shared elements, standing alone, are not protectable. (Moonbug Opp. at 9 (conceding that "the name 'JJ' alone may, on its own, not be protectable in copyright").) For example, BabyBus's expert opines JJ's "two front upper teeth" (Identified Element No. 7) "flows logically from the fact of depicting a baby, wherein only the front incisors would typically be visible." (*Id.* at 10.) She identifies a baby character in an 1895 comic strip with the same feature. (*Id.*) As another example, she opines that the family being "wholesome and idealistic" (Identified Element No. 43) "has been strongly pushed as a necessary component of prosocial children's programming from its inception." (*Id.* at 33.) Such "prosocial content appears frequently," including "[o]n children's cable networks, such as Disney and Nickelodeon," when prosocial acts occur four times per hour and one per minute, respectively. (*Id.*)

However, even if certain allegedly copied elements are not protectable in themselves, a combination of them "can support an infringement claim 'if those elements are numerous enough and their selection and arrangement original enough that their combination constitutes an original work of authorship.'" (Docket No. 71 at 16 (Order Denying Motion to Dismiss) (quoting *Malibu Textiles, Inc. v. Label Lane Int'l, Inc.*, 922 F.3d 946, 952 (9th Cir. 2019)). A selection and arrangement copyright protects "the particular way in which the artistic elements form a coherent pattern, synthesis, or design." *Id.* "[T]he principal focus should be on whether the selection, coordination, and arrangement are sufficiently original to merit protection." *Feist Pubs., Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 358 (1991). "Original, as the term is used in copyright, means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity." *Ets–Hokin v. Skyy Spirits, Inc.*, 225 F.3d 1068, 1076 (9th Cir. 2000). Thus, "trivial elements of compilation and arrangement fall below the threshold of originality." *Gray v. Hudson*, 28 F.4th 87, 101 (9th Cir. 2022) (cleaned up).

Here, reasonable minds can differ as to whether the traits shared between the CoComelon and Super JoJo characters, even when combined, are protectible. There is no dispute that the

"elements are numerous enough." *Malibu Textiles, Inc.*, 922 F.3d at 952. Specifically, JJ has 29 elements and his families 28. (Krause Rpt. App. 4.) Certain other elements that Moonbug's expert categorizes under "Look and Feel" also describe the characters, including "characters are mainly happy or neutral in mood," "discontent is always mild and passing," and "characters are never mad, scared, or overly agitated." (Identified Elements Nos. 91-93.)

But there are conflicting opinions on whether the selection and arrangement of the combined character elements, common to the accused and asserted characters, are original and creative. On this issue, although there are some parallels between determining a characters' copyrightability and step two analysis of the extrinsic test, the two differ in two main aspects. First, the elements considered in the copyrightability question include all the traits belonging to the character, while those at issue in respect to step two of the extrinsic test only include the traits shared between the accused and original work identified in step one of the extrinsic test. For example, JoJo does not have the blond twirl that the Court has found to be a unique element to JJ. Although JoJo sports a yellow and turquoise onesie, it does not have the same pattern as JJ's favorite onesie. Second, the copyrightability inquiry requires a binary choice while the filtration analysis entails more granular determinations. The Court therefore separately analyzes the originality of the combination of character elements under step two of the extrinsic test.

Moonbug argues that its selection and arrangement are distinct. For example, its expert opines that the combination of JJ's large, round head, the slight flattening above the ears, and the slight indentation below the eyes "helps to give him a chubby-cheeked appearance" and "accentuate his smile." (Krause Rpt. at ¶ 174.) JJ and the family "characters are mainly happy or neutral in mood [Identified Elements Nos. 19, 91], never mad, excessively scared, or overly agitated [Identified Element No. 93], and discontent is always mild and passing, connected to a particular narrative structure [Identified Element No. 92]." (*Id.* at ¶ 179.) "With combinations like this, the episodes are able to provide . . . a joyous experience in comforting and safe environment for exploration." (*Id.*) BabyBus's expert counters that the combinations of elements which are in common "really amount to just a description of the genre itself." (Seiter Rpt. at 196.) She provides a chart showing seven works in the children's entertainment genre, each depicting a

combination of most of the elements. (*Id.* at App. B.) But Moonbug has provided evidence that the combined Identified Elements is not random or common. For example, its expert opines that numerous Identified Elements in the "look and feel" categories are combined to "provide rich sensory stimulation." (Krause Rpt. at ¶ 179.)

