| | |
|---|---|
| 1 | JENNIFER KELLY (CSB No. 193416) |
| | jennifer@tyzlaw.com |
| 2 | RYAN TYZ (CSB No. 234895) |
| | ryan@tyzlaw.com |
| 3 | ERIN JONES (CSB No. 252947) |
| | ejones@tyzlaw.com |
| 4 | DEBORAH HEDLEY (CSB No. 276826) |
| | deborah@tyzlaw.com |
| 5 | CIARA MCHALE (CSB No. 293308) |
| | ciara@tyzlaw.com |
| 6 | SEAN APPLE (CSB No. 305692) |
| | sapple@tyzlaw.com |
| 7 | CHIEH TUNG (CSB No. 318963) |
| | chieh@tyzlaw.com |
| 8 | TYZ LAW GROUP PC |
| | 4 Embarcadero Center, 14th Floor |
| 9 | San Francisco, CA 94111 |
| | Telephone: 415.868.6900 |

Attorneys for Plaintiffs
Moonbug Entertainment Limited and
Treasure Studio, Inc.

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| MOONBUG ENTERTAINMENT LIMITED and TREASURE STUDIO, INC., | Case No: 3:21-cv-06536-EMC |
| Plaintiffs, | **PLAINTIFFS' TRIAL BRIEF** |
| v. | FINAL PRETRIAL CONFERENCE: |
| BABYBUS CO., LTD and BABYBUS (FUJIAN) NETWORK TECHNOLOGY CO., LTD, | Date: June 13, 2023<br>Time: 3:30 p.m.<br>Courtroom: 5 – 17th Floor<br>Judge: Hon. Edward M. Chen<br>Trial Date: July 3, 2023 |
| Defendants. | |

Page

I. MOONBUG'S THEORY OF THE CASE .................................................................................. 1

II. SUMMARY OF MOONBUG'S KEY EVIDENCE ...................................................................... 3

    A. CoComelon Copyrights and Deposits .................................................................. 3

    B. Defendants' Development Files and Admissions .................................................. 4

    C. Defendants' Fabricated Independent Creation Story and Evidence ..................... 6

    D. Defendants' Misrepresentations to YouTube ........................................................ 6

    E. Moonbug's Damages ............................................................................................. 7

III. CONTROLLING LAW ........................................................................................................ 7

    A. Moonbug Will Prevail on its Copyright Infringement Claim ............................... 7

        Moonbug Satisfies the Extrinsic Test ......................................................... 8

        Moonbug Satisfies the Intrinsic Test ......................................................... 13

    B. Moonbug Will Establish Defendants' Infringement Was Willful ....................... 13

    C. Entitlement to Damages for Willful Infringement .............................................. 14

    D. Moonbug Will Establish Entitlement to Injunctive Relief ................................. 14

    E. Moonbug Will Prevail on its Section 512(f) Claim ............................................ 15

**CASES**

*Alfred v. Walt Disney Co.*,
    821 F. App'x 727 (9th Cir. 2020) ................................................................... 9, 12

*Apple Inc. v. Psystar Corp.*,
    673 F. Supp. 2d 943 (N.D. Cal. 2009), aff'd, 658 F.3d 1150 (9th Cir. 2011) ............... 15

*Cadence Design Sys., Inc. v. Avant! Corp.*,
    125 F.3d 824 (9th Cir. 1997). ................................................................... 15

*DC Comics v. Towle*,
    802 F.3d 1012 (9th Cir. 2015) ................................................................... 12

*Desire, LLC v. Manna Textiles, Inc.*,
    986 F.3d 1253 (9th Cir. 2021) ................................................................... 10

*Diamond Foods, Inc. v. Hottrix*, LLC,
    No. 14-CV-03162-BLF, 2016 WL 3880797 (N.D. Cal. July 18, 2016) ....................... 10

*Dr. Seuss Enters., Ltd. P'ship v. ComicMix Ltd. Liab. Co.*,
    983 F.3d 443 (9th Cir. 2020) ................................................................... 10, 12

*eBay Inc. v. MercExchange, L.L.C.*,
    547 U.S. 388 (2006) ................................................................... 14

*Esplanade Prods., Inc. v. Walt Disney Co.*,
    768 F. App'x 732 (9th Cir. 2019) ................................................................... 9

*Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc.*,
    658 F.3d 936 (9th Cir. 2011) ................................................................... 13

*Malibu Textiles, Inc. v. Label Lane Int'l, Inc.*,
    922 F.3d 946 (9th Cir. 2019) ................................................................... passim

*Metcalf v. Bochco*,
    294 F.3d 1069 (9th Cir. 2002) ................................................................... 10

*Metro-Goldwyn-Mayer, Inc. v. Am. Honda Motor Co.*,
    900 F. Supp. 1287 (C.D. Cal. 1995) ................................................................... 11, 12, 13

*Michael Aram, Inc. v. Classic Touch Decor, Inc.*,
    No. 2:22-CV-01257-SSS-MRWx, 2022 WL 18284399 (C.D. Cal. Aug. 29, 2022) .. 9, 11