Given the conflicting opinions, a reasonable jury may agree with Moonbug's expert and find the combined, non-trivial Identified Elements in common are "numerous enough and their selection and arrangement original enough" to be protectable. *See Metcalf*, 294 F.3d at 1074 (holding "the presence of so many generic similarities and the common patterns in which they arise" helps "satisfy the extrinsic test"). BabyBus's main authority stands for a reminder that "[c]ourts have routinely rejected *Metcalf* claims over random similarities." *Zella v. E.W. Scripps Co.*, 529 F. Supp. 2d 1124, 1138 (C.D. Cal. 2007). But a jury may reasonably agree with Moonbug that the identified similarities not to be random, but rather specially arranged, as discussed above.

A reasonable jury may also agree with BabyBus's expert and find the selection and arrangement of the Identified Elements in common have little creativity considering the other works in the Genre. Therefore, at the Court cannot resolve step two as a matter of law.

### iii.  Step Three

After filtering out the unprotected elements, step three requires the determination of "the scope of protection (thick or thin) to which the *remainder* is entitled as a whole." *Corbello*, 974 F.3d at 974 (internal quotation marks omitted) (emphasis added). "[T]he greater the range of creative choices that may be made, the broader the level of protection that will be afforded to the resulting [work]." *Rentmeester*, 883 F.3d at 1120. On the flip side, "[i]f there's only a narrow range of expression (for example, there are only so many ways to paint a red bouncy ball on blank canvas), then copyright protection is 'thin' and a work must be 'virtually identical' to infringe." *Mattel*, 616 F.3d at 914.

If some of Moonbug's identified elements are protectable and not disregarded at step two, step three involves factual disputes. On one hand, BabyBus's experts opine that "there are only a finite number of ways to combine topics and locations that young children are familiar with and

can relate to." (BB Reply at 6 (citing Docket Nos. 194-16 (Saperstein Decl.), 194-18 (Denson Decl.)).) On the other hand, "[w]orks that are not factual," such as the CoComelon characters, "receive much broader protection under the copyright laws because of the endless variations of expression available to the artist." *McCulloch v. Albert E. Price, Inc.*, 823 F.2d 316, 321 (9th Cir. 1987). The jury should determine the scope of protection for the characters based on evidence on the range of creative choices available.

Because reasonable minds may differ on which shared character traits should remain to be compared and what scope of protection the remaining elements merit, there are triable issues as to the similarities between the CoComelon and Super JoJo characters under the extrinsic test.

### d. The Intrinsic Test Is a Question for the Jury

Moonbug also cannot satisfy the intrinsic test on summary judgment "because the subjective question whether works are intrinsically similar must be left to the jury." *Swirsky v. Carey*, 376 F.3d 841, 845 (9th Cir. 2004). "It is not the district court's role" to compare the works under subjective standard applicable to the intrinsic test. *Shaw v. Lindheim*, 919 F.2d 1353, (9th Cir. 1990), *overruled in part on other grounds by Skidmore*, 925 F.3d at 1066.

Moonbug attempts to escape the *Shaw* Rule by arguing that the extrinsic test evidence is "overwhelming." (Moonbug MSJ at 19.) But the authorities Moonbug cites all involve the relative rare situation of nearly *identical* copies. *See GoPro, Inc. v. 360Heros, Inc.*, 291 F. Supp. 3d 1060, 1073 (N.D. Cal. 2017) (accused infringer's website featured images that "appear identical," or at the very least "so overwhelmingly similar" to GoPro's copyrighted images); *Lucasfilm Ltd. LLC v. Ren Ventures Ltd.*, No. 17-CV-07249-RS, 2018 WL 5310831, at *2 (N.D. Cal. June 29, 2018) (defendants did not deny their marketing page includes images from plaintiff's works and did not contest infringement). That is not the case here. JoJo, though similar, does not appear identical to JJ. The former has three spiky red tufts while the latter has a blond twirl; they have different colors of eyes, noses, and eyebrows; they wear different pajamas. Although BabyBus may have reused certain elements from the Super JoJo videos it concedes to willful infringe the "Frame by Frame" Registrations, there are factual disputes over whether the reused elements are protectable, as discussed above. Moonbug thus cannot satisfy the intrinsic test on

23

summary judgment.  This is a matter for the jury to determine.