*Mitchell v. 3PL Sys., Inc.*,
    No. SACV 11-0534 AG ANx, 2013 WL 12129617 (C.D. Cal. Apr. 8, 2013)............... 14

*Online Pol'y Grp. v. Diebold, Inc.*,
    337 F. Supp. 2d 1195 (N.D. Cal. 2004) ................................................................... 15

*Paramount Pictures Corp. v. Axanar Prods., Inc.*,
	No. 2:15-CV-09938-RGK-E, 2017 WL 83506 (C.D. Cal. Jan. 3, 2017) ........................ 9

*Rogers v. Koons*,
	960 F.2d 301 (2d Cir. 1992) .................................................................................... 8

*S.O.S., Inc. v. Payday, Inc.*,
	886 F.2d 1081 (9th Cir. 1989) ................................................................................. 8

*Satava v. Lowry*,
	323 F.3d 805 (9th Cir. 2003) ................................................................................. 11

*Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*,
	562 F.2d 1157 (9th Cir. 1977) ......................................................................... 12, 13

*Skidmore as Tr. for Randy Craig Wolfe Tr. v. Led Zeppelin*,
	952 F.3d 1051 (9th Cir. 2020) ...................................................................... 9, 10, 12

*Swirsky v. Carey*,
	376 F.3d 841 (9th Cir. 2004) .................................................................................. 9

*Three Boys Music Corp. v. Bolton*,
	212 F.3d 477 (9th Cir. 2000) .................................................................................. 8

*Unicolors, Inc. v. Urb. Outfitters, Inc.*,
	853 F.3d 980 (9th Cir. 2017) .................................................................................. 8

*Williams v. Gaye*,
	895 F.3d 1106 (9th Cir. 2018) ................................................................................ 8

**STATUTES**

17 U.S.C. § 106 ................................................................................................................ 8

17 U.S.C. § 504(b) .......................................................................................................... 14

17 U.S.C. § 504(c)(2) ...................................................................................................... 14

17 U.S.C. § 512(f) ........................................................................................................... 15

Plaintiffs Moonbug Entertainment Limited and Treasure Studio, Inc. ("Moonbug") submit this trial brief to summarize Moonbug's theory of the case, identify Moonbug's key evidence, and provide a summary of controlling issues of law for their claims against Defendants.

Moonbug seeks to stop Defendants' relentless and willful copying of CoComelon, Moonbug's world-famous, #1-rated animated children's series. Moonbug asserts claims of copyright infringement and copyright misrepresentation. Dkt. No. 307. Defendants willfully and meticulously copied CoComelon to develop their "Super JoJo" animated series. Defendants have admitted that six of their Super JoJo episodes willfully infringe seven CoComelon registered video copyrights, but otherwise deny Moonbug's claims. Dkt. Nos. 194; 242. The evidence will show that the entire Super JoJo show and all Super JoJo episodes infringe CoComelon copyrights.

The Court has already ruled that (1) Moonbug owns 42 valid and enforceable copyright registrations in CoComelon, including in CoComelon video and character works; (2) Moonbug owns a valid copyright in the protectable CoComelon star character, JJ; and (3) that Defendants made frame-by-frame copies of CoComelon videos, willfully infringing seven CoComelon video copyright registrations, that Defendants admit they displayed in at least 220 locations (URLs). Dkt. Nos. 242, 310, 310-1. Issues that remain for trial are: (1) Defendants' liability for infringing the remaining CoComelon copyrights through their Super JoJo series and episodes, and whether that infringement is willful; (2) whether Defendants' false statements to YouTube to keep their Super JoJo show and videos up and running violate Section 512(f); and (3) what damages Defendants owe and other relief is warranted for such infringement and misrepresentations.

## I. MOONBUG'S THEORY OF THE CASE

Moonbug's CoComelon franchise is an award-winning animation show made for a preschool audience. CoComelon is one of the most popular preschool series in the world. With approximately 159 million subscribers, CoComelon's YouTube channel is the number one children's channel in the world, the most watched YouTube channel, of any genre, in the United States, and the second-most watched channel in the world. CoComelon is a series of episodes featuring a loveable cast of characters starring JJ and his supportive and cheerful family, that follow JJ through various adventures, and are set to toe-tapping songs and music. Treasure Studio

is the owner, and Moonbug is the exclusive licensee, of the CoComelon Works, including copyrights in the JJ character, the CoComelon family characters, the popular "Yes Yes" and "No No" series of videos, and many of CoComelon's most popular video works.

Recognizing CoComelon's runaway success, Defendants set out to create a knock-off show, called Super JoJo. Their plan began with Mr. Yan, Defendants' co-founder. In 2018, he decided to launch a new young children's YouTube channel aimed at toddlers to fill a gap in Defendants' line-up. Having no product targeting this demographic, Defendants conducted competitive intelligence on the intellectual property of young children's channels on YouTube to identify the top producer. They identified and ranked CoComelon as the most successful channel in the market. Defendants studied CoComelon, watching and downloading dozens of CoComelon videos to their files, summarizing them, and embedding images of CoComelon characters and video links in their competitive intelligence summaries and then their production plans.