   2.   The "Yes Yes" Registrations

This category of asserted copyrights consists of eight CoComelon videos with "Yes Yes" or "No No" in the videos' titles (*e.g.*, the "No No" Bedtime Song, the "Yes Yes Playground Song").  (Moonbug Ntc. App. A.)  They cover CoComelon's "Yes Yes" and "No No" series of videos.  (Moonbug MSJ at 1.)   Moonbug accuses 23 Super JoJo videos of infringing this category of registrations.  (*Id.*)  As with the character registrations, factual disputes preclude summary judgment on the "Yes Yes" Registrations as well.

      a.   Genuine Issues of Material Facts Remain on the Extrinsic Test

Triable issues remain as to the extrinsic test regarding the infringement of the "Yes Yes" Registrations at least because reasonable minds can differ on the extrinsic test regarding the character infringement discussed above.  The accused videos feature JoJo and his family while the "Yes Yes" Registrations include JJ and his family.

Moreover, Moonbug has identified other shared elements in this category of infringement, which presents additional factual disputes under the extrinsic test, as analyzed below.

         i.   Step One

Besides the character elements, for each accused video in this category, Moonbug's expert has identified subsets of similarities on the look and feel (Identified Element Nos. 58-102, including the use of color, tone, design, themes), cinematography (Identified Element Nos. 103-108), songs (Identified Element Nos. 109-114), and elements of expression particular to specific videos, such as their subject matter, themes, plots, sequences, expressions, gestures, moods, and specific physical arrangements of characters and objects in scenes and videos (Identified Element Nos. 115-121).  (*Id.* at ¶ 162.)  Moonbug thus has satisfied step one of the extrinsic test.

      b.   Step Two

As with the character traits, Moonbug does not defend the protectability of each and every individual element.  Instead, it relies on the combination and arrangement of the elements to establish protectability.

BabyBus's expert opines that each element on look and feel, cinematography, songs, and

specific video, standing alone, is not original or protectible. (Seiter Decl. at ¶ 6, Ex. R-2.) For example, she opines that "bright colors, soft edges"—an identified "look and feel" element—is a "ubiquitous element of children's television" and "flows necessarily from the genre" because empirical evidence suggests that "bright colors primarily drove attention in the youngest children (ages 6 to 18 months)." (Seither Decl. R-2 at 40 (quoting literature).) Regarding "substantially similar themes"—an identified "specific videos" element, she opines that "there are a limited number of themes available for programs aimed at preschool children to explore, due to the nature of their cognitive and emotional development," so the CoComelon videos' themes naturally flow from the Genre as well. (*Id.* at 83 (citing literature).)

Moonbug's expert, on the other hand, opines that combination of elements are protectable. (Krause Rpt. at ¶ 162.) He explains that "CoComelon has a distinctive and original look and feel, comprised by its use, selection, arrangement and expression of elements such as color, mood, theme, set design, plots, animation and movement style, use of music dance, as developed in the copyrighted CoComelon works." (*Id.* at ¶ 179.) The numerous Identified Elements in the "look and feel" categories, for example, are combined to provide "rich sensory stimulation and a joyous experience in comforting and safe environment for exploration." (*Id.*)

In response, BabyBus' expert opines that the combinations of the Identified Elements are not original and may be found throughout the genre. (Seiter Decl. Ex. R-4.) She charted seven shows in the genre that contain many of the elements. Saperstein concludes that there are numerous standardized and overlapping elements and techniques in the Genre that "make these videos and channels extremely similar to one another," and they are "effectively interchangeable substitutes for one another." (Saperstein Decl. Ex. 1 at 14.) Denson opines that preschool programming tends to incorporate similar sets of elements proven to have universal appeal to children in the age group. (Denson Decl. Ex. 1 at 2.)

A reasonable jury could find for either party at this step.

c. <u>Step Three</u>

If some of Moonbug's identified elements survive step two, step three involves triable issues for the same reason as explained for the character infringement—that is, whether the works

25

in the "Yes Yes" Registrations—non-factual and artistic—merit "thick" or "thin" protection given the nature of the Genre. Specifically, BabyBus's experts find only a finite number of ways to combine topics and locations in the Genre due to the audience's young age. (Saperstein Decl. at 3–14; Denson Decl. at 2–5.) But the CoComelon Works, as non-factual works, "receive much broader protection under the copyright laws because of the endless variations of expression available to the artist." *McCulloch*, 823 F.2d at 321. Moonbug's expert explained that CoComelon developed its "special and winning combination of elements independently, through trial and error, brick by brick, through the hard work of its team of artists." (Krause Rpt. at ¶ 186.) That opinion suggests a great range of creative choices thus a broad level of protection. *Rentmeester*, 883 F.3d at 1120.