Defendants' development plans for Super JoJo instructed the development team to "use the kids' channel CoComelon as the target setting." Defendants' planning documents are full of CoComelon content and repeatedly instruct Defendants' Super JoJo team to use CoComelon, even including instructions to make scenes "as identical as possible to CoComelon." Defendants' internal development files for Super JoJo are replete with images from, links to, and copies of the CoComelon Works. Defendants' plan to copy CoComelon even included meticulous copying of CoComelon's promotional thumbnail images for each episode. While Defendants considered alternative character designs, for JoJo they instead chose to buy a 3D model and mold it to replicate CoComelon's JJ. Defendants' admitted goal for the Super JoJo show was to "create a look and feel similar to CoComelon," and that is what they did. Defendants' admissions in their internal communications make clear that their copying of CoComelon was both intentional and approved at the highest level. The head of the 3D drawing team acknowledged Defendants' blatant copying of CoComelon, recommending "that in the future do not let people see so obviously that the reference video(s) are copied with no change made to them at all," citing "CoComelon." He worried, if caught: "What would viewers perceive BabyBus as then?"

Moonbug tried to stop Defendants' infringement, turning to YouTube. In July 2021,

Moonbug sent YouTube a detailed letter and 80 pages of exhibits of the pervasive infringement by Super JoJo, separately submitting three DMCA complaints seeking removal of twenty-two Super JoJo videos that each willfully infringed CoComelon's popular copyrighted video, "The Boo Boo Song." Within hours of receiving Moonbug's letter to YouTube, Defendants disabled public access to over 100 infringing videos on YouTube to prevent YouTube from removing the videos and issuing strikes against the Super JoJo channel. After YouTube began processing Moonbug's takedowns and applying strikes to the Super JoJo channels, Defendants began submitting counter notifications claiming that Super JoJo did not infringe and had nothing to do with CoComelon. When too many strikes accumulated, resulting in termination of the Super JoJo channel, Defendants told YouTube under penalty of perjury that the videos YouTube removed had nothing to do with CoComelon—videos that they have since conceded willfully infringe.

Faced with Defendants' counter notifications and denials of infringement, Moonbug filed this lawsuit. Yet Defendants' falsehoods have persisted throughout the litigation and still underpin their trial strategy. Indeed, Defendants have concocted a fictional independent development story based on a 2D character they now call "Doudou," which supposedly appeared in a video called the "Barber" in 2016. Defendants embedded an image of this supposed 2016 Doudou character in sworn witness and attorney declarations, but have never produced the image or been able to explain its origin. Nor can they, because the image admittedly does not appear in the Barber video. Defendants stated in pleadings, discovery, depositions and letters to YouTube, that Super JoJo is original to BabyBus and has nothing to do with CoComelon. Those statements have proven false. Not only do multiple Super JoJo episodes willfully infringe, the lead artist for Super JoJo admitted he was given an image of JJ to create JoJo. Yet Defendants continue to upload infringing videos and swear under penalty of perjury that they are their original works— even conceded videos.

## II. SUMMARY OF MOONBUG'S KEY EVIDENCE

### A. CoComelon Copyrights and Deposits

Treasure Studio is the owner, and Moonbug is the exclusive licensee, of registered copyrights in the CoComelon Works asserted in the case. Trial Ex. 29. The CoComelon Works

include copyrights in the JJ character, as he appears and is developed in the CoComelon copyrighted videos and art, the CoComelon family characters, the popular "Yes Yes" and "No No" series of videos, and many of CoComelon's episodes. Trial Exs. 1083-1233 (copyright registrations and deposits). CoComelon episodes feature a loveable cast of characters led by the star, baby JJ, and his supportive and cheerful family, composed of JJ's mother, father, older sister YoYo, older brother Tom Tom, and their dog named Bingo. The CoComelon Works feature JJ as the central character, and the episodes of the series follow JJ through various life adventures with the help of his family and friends, like his first-time swimming, going to the playground, eating vegetables, getting injured, getting dressed, etc. All CoComelon Works are the creative endeavors of Treasure Studio's artists and producers.

The Court has already found the CoComelon Works set forth in Paragraph 21 of Moonbug's complaint valid and enforceable Dkt. No. 307 ¶ 21. Defendants have conceded, and the Court has held, that six Super JoJo videos infringe one or more of the following CoComelon Works: U.S. Copyright No. PA0002181622 (The Boo Boo Song); U.S. Copyright No. PA0002149483 (Yes Yes Vegetables Song); U.S. Copyright No. PA0002159137 (Yes Yes Vegetables Song); U.S. Copyright No. PA0002191424 (Car Wash Song); U.S. Copyright No. PA0002146326 (Bath Song); U.S. Copyright No. PA0002145951 Yes Yes Playground Song); and PA0002146325 (Colors Song – Learn Colors"). Dkt. Nos. 194-46, 242 at 10–11. The Court has also held that JJ is a protectable character with "physical as well as conceptual qualities," who is "sufficiently delineated to be recognizable as the same character whenever [he] appears," and has distinctive elements rendering him "especially distinctive." Dkt. No. 242 at 13–14.