Taken together, a reasonable jury may conclude different on which shared elements should remain to be compared and what scope of protection the remaining elements merit, triable issues exist as to the substantial similarities between the accused works and the "Yes Yes" Registrations under the extrinsic test.

3. The Intrinsic Test is A Question for the Jury

For the same reason explained above, "the subjective question whether works are intrinsically similar must be left to the jury." *Swirsky*, 376 F.3d at 845. The asserted and accused videos are not identical or nearly identical. They feature non-identical characters, as discussed above, and they are not the same frame-by-frame. The intrinsic test cannot be decided as a matter of law here.

D. Summary

The Court grants summary judgment on Moonbug's ownership of valid copyrights of the CoComelon Works. The Court also grants summary judgment of willful infringement on the "Frame by Frame" Registrations by the videos (and the corresponding compilations and foreign language videos) listed in the relevant section of Moonbug's Appendix A to its motion. Because factual disputes remain on the extrinsic and intrinsic tests for the infringement of the CoComelon characters and of the "Yes Yes" Registration, the Court denies Moonbug's motion on those registrations.

# VI.     BABYBUS'S MOTION FOR SUMMARY JUDGMENT

BabyBus moves for summary judgment on non-infringement for 336 of the accused Super JoJo videos.  (Docket No. 180 ("BB MSJ") at 1.)  Analytically, it does not contest the first prong of the infringement analysis—that CoComelon owns valid copyrights in the CoComelon Works.  (Docket No. 219 ("BB Reply") at 1, 2.)  For the second prong, BabyBus focuses solely on unlawful appropriation, and more specifically, the extrinsic test of that component.  (*Id.* at 2, 6.)

As explained for Moonbug's motion, a reasonable jury could find for either party on the extrinsic test for the non-conceded Super JoJo videos.  BabyBus does not contest intrinsic test in this motion.  The Court therefore denies BabyBus's motion.

# VII.     SEALING MOTIONS

A "strong presumption of access to judicial records applies fully to dispositive pleadings, including motions for summary judgment and related attachments . . . because the resolution of a dispute on the merits, whether by trial or summary judgment, is at the heart of the interest in ensuring the 'public's understanding of the judicial process and of significant public events.'" *Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172, 1179 (9th Cir. 2006) (quoting *Valley Broadcasting Co. v. U.S. Dist. Ct.*, 798 F.2d 1289, 1295 (9th Cir.1986)).  "Thus, 'compelling reasons' must be shown to seal judicial records attached to a dispositive motion." *Id.* (quotation omitted).  That standard "is invoked even if the dispositive motion, or its attachments, were previously filed under seal or protective order." *Id.* (citation omitted).

BabyBus attempts to seal portions of the summary judgment motion briefs and attachments that appear to be merely embarrassing.  "The mere fact that the production of records may lead to a litigant's embarrassment, incrimination, or exposure to further litigation will not, without more, compel the court to seal its records." *Kamakana*, 447 F.3d at 1179.  Most materials at issue relate to how BabyBus studied, referenced, and marked up the CoComelon episodes.  Below are some examples:

- "Defendants' plan from the outset was to produce a competing series that both focused its visuals on CoComelon's JJ character and replicated the overall look and feel of the CoComelon series, and they implemented that plan by instructing their

team to make Super JoJo videos 'as identical as possible' to CoComelon, even tracing over an image of JJ to make JoJo. Dkt. No. 162, at 4-12; Dkt. No. 165, ¶¶22-47, 53; Exs. 527-548, 554 (Xue Tr.) 57:1–10 (testifying that Super JoJo wanted to create a look and feel similar to CoComelon's) . . . ." (Docket No. 192-2 at 12.)

- "Defendants admit they watched and studied the CoComelon Works during the development of Super JoJo, and the CoComelon Works are littered throughout Defendants' development files." (*Id.* at 14.)

- "Given the direct evidence of copying exposed in this case . . . ." (*Id.*)

- "It is notable that all of the planning documents with instructions to emulate CoComelon date to May, June, or July 2019." (Docket No. 195-29 at 8.)

- "This document also uses 14 images from CoComelon's copyrighted 'Yes Yes Vegetables' video work." (Docket No. 192-2 at 7.)