### B. Defendants' Development Files and Admissions

From the start, Defendants devised a plan to copy CoComelon and executed the plan. Defendants' witnesses will testify that, in 2018, as part of their plan to launch a new young children's show to fill a programming gap, Defendants set out to find and replicate the number one product in the market: CoComelon. Development began with a plan to use CoComelon "as the target setting" for Super JoJo. Trial Ex. 19. Defendants' master plan for the entire Super JoJo show, which described and introduced the show and its specifications, is replete with images of

and links to CoComelon videos, and used CoComelon's JJ character from CoComelon's "This is the Way" video (both CoComelon Works) as the "focus of the visuals." Trial Ex. 20. There are no other companies' baby characters in the master plan's production specifications.

Defendants implemented their plan to copy CoComelon by passing out JJ's image to their artists to use as a reference and downloading CoComelon videos to copy the look and feel, quality of visuals, and camera composition – to capture the exact expression of CoComelon that is so appealing to children. Some of Defendants' development documents instructed their team to make particular episodes as identical or similar as possible to CoComelon. Trial Exs. 3, 5–6, 9. Extensive Super JoJo planning documents contain images copied from CoComelon Works. Trial Exs. 3, 5–6, 9, 15, 275, 351, 353, 355, 359, 365, 689, 693, 703. Their Super JoJo development files are riddled with copies of CoComelon Works, as well as links to CoComelon Works and images from CoComelon Works. *See, e.g.*, Trial Exs. 3, 5-6, 9, 15, 22, 24, 251, 333, 395–398, 400–406, 408–413, 418–422, 701–702. In some instances, Defendants even downloaded copies of CoComelon works and ingested them into their video development workstream, tracing over CoComelon characters, to create their knockoff show. *E.g.*, Trial Ex. 22.

The evidence will show that Defendants not only copied CoComelon, but that, by their own admissions in internal communications and in the litigation, their copying was knowing and intentional. First, internal communications of Defendant concede their copying. They copied cuts from CoComelon, acknowledging they were doing so and remarking, "[i]t doesn't matter." Trial Exs. 353, 689. The head of the 3D drawing team saw the extent of Defendants' copying of CoComelon in 2021 and suggested that Defendants try to make it less obvious. Trial Ex. 100.

Second, despite arguing during summary judgment that Defendants' Super JoJo development followed two separate workstreams where video planning (including frame-by-frame copying) was done separately from character development, Defendants' 3D drawing team leader who created JoJo admitted in his deposition that he *used a reference image of JJ* to do so. Defendants have conceded that six of their Super JoJo videos willfully infringe one or more of seven CoComelon Works. Dkt Nos. 194, 242. And Defendants have conceded display of those willfully infringing videos at over 200 locations (URLs). Dkt. Nos. 310, 310-1.

### C. Defendants' Fabricated Independent Creation Story and Evidence

Moonbug intends to offer evidence that, faced with overwhelming evidence of their willful infringement, Defendants set out to manufacture a defense that they independently created JoJo based on an earlier existing BabyBus 2D character allegedly called Doudou, including manufacturing evidence to support that story.

Beginning with their first filings in the case, Defendants repeatedly submitted sworn declarations in which they embedded an image of the alleged "Doudou" character, claiming JoJo "originated" with that character in 2016 and relying on Chinese copyrights for that character. Trial Exs. 12, 329, 1001. But that image was never authenticated or produced in this case—no one can explain where it came from, despite it being filed in 2021 with the Chinese copyright office, mere weeks after Defendants were put on notice of Moonbug's claims. Trial Exs. 276–281. Defendants tried to claim that the image came from a video called the Barber, but now concede it is not the same as the character depicted in that video and they have no evidence that this minor character was ever named Doudou. *See* Dkt. No. 350 (Moonbug's Motion *in Limine* No. 5). Most telling, on the eve of trial, Defendants now want to *exclude* the Doudou registrations and images they have relied on throughout the case, arguing there is *no evidence* regarding when the DouDou image was created. But Moonbug will introduce evidence that the image was created in August 2021, when Defendants were desperate to create an "independent" reference for the JoJo character—a character that was actually developed by copying Moonbug's JJ. If Defendants are permitted to offer any evidence of their alleged independent creation of JoJo based on "Doudou," Moonbug will offer evidence of this whole story.

### D. Defendants' Misrepresentations to YouTube

Moonbug will show that Defendants made misrepresentations to YouTube in counter notifications to get YouTube to reinstate their infringing channels and videos, in violation of Section 512(f) of the DMCA. First, Moonbug will show that, after conceding that six of their videos willfully infringe CoComelon, Defendants continued to publish and submit counter notifications for willfully infringing videos, swearing under penalty of perjury to YouTube that the videos were original works of Super JoJo. Trial Exs. 1381, 1392. Second, Moonbug will also

show that when YouTube suspended Defendants' Super JoJo channel early in the case due to strikes resulting from Moonbug's copyright complaints, Defendants submitted counter notifications to reinstate the channel that falsely stated that every one of their Super JoJo videos was original, did not infringe, and had nothing to do with CoComelon. *See, e.g.,* Trial Ex. 11. Defendants made these statements with full knowledge of their internal development files.