BabyBus submitted a declaration by its Head of the Video Business Department, stating that revealing the information it seeks to seal would harm its competitive standing because its competitors would gain unfair insight into its competitive strategies, product development plans, and product development methods. (Docket No. 187-1 at ¶¶ 4-5.) But the materials at issue concern how, in the past, BabyBus allegedly attempted to copy CoComelon's videos. It is difficult to see how that information would give BabyBus's competitors any unfair advantage. BabyBus has failed to present articulable facts identifying interests favoring secrecy or to show that such interests overcome the presumption of access. Moreover, the facts it wishes to seal are at the core of Moonbug's allegations herein which are public. The Court therefore denies BabyBus's proposed sealings regarding such materials. However, certain internal materials concerning the parties' development philosophies and priorities warrant sealing. Guided by the above analysis, the Court rules as follows.

///

///

///

///

The following motions are granted: Docket Nos. 174, 199.

The following motions are granted in part and denied in part:

- Docket Nos. 175, 187
  - Denied as to
    - Moonbug's Memorandum of Points and Authorities in Support of Its Motion for Summary Judgment, except for the proposed sealing on page 10
    - Declaration of Sean Apple (the "Apple Declaration"), except for 28:3-9
    - Exhibit 1 to the Declaration of Fran Krause
    - Exhibit 520 to the Apple Declaration
  - Granted as to the remaining materials.
- Docket Nos. 182, 184
  - Granted as to the highlighted portions of Exhibit H and the entirety of Exhibit L to the Declaration of Roger Huddle in Support of BabyBus Defendants' Motion for Partial Summary Judgment of Noninfringement, filed on December 9, 2022
  - Denied as to the remaining materials for lacking a statement or declaration in support of sealing
- Docket Nos. 192, 206
  - Denied as to
    - Plaintiffs' Opposition to Defendants' Motion for Partial Summary Judgment of Noninfringement, except for 19:4-5
    - Declaration of Fran Krause (the "Krause Declaration")
    - Exhibits B, E, G, and J to the Declaration of Fran Krause in Support of Plaintiffs' Opposition)
  - Granted as to the remaining materials

- Docket No. 195
  - Denied as to
    - BabyBus's Partial Opposition to Plaintiffs' Motion for Summary Judgment for Infringement
    - Exhibit B to the Declaration of Xiangyin Lin
  - Granted as to the remaining materials
- Docket Nos. 196, 203
  - Granted as to Exhibits A through E and portions of Exhibit W to the Declaration of Roger Huddle in Support of BabyBus Defendants' Partial Opposition to Plaintiffs' Motion for Summary Judgment of Infringement (the "Huddle Declaration"), filed on January 4, 2023
  - Denied as to the remaining materials for lacking a statement or declaration in support of sealing
- Docket Nos. 200, 207
  - Granted as to Exhibits M, O, and P to the Declaration of Sam Stake in Support of Defendants' Motion for Leave to Serve the Supplemental Expert Report of Christian Tregillis ("Stake Declaration"), filed on January 10, 2023, and portions of the motion referencing these exhibits.
  - Denied as to the remaining materials for lacking a statement or declaration in support of sealing
- Docket Nos. 217, 226
  - Denied as to
    - Moonbug's Reply in support of its Motion for Summary Judgment of Infringement, except for the proposed sealing on page 15
    - Declaration of Erin Jones (the "Jones Declaration"), except for third parties' names
    - Exhibit AB to the Declaration of Deborah Hedley for lacking a supporting statement or declaration

o   Granted as to the remaining materials

The following motions are denied:

- Docket Nos. 181, 220, 221

## VIII.   CONCLUSION

The Court **GRANTS IN PART AND DENIES IN PART** Moonbug's motion for summary judgment and **DENIES** BabyBus's motion for summary judgment.

At this juncture, the Court instructs the Clerk of the Court to file this order, in its entirety, under seal.  The Court orders the parties to meet and confer to determine which portions of this order may be publicly filed consistent with the Court's guideline provided in this order.  The parties shall jointly file their request to file under seal within a week of the date of this order.

This order disposes of Docket Nos. 162, 174, 175, 180, 181, 182, 184, 192, 195, 196, 199, 200, 203, 207, 211, 217, 220, 221, and 226.

**IT IS SO ORDERED**.

Dated: March 7, 2023

_____
EDWARD M. CHEN
United States District Judge