### E. Moonbug's Damages

Moonbug will establish at trial that it is entitled to roughly $20 million in infringement damages and injunctive relief. Moonbug will first show it is entitled to disgorgement of Defendants' profits attributable to infringement. Dr. Jennifer Vanderhart will testify that Defendants earned at least $17,350,454 for their Super JoJo show in the United States. Trial Exs. 1035–1037. Defendants seek to reduce this number via a made-up and untimely allocation of expenses, but they failed to produce their allocation theory in discovery in violation of Judge Westmore's order, and so it must be excluded. *See* Dkt. No. 341. Defendants have also offered this data via their expert, Mr. Tregillis, but as set forth in a motion to exclude his testimony, the documents attached to his report were not produced in discovery, and are inadmissible hearsay that Defendants cannot submit to the jury under the penumbra of his expertise when he had no role in preparing them. Nor can Defendants deduct expenses in view of their willful infringement.

Dr. Vanderhart will testify that Moonbug is owed $4,482,308 in lost profits, calculated using econometric techniques to estimate profits that would have been generated by viewers of Super JoJo who, but for the infringement, would have viewed CoComelon. Trial Exs. 1035–1037. Dr. Vanderhart will testify that, taking unjust enrichment damages and accounting for lost profits, total damages for Plaintiffs are $19,023,292. *Id.* Moonbug will also show that Defendants' misrepresentations to YouTube resulted in lost profits and expenses to Moonbug. Moonbug seeks injunctive relief, which is warranted in view of Defendants' continued, constant upload to YouTube of infringing Super JoJo videos, including ones already conceded to infringe.

## III. CONTROLLING LAW

### A. Moonbug Will Prevail on its Copyright Infringement Claim

To prevail on a copyright infringement claim, Moonbug must show (1) ownership of the

copyright in the infringed work, and (2) the defendant copied protected elements of the copyrighted work. *Williams v. Gaye*, 895 F.3d 1106, 1119 (9th Cir. 2018) (citations omitted). "Copying" in this context "is shorthand for the infringing of any of" Moonbug's "five exclusive rights, described at 17 U.S.C. § 106." *S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1085 n.3 (9th Cir. 1989). Moonbug may prove copying with either direct evidence or indirect (circumstantial) evidence. *Williams*, 895 F.3d at 1119 (citing *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 481 (9th Cir. 2000)).

Moonbug will establish at trial that this case is "the rare scenario where there is direct evidence of copying" establishing infringement. *Rogers v. Koons*, 960 F.2d 301, 307 (2d Cir. 1992). In *Rogers*, the court found direct evidence of copying where the defendant had provided a copy of the copyrighted work and explicitly instructed that the work be copied. *Id.* The same circumstances are present here: Defendant provided the CoComelon Works to the team developing Super JoJo and repeatedly and explicitly instructed the team to make Super JoJo by targeting CoComelon as the setting, focusing the visuals on CoComelon's JJ character, and making the scenes as identical as possible to CoComelon.

Moonbug will also establish copyright infringement through indirect or circumstantial evidence, by showing that the defendant had access to the copyrighted work and that the works are substantially similar. *Williams*, 895 F.3d at 1119. In this case, it is undisputed that Defendants had access to the CoComelon Works—they have admitted it. In assessing whether works are substantially similar, courts in the Ninth Circuit apply a two-part analysis: the extrinsic test and the intrinsic test. *Unicolors, Inc. v. Urb. Outfitters, Inc.*, 853 F.3d 980, 985 (9th Cir. 2017). The extrinsic test considers overlap of "concrete elements based on objective criteria," while the intrinsic test is subjective, asking "whether the ordinary, reasonable person would find 'the total concept and feel of the works' to be substantially similar." *Id.* (citations omitted).

*Moonbug Satisfies the Extrinsic Test*

The extrinsic test assesses the objective similarities between two works, focusing on the protectable elements of the plaintiff's expression. *Malibu Textiles, Inc. v. Label Lane Int'l, Inc.*, 922 F.3d 946, 952 (9th Cir. 2019). Before that comparison is made, the court filters out

unprotectable elements of the plaintiff's work— "primarily ideas and concepts, material in the public domain, and scènes à faire (stock or standard features that are commonly associated with the treatment of a given subject)." *Esplanade Prods., Inc. v. Walt Disney Co.*, 768 F. App'x 732, 733 (9th Cir. 2019). What filtration is done – or not done – depends on the type of work. With "books, film, and television shows," after filtering out ideas and scènes à faire, protectable expression such as "plot, themes, dialogue, mood, setting, pace, characters, and sequence of events" remain for objective comparison. *Swirsky v. Carey,* 376 F.3d 841, 849 (9th Cir. 2004). But other works cannot be dissected into protected and unprotected elements in the same way. For example, many works are protectable as a "selection and arrangement," in which a combination of unprotectable elements is eligible for copyright protection "if those elements are numerous enough and their selection and arrangement original enough that their combination constitutes an original work of authorship." *Malibu,* 922 F.3d at 952 (finding copyrightable expression in selection and arrangement of floral elements in a pattern); *Michael Aram, Inc. v. Classic Touch Decor, Inc.*, No. 2:22-CV-01257-SSS-MRWx, 2022 WL 18284399, at *5 (C.D. Cal. Aug. 29, 2022) (identifying protectable combination in expression of leaf dishes); *Paramount Pictures Corp. v. Axanar Prods., Inc.*, No. 2:15-CV-09938-RGK-E, 2017 WL 83506, at *5 (C.D. Cal. Jan. 3, 2017) overruled in part on other grounds by *Skidmore as Tr. for Randy Craig Wolfe Tr. v. Led Zeppelin*, 952 F.3d 1051 (9th Cir. 2020) (finding copyrightable combination of elements that "may not be individually original and . . . protectable"). In the case of such a combination, the generic similarities and the common patterns in which they arise are not filtered out in the extrinsic analysis, but instead viewed in combination to establish objective similarity. *See, e.g., Alfred v. Walt Disney Co.*, 821 F. App'x 727, 729 (9th Cir. 2020) (reversing dismissal that discounted the similarities between works as based on tropes and failed "to compare the original selection and arrangement of the unprotectible elements" between them); *Malibu*, 922 F.3d at 953 (evaluating similarities in patterns without filtering out any natural or individually unprotectable elements). Ultimately, the applicable law is "cautious not to overzealously decompose visual expression into its abstract, and thus unprotectable, units, because that would mean that any amount of taking by [infringers] would be permissible." *Dr. Seuss Enters., Ltd.*

*P'ship v. ComicMix Ltd. Liab. Co.*, 983 F.3d 443, 456 n.5 (9th Cir. 2020); *see also Metcalf v. Bochco*, 294 F.3d 1069, 1074 (9th Cir. 2002) ("protectable expression includes the specific details of an author's rendering of ideas, or 'the actual concrete elements that make up the total sequence of events and the relationships between the major characters'") (citations omitted), overruled in part on other grounds by *Skidmore*, 952 F.3d 1051.

The Court should reject Defendants' self-serving distortions of the extrinsic test, which are contrary to the law and should not be put before the jury. **First**, Defendants have repeatedly argued the CoComelon Works are entitled only to "thin" copyright protection requiring "nearly identical" copying, and that this issue should be submitted to the jury. This is incorrect on multiple levels. The Court, not the jury, must decide the level of copyright protection the works are afforded. *See, e.g.*, *Desire, LLC v. Manna Textiles, Inc.*, 986 F.3d 1253, 1261 (9th Cir. 2021) (rejecting argument that question of whether a copyright is entitled to broad or thin protection is a question for the jury and holding that "we have squarely and repeatedly held that the district court must determine the scope of a work's copyright protection in the first instance").

The Court should also determine that CoComelon works and their star character, JJ, are entitled to the broad copyright protection typically afforded to creative works—if it has not already. Even if individual elements of these works in isolation were only entitled to "thin" protection—which they are not—the overall selection and arrangement of creative elements in CoComelon Works and in the protectable JJ character afford them broad protection. For example, in *Malibu*, the Ninth Circuit held that copyright provides broad protection for the original selection, coordination, and arrangement of floral elements in a lace pattern because there is "a wide range of expression" possible "for selecting, coordinating, and arranging" the elements of the pattern, even if copyright law does not protect the natural appearance of the individual flowers. 922 F.3d at 953. Other Courts have found that a selection or arrangement of elements is entitled to broad protection even where the individual elements are all unprotectable or entitled to only thin protection. *See, e.g., Diamond Foods, Inc. v. Hottrix, LLC*, No. 14-CV-03162-BLF, 2016 WL 3880797, at *8 (N.D. Cal. July 18, 2016) (combination of the nine asserted elements entitled to broad protection even though individual elements only entitled to thin protection)*; Metro-*

*Goldwyn-Mayer, Inc. v. Am. Honda Motor Co.*, 900 F. Supp. 1287, 1303 (C.D. Cal. 1995) (concluding that "a careful visual delineation of a fictional character . . . requires greater protection of the fictional works at issue than that accorded more factually-based or scientific works"). Indeed, "[w]hile it is understandable to require less protection of expressions of factual events or widely-licensed computer programs, conversely, it is important that this Court require greater protection for original works of fiction and the expression of the characters contained therein." *Id.*

Likewise, Defendants are mistaken that only thin protection applies to depictions of elements found in nature (*i.e.* human anatomy). Rather, thin protection is applied to *realistic* depictions of nature. *See Satava v. Lowry*, 323 F.3d 805, 812 (9th Cir. 2003) (holding that the scope of copyright protection is narrow for "realistic depictions" of live animals). But CoComelon does not depict nature realistically – it is a highly stylized animated cartoon of a family whose visual appearance includes both simplification (*e.g.*, surface details) and exaggeration (*e.g.*, JJ's large head). CoComelon characters have distinctive and idealized personalities, styles, and movements that have no real-life analog. CoComelon also features original songs, dialogue, stores, scenes, and plots that are not mere replicas of real life. Such stylized, original depictions are afforded broad copyright protection. *See, e.g.*, *Aram,* 2022 WL 18284399, at *6 ("Aram's designs are not merely realistic depictions of nature and, therefore, the designs are entitled to broad copyright protection."); *Malibu*, 922 F.3d at 953 (applying thick protection to stylized flower pattern). No Court has ever held that an animated show like CoComelon has only thin copyright protection, and the Court should not do so here. Indeed, the Court's summary judgment order suggested the application to CoComelon of the standard substantial similarity test for copyrighted works afforded the typical broad protection. *See, e.g.,* Dkt. 242 at 26.

***Second***, in view of the Court's holding that JJ is a protectable character under copyright law, it would be improper to apply further analytical dissection and filtration of JJ's constituent elements under the extrinsic test, and the Court should prevent further dissection at trial. Moonbug is aware of no authority applying analytical dissection and filtration under the extrinsic

test to a character that has already been found to be protectable under the Ninth Circuit's test, as here. *See, e.g., Metro-Goldwyn-Mayer*, 900 F. Supp. at 1296-99 (no analytical dissection of James Bond character performed after conclusion that character was copyrightable). Such analysis would be inconsistent with controlling case law that recognizes that a copyrightable selection and arrangement of features may be based on a collection of individually unprotectable elements, as above. Breaking the character back down into individual elements of expression risks losing sight of the "sufficiently delineated" and "distinctive" combination of "physical as well as conceptual qualities" that made the character copyrightable in the first place. *See DC Comics v. Towle*, 802 F.3d 1012, 1021 (9th Cir. 2015) (setting out three-part test for character copyrightability); *see also Seuss*, 983 F.3d at 456 n.5 (cautioning that overly zealous dissection may result in excusing infringement). The Court already found JJ protectable, and conducting further dissection would undermine that protection that—as for any human character— necessarily comes from a combination of elements, both unprotectable and unprotectable. *See Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1166 (9th Cir. 1977), overruled on other grounds by *Skidmore*, 952 F.3d 1051 (rejecting argument that the court should "ignore that intrinsic quality which they recognized" in H.R. Pufnstuf to conduct an extrinsic dissection of the characters). Here, it would be inappropriate to "fall prey to defendants' invitation to dissect the works." *See id.* at 1169.

**Third**, as provided and set forth in Moonbug's Motion *in Limine* No. 2, Defendants are incorrect that the comparison of individual features of other animated babies to JJ and JoJo has any relevance to issues that will go to the jury here. When, as here, there are multitudinous ways of selecting and arranging the physical and conceptual elements that make up the protected work – here the baby JJ character – the extrinsic test, as described above, does not proceed by assessing and comparing the ideas underlying each element of that character to other works. *See, e.g., Alfred*, 821 F. App'x at 729 (reversing dismissal); *Malibu*, 922 F.3d at 953. Even if it were the case that certain features like a tuft of hair or an endlessly sunny disposition were generic features of all babies—which they are obviously not—controlling law holds that a selection and arrangement of even generic features can support a substantial similarity finding. *See id*. Instead,

the extrinsic test focuses on the objective similarities between the selection and arrangement of the identified elements *in the asserted and accused works*. Here, that would call for the comparison of the parties' respective ideas of babies with a tuft of hair and perfect behavior, not the expression of such features in other programs. *See, e.g.*, *Malibu*, 922 F.3d at 953.

*Moonbug Satisfies the Intrinsic Test*

"The 'intrinsic' test asks whether the 'total concept and feel' of the two works is also substantially similar." *Metro-Goldwyn-Mayer*, 900 F. Supp. at 1299. The intrinsic test is "a subjective determination . . . left for the trier of fact." *Id.* Where, as here, there are many ways to express a concept (*e.g.*, depict a baby or family), Moonbug will show at trial that Defendants' copied Moonbug's protectable expression in the CoComelon works by copying the "total concept and feel" of the franchise. *See Sid & Marty Krofft*, 562 F.2d at 1169 ("it is the combination of many different elements which may command copyright protection because of its particular subjective quality.").

**B.     Moonbug Will Establish Defendants' Infringement Was Willful**

At trial, Moonbug will establish that Defendants' infringement was willful. To prove "willfulness" under the Copyright Act, Moonbug must show (1) that Defendants were actually aware of the infringing activity, or (2) that Defendants' "actions were the result of 'reckless disregard' for, or 'willful blindness' to, the copyright holder's rights." *Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc.*, 658 F.3d 936, 944 (9th Cir. 2011) (internal citations omitted). *First*, Defendants have already admitted to willfully infringing seven of the CoComelon Works. Dkt. Nos. 194, 242. *Second*, the record is replete with Defendants' instructions to copy CoComelon, proving they were not only aware of the infringing activity but actively encouraged it. *See, e.g.*, Trial Exs. 3, 5-6, 9, 20. While Defendants may try to cabin these copying instructions to just a few episodes, those were copied from CoComelon's most popular episodes and served to launch the Super JoJo series and its many episodes to follow. And once Defendants intentionally copied CoComelon, they reused the same characters, settings, and scenes throughout the Super JoJo series. *Third*, Defendants' 3D drawing team leader admitted that Defendants' copying of CoComelon was "so obvious." Trial Ex. 100. *Fourth*, Defendants' development files for Super

JoJo are littered with images, videos and links from and to CoComelon videos. *Fifth*, Defendants' head of 2D drawing, Xiaohui Chen, admitted that he used Moonbug's character JJ as a reference image in creating JoJo. With this level of calculation and intent throughout in the evidence Moonbug will present at trial, Defendants cannot escape a finding of willfulness.

### C. Entitlement to Damages for Willful Infringement

At trial, Moonbug will establish entitlement to extensive damages resulting from Defendants' willful infringement. First, Moonbug may elect statutory damages of up to $150,000 per work infringed where Defendants' infringement was both concededly and unquestionably willful. 17 U.S.C. § 504(c)(2). Second, instead of statutory damages, Moonbug may elect an award of damages in the form of actual damages suffered from Defendants' infringement. Under the Copyright Act, actual damages mean the amount of money adequate to compensate Plaintiffs for the reduction of the fair market value of the CoComelon Works—*i.e.*, the amount of profits Plaintiffs lost due to infringement. 17 U.S.C. § 504(b). In addition to actual damages, Plaintiffs are entitled to any profits of the Defendants attributable to their infringement. *Id*. Here, Moonbug's expert will show that Moonbug is owed lost profits and disgorged profits.

### D. Moonbug Will Establish Entitlement to Injunctive Relief

Moonbug is entitled to a permanent injunction to stop Defendants' continuous infringement. It only need demonstrate: (1) that it has suffered irreparable injury; (2) that monetary damages are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the parties, a remedy in equity is warranted; and (4) that the public interest is not disserved by an injunction. *Mitchell v. 3PL Sys., Inc.*, No. SACV 11-0534 AG ANx, 2013 WL 12129617, at *3 (C.D. Cal. Apr. 8, 2013) (*citing eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)). First, Moonbug has suffered irreparable injury – Defendants continue to place their competing infringing products on the same platforms as CoComelon, including uploading videos that they conceded willfully infringed. *See id.* (noting similarity of businesses and infringer intent to continue infringing as irreparable harm). Second, monetary damages fail to address the intangible harms to Moonbug's brand. *See id.* at *4. Third, the balance of hardships favors Moonbug because if infringement continues, it would face ongoing monetary and

irreparable harms in the lack of control over its IP and in costs to continually police Defendants' ongoing misconduct, while Defendants would only need to comply with the law. *See Cadence Design Sys., Inc. v. Avant! Corp.*, 125 F.3d 824, 829-30 (9th Cir. 1997). Finally, the public interest favors an injunction, because the public receives a benefit when the "legitimate rights of copyright holders are vindicated." *Apple Inc. v. Psystar Corp.*, 673 F. Supp. 2d 943, 950 (N.D. Cal. 2009), aff'd, 658 F.3d 1150 (9th Cir. 2011).

### E. Moonbug Will Prevail on its Section 512(f) Claim

Section 512(f) specifies that any person who knowingly materially misrepresents that material was removed from a service provider by mistake or misidentification shall be liable for all damages, including costs and attorneys' fees, incurred by the copyright owner as the result of the service provider relying upon such misrepresentation in replacing the removed material or ceasing to disable access to it. *See* 17 U.S.C. § 512(f). Moonbug will establish (1) Defendants' material misrepresentation; (2) YouTube's reliance on such misrepresentation; and (3) Moonbug's damages caused by this misrepresentation. In response to Moonbug's DMCA notices to YouTube, Defendants have responded with knowingly false counternotifications. Mr. Yan has repeatedly sworn, under penalty of perjury, that Super JoJo videos are "completely BabyBus' original creation" and have nothing to do with CoComelon. But Defendants internal development documents, deposition testimony, and recent concessions of willful infringement prove those statements were knowingly false. *See Online Pol'y Grp. v. Diebold, Inc.*, 337 F. Supp. 2d 1195, 1204 (N.D. Cal. 2004) (citing BLACK'S LAW DICTIONARY (8th ed. 2004)) (construing the knowledge requirement in section 512(f)). YouTube relied on Defendants' counternotices to reinstate the Super JoJo channel and willfully infringing videos, and Moonbug has incurred damages as a result, including investigation and remedial fees and lost profits.

Dated: May 23, 2023　　　　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　　　　　*/s/ Ryan Tyz*
　　　　　　　　　　　　　　　　　　　　　Ryan Tyz
　　　　　　　　　　　　　　　　　　　　　Attorneys for Plaintiffs Moonbug
　　　　　　　　　　　　　　　　　　　　　Entertainment Limited and Treasure Studio, Inc.