1
2
3
4
5
6

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

<table>
<tr><td>MOONBUG ENTERTAINMENT LIMITED, et al.,<br><br>    Plaintiffs,<br><br>  v.<br><br>BABYBUS (FUJIAN) NETWORK TECHNOLOGY CO., LTD, et al.,<br><br>    Defendants.</td><td>Case No. 21-cv-06536-EMC<br><br>**ORDER RE PLAINTIFFS' AND DEFENDANTS' MOTIONS TO EXCLUDE EXPERT TESTIMONY**<br><br>Docket Nos. 287-290, 294, 302</td></tr>
</table>

United States District Court
Northern District of California

Prior to trial, Plaintiffs Moonbug Entertainment Limited and Treasure Studio, Inc. (collectively, "Moonbug") and Defendants BabyBus Co., Ltd. and BabyBus (Fujian) Network Technology Co., Ltd. ("BabyBus Tech.") (collectively, "BabyBus") have filed *Daubert* motions to exclude the opinions of six experts.  *See* Docket Nos. 287, 288, 289, 290 (Moonbug's *Daubert* motions); Docket Nos. 294, 302 (Babybus' *Daubert* motions).  The Court addresses each motion in turn.

## I.  LEGAL STANDARD

Federal Rule of Evidence 702 tasks a district judge with "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."  *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. at 597.  "Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry.  And it is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline."  *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022) (quoting *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013)).

"[T]he test under *Daubert* is not the correctness of the expert's conclusions but the soundness of his methodology." *Daubert*, 43 F.3d at 1318.  The Court is "a gatekeeper, not a fact finder." *Primiano v. Cook*, 598 F.3d 558, 568 (9th Cir. 2010) (quotation omitted).  If the proposed testimony meets the thresholds of relevance and reliability, its proponent is "entitled to have the jury decide upon [its] credibility, rather than the judge." *United States v. Sandoval-Mendoza*, 472 F.3d 645, 656 (9th Cir. 2006).  "Challenges that go to the weight of the evidence are within the province of a fact finder, not a trial court judge.  A district court should not make credibility determinations that are reserved for the jury." *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014).  "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano*, 598 F.3d at 564.

## II.   DISCUSSION OF PLAINTIFFS' MOTIONS TO EXCLUDE

A.   Motion to Exclude Opinion of Denise Denson (Docket No. 287)

Denise Denson is currently the Head of Expansion for Viaplay and previously the Executive Vice President of Content Distribution at Viacom.  Docket No. 194-19 Exh. 1 (Expert Report of Denise Denson ("Denson Rep.")), Appendix A at 1.  She has over two decades of experience in the children's media and television business, leading distribution of children's content across video platforms such as YouTube, Netflix, Amazon, and cable.  *Id.* at 1.  In her expert report, Mr. Denson opines on the characteristics of Babybus' Super JoJo videos that appeal to young preschool children and describes how revenue is generated by the Super JoJo videos on YouTube through video traffic and searches that do not relate to CoComelon.  *Id.* at 1.  Her report explains that her conclusions are based on YouTube analytics for only a subset of accused videos:

> I have reviewed and analyzed detailed data related to BabyBus search and discovery on YouTube, world-wide and domestic viewership, and revenue for sixty-two Super JoJo videos.[12] Based upon my analysis of this data, less than one percent of all searches leading to a view of these Super JoJo videos involved a search which included "Coco." Typically, a majority of the searches leading to a view of these videos involved a search which included "JoJo." . . . In addition, the data I reviewed shows that CoComelon videos were viewed prior to the viewing of a Super JoJo video only 379 times out of 2.9 million views (.013%). Further, in 94% of the Super JoJo videos I reviewed, a preceding Super JoJo video was the

United States District Court
Northern District of California

1    sole source of discovery for the reviewed video.

2    Footnote 12: I understand from counsel that as of the date of this
     report YouTube analytics were only available for these 62 of the 392
3    videos accused by Plaintiffs of infringing.

4    Docket No. 194-19 Exh. 1 (Expert Report of Denise Denson ("Denson Rep.")) at 16.

5         Moonbug seeks to exclude expert testimony provided by Ms. Denson, specifically her

6    opinions on YouTube analytics.  Docket No. 287 (P's Motion to Exclude Denson ("MTE

7    Denson")).  Moonbug argues that while Ms. Denson can testify as a fact witness to the value of

8    intellectual property and the value of licensing copyrighted and derivative works, she has no

9    specialized knowledge in statistics or the YouTube algorithm and her testimony on these statistics

10   is based on unreliable data and methods.  *Id.* at 2.

11        As a preliminary matter, Ms. Denson is qualified to interpret YouTube metrics and her

12   expertise would be helpful to a factfinder.  Ms. Denson acquired expertise in children's

13   programming from over two decades at Viacom distributing children's programming over video

14   platforms.  *See* Denson Rep. at 1.  Although she applied only "simple arithmetic" to the data, her

15   expertise will assist the jury in interpreting hundreds of pages of YouTube analytics and metrics

16   reports for 62 of the BabyBus videos accused of infringement.  *See Spintouch, Inc. v. Outform,*

17   *Inc.*, No. SACV82100840DOCADS, 2022 WL 17363902, at *6 (C.D. Cal. Sept. 28, 2022)

18   ("Though [the expert] performed simple arithmetic, the Court finds that argument to be

19   insufficient grounds for exclusion."); *McMorrow v. Mondelez Int'l, Inc.*, No. 17-CV-2327-BAS-

20   JLB, 2021 WL 859137, at *6 (S.D. Cal. Mar. 8, 2021) ("[T]he Court disagrees that [the expert's]

21   use of a simple arithmetic formula to calculate actual damages makes his opinion unreliable or

22   unhelpful to a factfinder.").

23        Ms. Denson's expert testimony as to the YouTube analytics is also relevant and supported

24   by reliable facts and data.  Her conclusions are directly relevant to the issue of causation: her

25   analysis of the YouTube metrics purport to show that the Super JoJo videos have independent

26   appeal, challenging Moonbug's claim of causation of damages by infringement.  Her dataset is

27   also sufficient.  Ms. Denson opines that: "In addition, the data I reviewed shows that CoComelon

28   videos were viewed prior to the viewing of a Super JoJo video only 379 times out of 2.9 million

                                            3

views (.013%).  Further, in 94% of the Super JoJo videos I reviewed, a preceding Super JoJo video was the sole source of discovery for the reviewed video."  Denson Rep. at 16.  Moonbug argues that these numbers only pertain to the 62 videos Ms. Denson reviewed and should not be representative of the 76.3 million views generated by the 392 total videos.  MTE Denson at 5. Although Moonbug challenges Ms. Denson's dataset as a "partial and incomplete" dataset, MTE Denson at 5, Ms. Denson expressly states that her findings are premised only on the set of videos she reviewed.  Simply because Ms. Denson did not have access to the full 392 video dataset does not mean she cannot opine on the 62 videos she did have access to.  So long as she makes clear that the 0.013% metric and the 94% metric are based on the limited dataset—which she does— then a jury would not be led to the believe that the metrics are necessarily representative of the full 392 videos.  *See* Denson Rep. at 16 (caveating the metrics with "the data I reviewed" and "the Super Jojo videos I reviewed").  Any resulting limitation on the power of her testimony may be highlighted on cross-examination.

Moonbug also alleges that Ms. Denson cannot remember or point to which 62 videos she included in her analysis.  In her deposition, Ms. Denson says:

> A. I reviewed all the materials I was given and tallied 62 of these. I don't -- I don't know if you want to go through each one and ask me because I don't remember the names of the videos. I did them by Bates numbers, right, so -- but I wouldn't know that either, so don't ask me the Bates numbers.
>
> . . .
>
> Q. Are you able to tell me which subset of those 392 materials constitute this 62 videos for which you analyzed data in reaching your second opinion?
>
> A. They're within the documents I've listed. Say the 62 YouTube reports are within the Bates documents as a subset to the video files of the 392.
>
> Q. Okay. Are you able to identify those Bates numbers for me for the 62 videos?
>
> A. I don't have that handy.
>
> Q. Where is that information?
>
> A. Within each document.

United States District Court
Northern District of California

1   Docket No. 291-2 Exh. C (Deposition of Denise Denson ("Denson Dep.")) at 104–110.  Although

2   Ms. Denson could have structured her report to expressly identify the titles of the 62 videos she

3   considered, Babybus proffers that it is possible to identify the 62 videos pertaining to accused

4   videos of the 66 metrics reports listed on Ms. Denson's disclosed list.  All 62 came from that set.

5   Thus, Ms. Denson's analysis does not meet the bar of being so "unnecessarily difficult, if not

6   impossible, to test or replicate" that it warrants exclusion.  *Dueker v. CSRT Expedited Inc.*, No.

7   218CV08751MCSFFM, 2020 WL 7222095, at *4 (C.D. Cal. Dec. 7, 2020) (citing *Daubert*, 43

8   F.3d at 1319 n.11).

9          The remainder of Moonbug's arguments to exclude Ms. Denson's report constitute

10   Moonbug's suggestions of alternate methodologies or search terms that Ms. Denson could have

11   conducted.  *See, e.g.*, MTE Denson at 7–9 (challenging Ms. Denson's report for not looking for

12   search terms associated with CoComelon outside of "coco," challenging her report for only

13   considering videos that immediately preceded some Super JoJo views, challenging her report for

14   not analyzing video suggestions from the YouTube algorithm).  A difference of expert opinion is a

15   question for the jury.  *See McMorrow v. Mondelez Int'l, Inc.*, No. 17-CV-2327-BAS-JLB, 2020

16   WL 1237150, at *4 (S.D. Cal. Mar. 13, 2020) (finding an expert's "minority view" admissible

17   "because [his] opinions in this case are also based on his review of materials, his research, the

18   studies he has conducted, and his education and training").  The methodology may be subject to

19   critique but is not fundamentally flawed so as to warrant exclusion.  Moonbug is free to cross-

20   examine at trial.

21          The Court thus **DENIES** the motion to exclude Ms. Denson's opinions.

22   B.    Motion to Exclude Opinion of Dr. Ellen Seiter (Docket No. 288)

23          Dr. Seiter is the Director of the Academy of Film, and Chair Professor for Film and Media

24   Studies at Hong Kong Baptist University with over four decades of academic experience.  Docket

25   No. 291-1 (Declaration of Deborah Hedley) Exh. A (Report of Ellen Seiter ("Seiter Report")) at 5.

26   Her expert rebuttal report of Moonbug's expert Fran Krause concludes that any similarities

27   between BabyBus' Super JoJo works and Moonbug's CoComelon works are attributable to

28   features that are not original to Moonbug and pervasive throughout the children's entertainment

United States District Court
Northern District of California

5

genre. *Id.* at 2.

Moonbug seeks to exclude Dr. Seiter's testimony. Docket No. 288 (P's Motion to Exclude Seiter ("MTE Seiter")). Moonbug objects, specifically, to Dr. Seiter's opinions that (1) that Moonbug's copyrighted works are "almost entirely derivative of earlier works in the same genre" for failure to disclose the underlying facts, (2) that CoComelon's JJ is unprotectable because protectability is irrelevant, and (3) on child development, including how infants grow teeth or accomplish milestones, because she has no specialized expertise in the area. *Id.* at 1.

First, Dr. Seiter's testimony complies with the disclosure requirements of Rule 26. Moonbug argues that Dr. Seiter does not identify in the report all the materials she considered in coming to her own understanding of what her "children's entertainment genre" contains. In her expert report, Dr. Seiter opines:

> ¶ 1. The copyrighted works asserted by Moonbug are almost entirely derivative of earlier works in the same genre, and show a low degree of originality (if any). It is my understanding that Moonbug must show BabyBus copied elements of its videos that are original, and Moonbug has not made that showing, because the elements it has identified as "copied" are not original.
>
> . . .
>
> ¶ 3. Even combinations of the 121 "substantially similar" elements identified by Moonbug are not original to Moonbug, because the same elements, in the same combinations, may be found throughout the children's entertainment genre (including in competing works such as LooLoo Kids, Little Baby Bum, Little Angel, and Dave and Ava). In effect, the locus of elements identified by Moonbug describes most works in the genre, and thus even combinations of the elements are not original to Moonbug.

Seiter Report. Under FRE 26(a)(2)(B)(ii), a testifying expert must disclose "the facts or data considered by the witness in forming" his opinions. Fed. R. Evid. 26(a)(2)(B)(ii); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) ("[I]n federal court . . . an expert witness must produce all data she has considered in reaching her conclusions."). Dr. Seiter has sufficiently disclosed the videos she considered in forming her expert opinion: in Appendix C to her expert report, she lists out over one hundred links to YouTube videos that she considered, *see* Seiter Report Appendix C, and cites to specific animated children's shows to demonstrate which combinations of elements were found in both CoComelon and other shows, *see* Seiter Report Appendix B. In its motion to

United States District Court
Northern District of California

6

exclude, Moonbug mischaracterizes Dr. Seiter's deposition testimony—she does not admit that Appendix C is missing disclosures to videos that she considered; rather, she admits that Appendix C does not contain *titles* of videos that she considered, only the direct links; and she describes that Appendix B only contains examples of other shows with commonalities, not a comprehensive list. MTE Seiter at 3–4.

Second, Dr. Seiter's opinions about the protectability of JJ are relevant and not foreclosed by the Court's summary judgment order.  Moonbug argues that the Court has already decided that JJ is protectable and should entirely exclude Seiter's opinion about JJ being unprotectable.  MTE Seiter at 7–8.  Indeed, in its summary judgment order, the Court did decide that Moonbug's JJ character (1) has have physical and conceptual qualities, (2) is sufficiently delineated to be recognizable as the same character, and (3) is especially distinctive with unique elements of expression—and concluded that JJ "is a copyright protectible character."  Docket No. 242 (Summary Judgment Order) at 12–16.  However, the jury still must consider which elements or combination of elements were "protectable" or "unprotectable" in conducting the extrinsic test of the infringement analysis.  *Id.* at 19–20.  Expert testimony would still be necessary because "[a] reasonable jury may also agree with BabyBus's expert [Seiter] and find the selection and arrangement of the Identified Elements in common have little creativity considering the other works in the Genre."  *Id.* at 22.  A jury must "filter out' the unprotectable elements of the plaintiff's work—primarily ideas and concepts, material in the public domain, and scènes à faire (stock or standard features that are commonly associated with the treatment of a given subject)."  *Rentmeester v. Nike, Inc.*, 883 F.3d 1111, 1118 (9th Cir. 2018), *overruled in part on other grounds by Skidmore as Tr. for Randy Craig Wolfe Tr. v. Led Zeppelin*, 952 F.3d 1051 (9th Cir. 2020).  Thus, Dr. Seiter's opinions about the protectability of elements of JJ are still relevant at this stage.  However, the elements on which Dr. Seiter may opine as to protectability shall be limited to those which Moonbug asserts are common with the Babybus' JoJo.  Under the extrinsic test, filtering occurs after the commonalities are identified.  *See Corbello v. Valli*, 974 F.3d 965, 974 (9th Cir. 2020).

Third, Dr. Seiter's opinions as to specific timing of milestones in child development are

United States District Court
Northern District of California

outside the scope of her expertise.  Under Rule 702, a witness may be qualified as an expert if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702; *Edwards Lifesciences Corp. v. Meril Life Scis. Pvt. Ltd.*, No. 19-CV-06593-HSG, 2022 WL 254348, at *2 (N.D. Cal. Jan. 27, 2022) ("Courts consider a purported expert's knowledge, skill, experience, training, and education in the subject matter of his asserted expertise.") (citing *United States v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000)).  Dre. Seiter has background and expertise in film and media studies; she has been a professor in Film and Media Studies for 42 years and she holds a Ph.D. in Radio-TV-Film and an MFA in Radio-TV-Film.  *See* Seiter Report at Appendix A.  She has authored several books and articles on the topics of children and media, such as "The Internet Playground: Children's Entertainment, Access and Mis-Education," "Sold Separately: Children and Parents in Consumer Culture," and "Parents and Teachers Negotiating Children's Knowledge of the War in Iraq."  *See* Seiter Report at Appendix A.  While Dr. Seiter's professional expertise touches lightly on the subject of children and media, that does not appear to be a major focus of her work nor does she appear to have any other source of experience with children's physical, emotional, and social development.  Thus, lacking the specialized knowledge necessary to render an expert opinion, Dr. Seiter's opinions as to specific timing of milestones in child development are excluded.  *See, e.g.*, *Snyder v. Bank of Am., N.A.*, No. 15-CV-04228-KAW, 2020 WL 6462400, at *4 (N.D. Cal. Nov. 3, 2020).

For instance, the Court excludes:

- "In most children, the central incisors appear first." *Id.* at 120.
- "It is commonly accepted that all babies begin to coo and gurgle between the ages of 1 to 3 months." *Id.* at 126.
- "Most babies laugh by the time they are three or four months old, which is before they typically speak their first words." *Id.* at 126.
- "'Wow' being a common interjection to express surprise or awe, as well as a single

syllable word easy for infants and toddlers to understand and use." *Id.* at 127.

The following observations are not ones which require expertise and hence they too are barred:

- "Clapping is another universal milestone in motor development for infants." *Id.* at 126.
- "Crawling being a developmental stage before walking . . ." *Id.* at 128.

The Court thus **DENIES** the motion to exclude Dr. Seiter's opinions regarding the genre of CoComelon's works and JJ's protectability (except as limited herein) but **GRANTS** the motion to exclude Dr. Seiter's opinions as to the specific timing of milestones in child development.

C.      Motion to Exclude Opinion of Christian Tregillis (Docket No. 289)

Mr. Christian Tregillis is Babybus' damages expert, a financial consultant and investigative accountant with three decades of experience at private firms and in organizations such as the Economic Damages Task Force of the American Institute of Certified Public Accountants.  Docket No. 198-14 Exh. M (Rebuttal Report of Christian Tregillis ("Tregillis Report")), Appendix B.  In his rebuttal report to Moonbug's damages expert Dr. Jennifer Vanderhart, Mr. Tregillis concludes that (1) Dr. Vanderhart's lost profits analysis is flawed because it overstates Super JoJo's impact on CoComelon, encompass more than CoComelon's YouTube revenue, and fail to account for non-infringing alternative videos, and (2) Dr. Vanderhart's unjust enrichment calculation fails to reduce revenues by all of Babybus' expenses. *Id.* at 3–4.  Mr. Tregillis suggests corrections to Dr. Vanderhart's methods and calculates Moonbug's lost profits and Babybus' profits using his suggested methods.  *Id.*

Moonbug seeks to exclude Mr. Tregillis' testimony on damages.  Docket No. 289 (Motion to Exclude Tregillis ("MTE Tregillis")).  Specifically, Moonbug challenges Mr. Tregillis' opinions on deductible expenses, Babybus' profits attributable to other facts, and use of a non-infringing alternative.  *Id.* at 1.  Moonbug argues that these opinions should be excluded for violating FRE 702, including because they are not based on specialized knowledge, not supported by sufficient facts and data, reliable principles and methods, or the law, and would not help the jury determine damages.  *Id.* at 2.

First, as to Mr. Tregillis' testimony on deductible expenses from Babybus' revenue, Moonbug argues that Mr. Tregillis "does not provide any expert opinion or testimony on that

allocation" but rather "relies entirely on unreliable allocation data compiled by Defendants' lay witness employees that was neither maintained in the ordinary course of business, nor produced in discovery" that was prepared specifically for litigation.  MTE Tregillis at 1.  The Court declines to exclude on this basis.  The report is clear that Mr. Tregillis has personal knowledge of the methodology applied to create the data.  Mr. Tregillis' report explains that he calculated "analysis of expenses to deduct from BabyBus's revenue on the videos at issue, guided by these Model Jury Instructions and case law."  Tregillis Report.  He explained in further detail how he calculated expenses:

> ¶ 168. To calculate the amount of expenses that fall into the three categories of production, distribution, and sale, I used information from BabyBus's business records and internal accounting system, which has been used to generate the company's financial statements, whose system, internal controls, and financial statements have been audited by the company's external auditor, Ernst & Young. I also spoke with internal BabyBus personnel.

> ¶ 169. These expenses fall into groups as follows:

> • Personnel expenses incurred only for Super JoJo (e.g., payroll expenses of personnel who only worked on Super JoJo)

> • Personnel expenses incurred that relate to individuals who worked on Super JoJo and other properties/videos (e.g., Baby Panda)

> • Other expenditures that were for the benefit of only Super JoJo

> • Other expenditures that relate to Super JoJo and other properties

> ¶ 170. The company has also incurred expenses associated with individuals and other expenditures that only relate to other productions, as well as expenses that are not incurred related to the production, distribution, and sale of BabyBus properties. For example, I have excluded from deductible costs all personnel expenses relating to the individuals from BabyBus's accounting and finance department.

> ¶ 171. To accurately estimate the expenses that could be deducted from the revenue at issue, I spoke with internal BabyBus personnel: Lifang Tang, Naiyong Yan, Xunjie Zhang, and Lei Sun. I understand that this process, which involves the allocation of shared costs, some of which are overhead, is consistent with the Ninth Circuit Model Jury Instructions I cite above ("Expenses are all [operating costs] [overhead costs] [and] production costs incurred in

United States District Court
Northern District of California

> producing the defendant's gross revenue.") To implement this, I explained that I wanted to quantify BabyBus's costs that fell into the deductible expense categories I reference above, and the company provided reports to show me what the figures were, by year, in the four categories I reference in the bullets above. I then explained that for shared expenses I needed to allocate those expenses between Super JoJo and other properties, based on the time spent by the personnel at issue, as well as which properties received the benefits of shared expenditures (e.g., server costs).

Tregillis Report.  Although Mr. Tregillis admits that he did not pull records himself, he does explain the underlying process that took place:

> ¶ 172. I understand that to effectuate the processes I defined and explained, BabyBus personnel went through the data from BabyBus's records and accounting system, and looked at time records where available to allocate costs. Where there were no time records, BabyBus personnel with whom I spoke conducted interviews to instruct the allocation of time between properties.

> ¶ 173. The results of these processes and analyses, making use of business records kept in the normal course of business, bank records, invoices, and interviews with personnel, are shown in my Schedule 8.1.

Tregillis Report.  "The fact that [an expert's] opinions are based on data collected by others is immaterial; Federal Rule of Evidence 703 expressly allows such opinion testimony." *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1142 (9th Cir. 1997).  Mr. Tregillis was involved in the collection of the data on which he relies, having personally instructed BabyBus personnel on what types of data needed to be identified and how expenses were to be allocated.  Moreover, other witnesses have verified that the underlying data is reliably kept in the regular course of business.  Docket No. 321-6 (Stake Decl.) Exh. F (Tang Dep.) at 17–18 ("Q: And does BabyBus' financial accounting software maintain financial records as it relates to Super JoJo specifically? . . . A: In our financial record, we keep all financial information of the company."); *id.* at 57–58 (listing "[d]epreciation cost, cost for consignment of development, expenses for benefits, material cost [and] costs associated with business trips, with promotions, and some expenses for consultation, certification and others" for the Super JoJo project).  Whether it is "credible that Defendants were able to carefully reconstruct and verify – in four days – the fraction of time four dozen employees spent on Super JoJo projects directed to the United States only, over a period of three and a half years," MTE Tregillis at 6, amounts to speculation by Moonbug that does not

United States District Court
Northern District of California

1    warrant exclusion of Mr. Tregillis' expert opinion.  Instead, it is a matter that may be inquired into

2    on cross-examination.

3        Second, as to Mr. Tregillis' testimony on apportionment of Babybus' revenue, Moonbug

4    argues that Mr. Tregillis' opinion is "purely speculative" as to Babybus' actual Super JoJo profits.

5    MTE Tregillis at 1.  Specifically, Moonbug challenges Mr. Tregillis' modification of a 32.8%

6    "lost views factor" (percentage of Super JoJo views that would have gone to CoComelon in a

7    hypothetical world without Super JoJo) from Dr. Vanderhart's report to estimate profit:

8            ¶ 176. Dr. Vanderhart estimated that the portion of Super JoJo traffic
             that would have gone to Plaintiffs in the but-for world is 32.8%. I
9            understand this to represent the portion of Super JoJo video views
             that would have gone to CoComelon in the but-for world in which
10           the SJJNR channel did not exist, such that a portion of the SJJNR
             videos that allegedly use the copyrights-in-suit would have gone to
11           CoComelon (32.8%). As I have described above, I believe that this
             is an overstatement of the portion of video views that would have
12           gone to Plaintiffs/CoComelon in the but-for world, with a
             conservative corrected percentage of 14.5% (removing Super JoJo
13           from MFK, including August 26–31 as YouTube take-down days,
             and using Pandobi as a non-infringing alternative).

14

15   Tregillis Report.  Moonbug argues that Mr. Tregillis does not satisfy Babybus' burden to

16   "apportion[] profits attributable to factors other than infringement."  MTE Tregillis at 8 (citing

17   *Lucky Break Wishbone Corp. v. Sears Roebuck & Co.*, 373 F. App'x 752, 757 (9th Cir. 2010)).

18   Mr. Tregillis' simplistic use of the lost views factor to approximate apportioned profits is not so

19   unreliable as to justify exclude this opinion.  Mr. Tregillis explains that he modified the lost views

20   factor with "fixes/improvements" to (1) remove Super JoJo Nursery Rhymes from the MFK

21   group, (2) include August 26–31 as YouTube take-down days, (3) treat Pandobi as a non-

22   infringing substitute, and (4) correctly use YouTube revenue rather than total revenue.  Tregillis

23   Report ¶ 139.  The described methodology is not irrational or illogical.  Moonbug may cross-

24   examine Mr. Tregillis on these choices in methodology at trial.

25       Third, as to Mr. Tregillis' testimony on non-infringing alternative to Super JoJo, Moonbug

26   argues that Mr. Tregillis improperly relies on patent law theories to argue that Moonbug's

27   disgorgement and lost profits damages should be reduced because Babybus would have profited

28   from a non-infringing alterative show Super Pandobi if they had not launched the Super JoJo

                                          12

show.  MTE Tregillis at 1.  Moonbug argues that Mr. Tregillis is speculating that "in a but-for world where Defendants do not infringe CoComelon, Defendants would have created and promoted some other non-infringing content."  MTE Tregillis at 11.  Not so.  The Super Pandobi channel had actually been active and Mr. Tregillis used actual metrics to quantify the popularity of Super Pandobi as an alternative.  Mr. Tregillis accounted for the views that the Super Pandobi channel accumulated—114.4 million views over the 6 months that it was active—which was 30.3% to 37.5% of the views that the Super JoJo channel had—377.3 million views in first 6 months.  Tregillis Report at 50–52.  He then concluded that, as a conservative estimate, "had Super JoJo Nursery Rhymes never been launched, and the Pandobi channel launched in its place, that channel, without infringing any of the alleged copyrights-in-suit, would have been able to do 30.3% of the video views that it has, which is 69.7% lower than it did." *Id.* at 52.  Moonbug does not challenge Mr. Tregillis' assumption that Super Pandobi would be a perfect noninfringing alternative—thus obtaining all of the Super JoJo views in an alternate world in calculating viewership—but rather challenges Mr. Tregillis' consideration of a noninfringing alternative altogether.  There is no legal impropriety in considering a noninfringing alternative in this case.  While this court has indeed excluded expert opinions for the consideration of "non-infringing alternatives," the Court finds that there is little danger that the alleged infringer here "could avoid disgorgement by claiming he could have substituted some non-infringing alternative."  *Oracle Am., Inc. v. Google Inc.*, No. C 10-03561 WHA, 2016 WL 1743154, at *3–4 (N.D. Cal. May 2, 2016) (rejecting "the use of non-infringing alternatives in the context of disgorgement").  Because Super Pandobi actually exists, Mr. Tregillis' consideration of Super Pandobi—and his correction to Dr. Vanderhart's calculations that did not fully account for Super Pandobi—is not actually a speculative hypothetical "non-infringing alternative" but rather a correction of Dr. Vanderhart's apportionment of infringing and non-infringing views.  D's Opp. to MTE Tregillis at 13.  It is reasonable for an expert to assume that Super Pandobi does not infringe (there are no outstanding infringement claims) and that Pandobi would be an acceptable substitute in the eyes of Super JoJo viewers (both intended for audiences of kids under age 13).  To the extent that Mr. Tregillis' assumption that Super Pandobi would obtain all of Super JoJo's views, Mr. Tregillis' reasoning

that "in the but-for world BabyBus would develop and release a property such as Pandobi and promote that property as BabyBus has promoted Super JoJo, such that a percentage of Super JoJo viewers would view that instead of CoComelon," Tregillis Report at 50, sufficiently supports his calculations.  Moonbug may cross-examine Mr. Tregillis as to other factors he may have considered or not considered.

The Court thus **DENIES** the motion to exclude Mr. Tregillis' expert testimony on damages.

D.     Motion to Exclude Opinion of Frank Saperstein (Docket No. 290)

Frank Saperstein is a producer, writer, director, and studio executive with over 30 years of experience in the creation, development, production, financing, marketing, and distribution of television, film and short form video content for children and families.  Docket No. 194-17 (Report of Frank Saperstein ("Saperstein Report")) at 1.  He had provided award-winning animated content for broadcasters and digital platforms including Disney, Nickelodeon, Cartoon Network, NBC/Universal, PBS, BBC, CBC, Amazon Prime, Hulu, and YouTube; his works include modern children's classics such as the pre-school show "Peppa Pig." *Id.*  On behalf of Babybus, Mr. Saperstein identifies the creative elements that are common to the genre of preschool videos at issue in this case and compares the use of these elements among the main participants in this genre. *Id.* at 3–14.  He concludes that across the over 14 channels in the preschool genre on YouTube, there are "numerous standardized and overlapping elements and techniques" that results in videos that are "effectively interchangeable substitutes for on another." *Id.* at 14–15.

Moonbug seeks to exclude Mr. Saperstein's "identification of a 'genre' of shows like CoComelon" for (1) being based on undisclosed YouTube searches and research, (2) being skewed by confirmation bias of the primary search term "CoComelon."  Docket No. 290 (Motion to Exclude Frank Saperstein ("MTE Saperstein")) at 1.  Moonbug argues that Mr. Saperstein's methods conflict with what Babybus' other expert Dr. Seiter defines as the relevant genre in this case. *Id.* at 1.  Lastly, Moonbug argues that the Court should exclude Mr. Saperstein's opinion that baby characters are interchangeable stock characters. *Id.* at 1.

United States District Court
Northern District of California

1    First, Mr. Saperstein's opinion is properly based on disclosed facts and data.  Under FRE

2    26(a)(2)(B)(ii), a testifying expert must disclose "the facts or data considered by the witness in

3    forming" his opinions.  Fed. R. Evid. 26(a)(2)(B)(ii); *see also Biestek v. Berryhill*, 139 S. Ct. 1148,

4    1154 (2019) ("[I]n federal court . . . an expert witness must produce all data she has considered in

5    reaching her conclusions.").  Contrary to Moonbug's argument, Mr. Saperstein does disclose all

6    the videos that he based his opinion on, including details of fourteen separate video channels of

7    animated musical videos for preschoolers that utilized 3D CGI animation:

8    　　　Both the CoComelon and Super JoJo channels and videos are part of
     a genre of animated videos for preschoolers featuring songs and
9    nursery rhymes about sharing, bedtime, eating vegetables, colors,
     and the like. Other channels that air content in this genre include
10   ChuChu TV, LooLoo Kids, BillionSurpriseToys, Little Baby Bum,
     Little Angel, Videogyan, Little Treehouse, TooToo Boy, Baby Joy
11   Joy (Joy Joy World), Junior Squad, Bebefinn, NuNu Tv, Sweet
     Songs and YooYoo Kids. Each of these channels has more than one
12   million subscribers on YouTube. Each of these channels employs
     overlapping and universally reprocessed storylines, songs, family
13   composition (generally including a toddler with a nuclear family of
     Mom and Dad with two older siblings), grandparents, stuffed and
14   real animals, everyday settings, vibrant colors, recognizable music,
     soothing voices, cartoony sound effects (sometimes), basic camera
15   framing, simple CD CGI animation design, rigging and animation
     style. These channels offer content that all utilizes the same basic
16   tropes, themes, songs, storylines, characters and other conventions
     that makes their content largely interchangeable to the consumer. It
17   is the use of the conventions listed above that defines the genre.

18   Docket No. 194-17 (Saperstein Report) at 2–3.  Moreover, Mr. Saperstein lists well-known songs

19   that often dictate the storyline of videos, *see* Saperstein Report Exh. C, a detailed illustration of the

20   physical similarities among characters in the nuclear families common to the genre, *see* Saperstein

21   Report Exh. D, and a detailed illustration of the toddler characters from several of the channels

22   that produce videos in the genre, *see* Saperstein Report Exh. E.  There is enough specificity in his

23   identification of the documents he considered; for instance, he lists the titles, upload date,

24   hyperlink, and exhibit number of each of the YouTube videos that he considered.  *See* Saperstein

25   Report Exh. C at 1–8.

26   　　　Moonbug's argument challenges not Mr. Saperstein's failure to disclose the underlying

27   facts and data of his report, but rather the fact that he did not meticulously document the *process*

28   that led him to these example video channels.  But Mr. Saperstein is not obligated to do so.  *See*

1   *Utne v. Home Depot U.S.A., Inc.*, No. 16-CV-01854-RS, 2022 WL 1443338, at *4 (N.D. Cal. May

2   6, 2022) (declining to exclude expert opinion based on failure to disclose "drafts of the tool he

3   used to then produce his opinion"); *see also* Fed. R. Civ. P. 37(c)(1) (providing exception to

4   exclusion when failure to disclose "was substantially justified or is harmless").  What he relied on

5   was disclosed.  If Moonbug believes the selection was based or not representative, they can

6   demonstrate on cross-examination.  In any event, his deposition reveals that he did disclose the

7   broad strokes of the search parameters that led him to the videos that he based his opinion on:

8           Q. And how was the material that's indicated within the exhibits
            identified?
9
10          A. The Moonbus and -- Moonbug and Babybus materials were
            provided to me as indicated by counsel, and most of the -- all of the
11          other videos were through exploration via YouTube.

12          Q. Let me see if I understand this.· All of the videos cited in your
            report that are not produced by Moonbug or Babybus were located
13          by you through searches or exploration via YouTube; is that correct?

14          A. That is correct.

15          . . .

16          Q. What do you mean by common to the genre?

17          A. Exactly what common to the genre means. It's something that is
            common amongst like things.
18
            . . .
19
            Q. And now can you walk me through the process of your
20          exploration on YouTube for finding the third-party content
            providers cited in your report?
21
            A. I started with typing in CoComelon, seeing what the search
22          engine would bring me and then started following leads that were
            provided to me, and as I went through those videos started finding
23          things that fit within certain parameters that I felt these videos
            contained.
24
            Q. So tell me the parameters -- strike that. What were the certain
25          parameters that you felt these videos contained?

26          A. Basically the parameters that are issued in my report.

27          . . .

28          Q. And what were the parameters that you used to determine what
            videos would make it into your report?

16

1    A. As I viewed the material, I started to further identify similarities

2    between various sites and types of videos.

3    Q. And what were the parameters that you used?

4    A. The parameters evolved as I watched the videos based on what I

     saw.

5    Q. And what parameters were those?

6    A. Things -- elements that were similar across various videos or

7    types of videos.

     Q. I'm asking you to identify what those similarities or elements are.

8

9    A. First is the use of music for nursery rhymes as the driving force

     in the story.· Second would be 3D animation, the prominent use of a

10   toddler or baby character, the presence of a nuclear family of a

     particular makeup, which evolved as I watched videos, the time

11   length of the videos.  Those are some of the ones that immediately

     come to me.

12   Q. Sitting here today, do you recall any other of the elements or

13   parameters that you use to select the videos or channels that made it

     into your report?

14   A. No.

15   Q. And did you save your searches on YouTube and the search

16   results?

17   A. I do not believe so.

     Q. And why not?

18

19   A. I was not instructed to do so.

20   Q. Other than searching for CoComelon in -- or on YouTube, did

     you perform any other searches?

21   A. Well, as I searched for various videos, I then searched other sites

22   as indicated, like LooLoo Kids or NuNu TV.· As the various sites

     came up, I would then explore them.

23   Q. So I'm just asking what searches, did you -- what searches did

     you type into the search bar in YouTube other than CoComelon?

24
     A. Nursery rhyme, preschool, musical content. I honestly do not

25   recall all of the different searches that I would have done.

26   Docket No. 291 Exh. G (Saperstein Dep.) at 13:23–18:3.

27       Second, Mr. Saperstein's opinion is not obviously skewed by confirmation bias simply

28   because he used the primary search term "CoComelon."  Mr. Saperstein extensively explains why

he selected the channels to include in his report, including consideration of the subscriber amount

("one million plus subscribership") and creative elements:

> Q. And so -- did you include every channel that came up in the
> search results for CoComelon in your report?

> A. No.

> Q. Why not?

> A. Because some of those channels did not fit the overall, as you
> would say, conventions of what I identified as the specific genre.

> Q. Did you identify the genre before or after the conventions?

> A. I identified the genre as I was exploring the videos and learning
> the conventions -- or uncovering the conventions.

> Q. Is there any channels or videos that met the conventions that are
> not included in your report?

> A. I'm sure there are.

> Q. And why aren't they in your report?

> A. As I stated in the report, I limited the channels I focused on to
> one million or more subscribers.· I'm sure there are other channels
> out there that have fewer subscribers with similar content. . . . The
> sites that would have the most eyeballs ·is how I interpret that,
> hence my processing of the one million plus subscribership.

> Q. So the number of subscribers to the channel was the metric that
> you used to determine whether it was a main participant in the
> genre?

> A. For the purpose of this report, yes.

> Q. Any other principle or method that you used to identify the main
> participants in the genre?

> A. Well, it was the creative elements that are listed within the report.

> Q. So you used the creative elements listed in the report, as well as
> the amount of subscribers for a channel, to determine whether a
> particular channel was a main participant in the genre?

> A. I identified the genre by looking at videos and finding these like
> elements that seemed common across this preschool musical genre
> of short-form videos. Once I identified those various elements, I
> focused the report on the sites with one million or more subscribers
> that I was able to identify.

> Q. And how did you compare the use of common elements among
> the main participants in the genre?

United States District Court
Northern District of California

18

A. By watching the videos and drawing on my 38 years of experience.

Docket No. 291 Exh. G (Saperstein Dep.) at 18:7–19:4, 21:1–21:25 (emphases added).  Mr. Saperstein's opinion is based on his many decades of relevant experience and is sufficiently reliable for the purposes of *Daubert*.  That Mr. Saperstein and Dr. Seiter provide different definitions of the relevant "genre" here with which to compare to CoComelon does not mean that their opinions are mutually exclusive.  *Compare* Saperstein Report at 2–3 (defining the genre as "animated musical videos for preschoolers") *with* Seiter Report at 208 (defining the genre as ""subgenre of 3D animated, musical YouTube channels for children").  "Animated musical videos for preschoolers" may very well encompass a similar set of videos as a "subgenre of 3D animated, musical YouTube channels for children."  Nor does the fact that Mr. Saperstein and Dr. Seiter include a different list of representative genre-defining videos.  *Compare* Saperstein Dep. at 86–87 (not including the film The Incredibles) *with* Seiter Report at 123 (including The Incredibles).  That two experts don't define the genre using precisely the same name or list precisely the same representative videos does not warrant exclusion of either on a *Daubert* motion, so long as their methodologies are reasonably sound.  *See Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1023–24 (9th Cir. 2022) ("These concerns [that the expert report conflicts with other testimony] speak to corroboration, not foundation, and are properly addressed through impeachment before a jury at trial—not exclusion by a district judge at the admissibility stage.").  Moonbug is free to cross-examine Mr. Saperstein on his methodology of selecting videos at trial.  *See Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").  The Court thus **DENIES** the motion to exclude Mr. Saperstein's opinions identifying a genre.

Lastly, Mr. Saperstein's opinions that JJ is a stock character or interchangeable with other baby characters in the genre is relevant, at least as to application of the extrinsic test.  Mr. Saperstein opines:

In the majority of the videos in this genre the families appear similar

in their makeup and character design. For example, the families in the genre almost always consist of prototype, cookie-cutter characters, of happy demeanor, predictable behavior, and similar physical proportions, including the lead toddler, 30/40 something appealing and fit Mom and Dad, with two older siblings (most often a boy and a girl, 5 to 12 years in age), a family pet, and grandparents.

. . .

These families and characters are virtually interchangeable elements between the different videos and channels in the genre. One could take the mom or the dad or a sibling from LooLoo Kids or Little Angel or Nu Nu Tv or any other channel and drop them into the CocoMelon, Super JoJo, or BillionSurpriseToys world, and it would barely be noticeable or make a difference to the story. These videos generally lack familial diversity and instead tend to employ a traditional nuclear family with a mom, dad, toddler, older brother and sister.

Saperstein Report at 10–11.  Moonbug argues that these opinions should be excluded because the Court has already ruled that CoComelon's JJ is a distinctive, copyrightable character and so opinions on CoComelon's originality are irrelevant.  MTE Saperstein at 6.  As explained above in the Court's decision on the motion to exclude Dr. Seiter's opinions, *supra*, the Court did conclude that JJ "is a copyright protectible character," Docket No. 242 (Summary Judgment Order) at 12–16, but the Court left to the jury the question of which elements or combination of elements were "protectable" or "unprotectable" in conducting the extrinsic test of the infringement analysis, *id.* at 19–20.  Expert testimony will assist the jury in whether they choose to "agree with Moonbug's expert and find the combined, non-trivial Identified Elements in common are 'numerous enough and their selection and arrangement original enough' to be protectable" or "agree with BabyBus's expert and find the selection and arrangement of the Identified Elements in common have little creativity considering the other works in the Genre."  *Id.* at 22; *see also Rentmeester*, 883 F.3d at 1118.  Again, however, Mr. Saperstein's testimony as to unprotectability is limited to those aspects which Moonbug contends are substantially similar between JJ and JoJo.

Additionally, Mr. Saperstein's testimony of other similar characters goes to the issue of damages.  As Babybus proffers, "Mr. Saperstein's testimony will show that any alleged harm cannot be attributed to BabyBus' alleged infringement, and that views taken by other, interchangeable substitutes [not necessarily owned by Babybus] accounts for any lost views by

CoComelon."  D's Opp. to MTE Saperstein at 16; *see also* Tregillis Report ¶ 95 (citing Saperstein Report).  The Court thus **DENIES** the motion to exclude Mr. Saperstein's opinion that baby characters are interchangeable stock characters, except as limited herein.

### III.   DISCUSSION OF DEFENDANTS' MOTIONS TO EXCLUDE

A.   Motion to Exclude Opinion of Fran Krause (Docket No. 294)

Fran Krause is an internationally award-winning director of animated films with more than 23 years of experience in the field.  Docket No. 154-3 (Opening Report of Fran Krause ("Krause Report")) ¶ 3.  He has taught animation at the college and graduate level for eighteen years, at institutions such as California Institute of the Arts and New York University in subjects such as 3D animation, animation production, and storyboarding.  *Id.*  In his expert report on behalf of Moonbug, Mr. Krause describes animation industry practices and norms in development, design, and production.  *Id.* at 4–9.  He describes the development of CoComelon and JJ by Moonbug, beginning from the founding of Treasure Studio in 2006.  *Id.* at 10–33.  After considering various dimensions of animated works, Mr. Krause concludes that CoComelon's JJ character and family characters are protectible, *id.* at 34–43, and that Super JoJo works infringe CoComelon's works, *id.* at 43–83.

Babybus requests that the Court exclude parts of the expert opinion of Mr. Krause.  Docket No. 294 (Motion to Exclude Fran Krause ("MTE Krause")).  Specifically, Babybus seeks to prevent Mr. Krause from opining on the ultimate legal question of substantial similarity, comparing the competing works, opining about the intrinsic test, explaining the factual narrative of CoComelon's development, or speculating about Babybus' state of mind.  *Id.* at 5–8.  Moonbug argues that each of Mr. Krause's expert opinions is based on reliable facts and methodology.  Docket No. 314 (P's Opp. to MTE Krause).  Babybus does not challenge Mr. Krause's qualifications as an expert.

First, as to the issue of substantial similarity, Mr. Krause opines that "BabyBus has also made many Super JoJo Video Works that even if they do not copy CoComelon videos entirely frame-by-frame, they copy CoComelon expression by copying specific plots, settings, sequence of events, character posing, shot composition, song structures and titles from other CoComelon

United States District Court
Northern District of California

United States District Court
Northern District of California

1   videos. I detail these *substantial similarities* in the works in Appendix 4." Krause Report ¶ 232

2   (emphasis added). Mr. Krause also details the "substantial similarity" of the "overall animation

3   style," "theme, mood, setting, pace, sequence and plot," "distinctive cinematography style,"

4   "title," and "theme." *Id.* ¶¶ 238–39, 241. The Court concludes that Mr. Krause is permitted to

5   testify as to the points of similarity between the works at issue here. Experts are permitted to

6   testify at trial on detailed point-by-point comparison of asserted and accused works. *See, e.g.*, *Jeff*

7   *Benton Homes v. Alabama Heritage Homes, Inc.*, 929 F. Supp. 2d 1231, 1241 (N.D. Ala. 2013)

8   (permitting expert testimony on substantial similarity "given that [the expert's] method for

9   comparing the plans to each other already has been deemed sufficiently reliable"); Fed. R. Evid.

10  704 ("An opinion is not objectionable just because it embraces an ultimate issue."); *Hangarter v.*

11  *Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004) (holding that an expert may not

12  "give an opinion as to her legal conclusion, i.e., an opinion on an ultimate issue of law" nor

13  "instruct[] the jury as to the applicable law"). Mr. Krause is not opining an ultimate legal issue,

14  but rather providing underlying factual evidence of various points of similarity on which the jury

15  will then make an ultimate legal conclusion. While the jury will ultimately determine whether the

16  two works are substantially similar, the Court finds that Mr. Krause's expert testimony regarding

17  factual similarities and differences in animation style assist the jury in deciphering the videos and

18  characters at issue. In cases involving animations, the need for expert testimony may be greater,

19  given the somewhat complex subject matter. *T–Peg, Inc. v. Vermont Timber Works, Inc.*, 459

20  F.3d 97, 116 (1st Cir. 2006) ("Moreover, the need for expert testimony may be greater in cases

21  involving complex subject matters where an ordinary observer may find it difficult to properly

22  evaluate the similarity of two works without the aid of expert testimony."). Mr. Krause's

23  background and experience as an award-winning animation professor makes him well-qualified to

24  provide expert opinion comparing two animations. The Court thus **DENIES** the motion to

25  exclude Mr. Krause's opinions on factual similarities between the works. However, the Court will

26  instruct Mr. Krause not to use the terminology "substantially similar" as to not confuse the jury,

27  which will make the determination on the ultimate issue of substantial similarity.

28       Second, as to general comparisons between the works, Mr. Krause's report sets forth

22

several statements comparing CoComelon's JJ with Super JoJo that Babybus seeks to exclude, for instance:

> ¶ 166. For example, it is my opinion that CoComelon's JJ character contains especially distinctive and unique elements in his physical expression. He has a distinctive-looking design, with large eyes, a chubby round head, and a small swooping tuft of hair above his forehead. He often wears a signature onesie at home or shorts and a t-shirt when outside, and frequently wears blue. As enumerated in Appendix 4, part 1, these elements are (1) his name, (2) shape of his large rounded head, with prominent cheeks and a slight flattening above the ears, (3) the one-color curling tuft of hair above is forehead hair, (4) thin rounded opaque eyebrows (5) extra-large eyes with rounded top lid and flattened bottom lid, large irises and pupils, (6) button nose with no bridge, (7) two front upper teeth, (8) thin lips on a mouth that is a half moon smile, (9) comparatively small body in relation to head, (10) and his characteristic yellow and turquoise pajama onesie at home or tan shorts and a t-shirt when outside. Although it may be true that other baby characters may have these traits alone or in combination, it is the way JJ expresses these traits, and the way these traits combine into a whole, that makes the character of JJ one that I consider distinctive, recognizable and original. Because we are talking about visual characteristics, it is difficult to express the subtleties in words, and instead show them in pictures:



Docket No. 154-3 (Krause Report).  Babybus argues that Mr. Krause's methodology is unreliable because he "failed to make any effort to exclude genre-specific unprotectable elements within CoComelon videos before he compared them to BabyBus' videos. Instead, he compared both unprotectable and protectable elements without ever doing anything to distinguish the two."  MTE Krause at 6.  Doing so, Babybus alleges, "departs from the legal framework the jury will have to

United States District Court
Northern District of California

apply" and will only confuse the jury. *Id.* at 7.  Moonbug argues that Babybus' argument

overlooks the portions of Mr. Krause's report that rebut Babybus' argument that each of 121

elements of expression was not original or protectable.  P's Opp. to MTE Krause at 6–7.  Indeed,

Mr. Krause's report directly addresses Babybus' argument that CoComelon characters are not

protectible because "certain of his features are nothing more than naturally occurring features

common to real-life infants and media representations of infants, or not completely unique, or

both" or because "certain elements of their design, character, mood, theme, color, set and prop

design, and look and feel, are not protectible."  Krause Report ¶ 159.  Mr. Krause then

individually lists the 121 elements of CoComelon expression.  *See* Krause Report ¶ 162; Krause

Report Appendix 4, Appendix 5.  For instance:

| Element No. | Classification | |
|---|---|---|
| 1 | Physical | Name is "JJ" |
| 2 | Physical | Large, rounded head with prominent cheeks and a slight flattening above the ears |
| 3 | Physical | Monolithic, monocolor tuft of hair above forehead |
| 4 | Physical | Thin rounded opaque eyebrows |
| 5 | Physical | Extra-large eyes with rounded top lid and flattened bottom lid, large irises and pupils |
| 6 | Physical | Button nose with no bridge |
| 7 | Physical | Two front upper teeth |
| 8 | Physical | Thin lips on a mouth that is a half moon smile |
| 9 | Physical | Comparatively small body in relation to head |
| 10 | Physical | Yellow and turquoise pajama onesie when at home, or shorts and a t-shirt when outside |
| 11 | Conceptual | Walks |
| … | … | … |

Krause Report Appendix 4.  Mr. Krause then addresses why he believes each of the elements of

expression is original and protectible, for instance, explaining:

> ¶ 171. I understand that BabyBus intends to argue that JJ's physical
> expression cannot be original because other baby images (and real
> babies) share some features that could be described using the same
> text used in my high-level descriptions of JJ's expressive features
> (e.g., that a prior baby character has been depicted with a "large
> rounded head," for example). But I do not think viewing the
> elements in isolation, at such a high level of generality, is
> meaningful. For example, focusing narrowly on the question of
> whether a character exhibits a short checklist of highly general

United States District Court
Northern District of California

> features (big head, tuft of hair, big eyes, half moon smile) would
> lead to the nonsensical conclusion that the following characters are
> not unique expression because they share a few visual
> characteristics.

Krause Report ¶ 171; *see also* Krause Report ¶¶ 171–76 (CoComelon's JJ), 177–88 (CoComelon's family characters).  Whether certain elements of expression are protectible is an issue for the jury to decide, and factual testimony about how these elements of expression manifest in the works should be permitted.  Mr. Krause has provided a reasonable and reliable analysis as to why, in his expert opinion, each of the elements is protectible.  Moreover, "even if certain allegedly copied elements are not protectable in themselves, a combination of them 'can support an infringement claim.'"  Docket No. 242 at 20 (citing *Malibu Textiles, Inc. v. Label Lane Int'l, Inc.*, 922 F.3d 946, 952 (9th Cir. 2019)); *see also Paramount Pictures Corp. v. Axanar Prods., Inc.*, No. 2:15-CV-09938-RGK-E, 2017 WL 83506, at *5 (C.D. Cal. Jan. 3, 2017), *overruled in part on other grounds by Skidmore v. Led Zeppelin*, 952 F.3d 1051 (9th Cir. 2020) ("Although each of these elements may not be individually original and . . . protectable, they are numerous enough and their selection and arrangement original enough that their combination constitutes an original work of authorship.") (internal citations omitted).  Simply because Babybus disagrees with Mr. Krause's conclusions—absent a showing of unreliable data or methodology—is not grounds to exclude Mr. Krause's expert report.  The Court thus **DENIES** the motion to exclude Mr. Krause's opinions on general comparisons between the works.

Third, as to the intrinsic test, Mr. Krause opines as to the "total concept and feel" of the two works.  For instance, in his report, he opines:

> ¶ 194. In my opinion, the entire Super JoJo franchise is a copy of
> CoComelon, and is substantially similar to CoComelon in its central
> character, family makeup and dynamic of the secondary characters,
> settings, stories, and *total concept and feel*. In my opinion, the level
> of copying in the characters, settings, and look and feel alone is so
> striking as to make it clear that any Super JoJo Video containing the
> Super JoJo characters and settings is substantially similar to
> CoComelon.

Krause Report ¶ 194 (emphasis added).  Babybus argues that this statement should be excluded because the jury should not consider expert opinion in the intrinsic test, which is a subjective comparison of the CoComelon videos and the Super JoJo videos.  *See Gray v. Hudson*, 28 F.4th

87, 96 (9th Cir. 2022) ("The intrinsic test focuses on 'similarity of expression from the standpoint of the ordinary reasonable observer, with no expert assistance.'"); *Brown Bag Software v. Symantec Corp.*, 960 F.2d 1465, 1475 (9th Cir. 1992) ("The intrinsic test . . . should measure substantial similarity in expressions depending on the response of the ordinary reasonable person. It does not depend on the type of external criteria and analysis which marks the extrinsic test.  In applying the intrinsic test, therefore, analytic dissection and expert testimony are not appropriate.") (cleaned up).  The Court agrees.  The Ninth Circuit is clear that expert opinion has no role in the intrinsic test, and Mr. Krause's expert opinion as to the "total concept and feel" goes precisely to the subjective overall comparison of the intrinsic test.  Moonbug's argument that Mr. Krause is opining on the "total concept and feel of the CoComelon *franchise*, not a comparison of the works" and "comparison of the parties' animation models, tools, and the precise movement and quality of their animated characters," P's Opp. to MTE Krause at 13, may be true as to the remainder of that paragraph of Mr. Krause's report, but does not make it permissible for Mr. Krause to opine on the intrinsic test with the terminology "total concept and feel."  Thus, the Court narrowly **GRANTS** the motion to exclude Mr. Krause's opinion expressly on the "total concept and feel."  Mr. Krause may opine as to the underlying factual comparison  and elements which may inform that ultimate question, but that ultimate question is reserved for the jury.

Fourth, Babybus seeks to generally exclude Mr. Krause's testimony offering "a factual narrative about the development of the CoComelon franchise or any of its characters."  MTE Krause at 8.  Babybus argues that it would otherwise "rehash otherwise admissible evidence" and is "properly presented through percipient witnesses and documentary evidence" such as the testimony of Moonbug employees and Treasure Studio founder Jay Jeon.  *Id.*  Babybus does not pinpoint any specific sections or types of testimony in Mr. Krause's report.  Moonbug argues that Babybus fails to identify specifically what testimony they seek to exclude.  *See* P's Opp. to MTE Krause at 13.  Moonbug also argues that Mr. Krause, as an expert witness, is entitled to explain to the jury the evidence that forms the basis for his opinions, even if it is hearsay or otherwise inadmissible.  *Id.* at 14.  The Court agrees with Moonbug.  Under FRE 703, an expert may use offer otherwise inadmissible evidence to explain the basis of his opinion, though not to prove the

United States District Court
Northern District of California

fact of the matter asserted.  *See Paddack v. Dave Christensen, Inc.*, 745 F.2d 1254, 1261–62 (9th Cir. 1984) ("Rule 703 merely permits such hearsay, or other inadmissible evidence, upon which an expert properly relies, to be admitted to explain the basis of the expert's opinion.  It does not allow the admission of the reports to establish the truth of what they assert.") (internal citations omitted).  Here, Mr. Krause would be permitted to use the trajectory of the character JJ's development— such as which features were unexpected popular or commonplace—as the basis for why he reached the expert conclusion that JJ has a physically distinctive selection and arrangement of features.  The trajectory of JJ's developed—as opposed to simply the static character as it is now—goes to what studios (such as Moonbug) understood to be elements commonplace to the genre of children's animations.  *See Ets-Hokin v. Skyy Spirits, Inc.*, 323 F.3d 763, 765 (9th Cir. 2003) ("Under the related doctrine of scenes a faire, courts will not protect a copyrighted work from infringement if the expression embodied in the work necessarily flows from a commonplace idea . . .").  The Court **DENIES** the motion to exclude Mr. Krause's testimony offering a factual narrative about the development of CoComelon, insofar as the narrative is a basis for his expert opinion.

Fifth, as to Babybus' state of mind, Babybus challenges two of Mr. Krause's opinions about what Babybus may have thought or intended.  Indeed, "the opinions of expert witnesses on the intent, motives, or states of mind of corporations, regulatory agencies and others have no basis in any relevant body of knowledge or expertise."  *Stanley v. Novartis Pharms. Corp.*, No. CV1103191JGBOPX, 2014 WL 12573393, at *6 (C.D. Cal. May 6, 2014) (cleaned up).  Looking to Mr. Krause's statements in the context of his expert report, Mr. Krause does not provide sufficient factual bases that necessitate the conclusion that Babybus was "well aware of the substantial similarity" between the works, "set out to" copy CoComelon, or "deliberately copied" the look and feel of CoComelon:

> ¶ 248. To the extent BabyBus may assert that the redesign of the Super JoJo characters and environment after Xunjie Zhang took over as Team Leader of the Planning Department addressed or reduced the degree of Super JoJo's copying and substantial similarity to copyrighted CoComelon Works, I disagree. In my opinion, the documentation and testimony regarding this redesign suggest to me that *BabyBus was well aware of the substantial similarity* between

1    Super JoJo and CoComelon, and in this redesign, doubled down in
     its efforts to copy Cocomelon.

2    . . .

3    ¶ 191. As discussed above, prior to developing Super JoJo, BabyBus
     gathered competitive intelligence that identified CoComelon as its
4    top competitor. *BabyBus then set out to* "[u]se the kids' channel
     Cocomelon as the target setting" and created a document to train
5    those working on Super JoJo development that CoComelon should
     be the focus of the visuals for Super JoJo. In my opinion, based on
6    my review of early Super JoJo videos, *BabyBus indeed did what it
     set out to do and copied CoComelon.*

7
     ¶ 192. As described above, Defendants' documentation and
8    testimony make clear that *Defendants' aim and goal for their
     Accused Super JoJo Channels was to copy* CoComelon's entire
9    show and its episodes, down to the tiniest details. To that end,
     Defendants deliberately copied the look and feel of CoComelon, the
10   characters of CoComelon, the story setting and plots of CoComelon,
     and the camera angles and movement, length, duration, visuals,
11   sounds, poses, facial expressions, and more. *Defendants admit that
     their intention and plan was for their channel to copy* the look and
12   feel of CoComelon.

13   Krause Report (emphases added) (citing Jiachun Xue Dep. at 54:20–55:6, 55:8–13 ("I believe that

14   the—the planning document wanted to have to create a look and feel similar to CoComelon's.");

15   BB_00046093; BB_00045954.  This amounts to speculation on Babybus' employees' specific

16   state of mind and is more properly the province of the jury.  Thus, the Court **GRANTS** the motion

17   to exclude the expert testimony of Mr. Krause that opines on the state of mind of Babybus.

18   B.      Motion to Exclude Opinion of Jennifer Vanderhart (Docket No. 302)

19          Jennifer Vanderhart is Moonbug's damages expert, who works as an economist and

20   Managing Director with the economics and data science firm Intensity.  Docket No. 301-7 (Expert

21   Report of Jennifer Vanderhart ("Vanderhart Report")) ¶¶ 1–4.  She has previously taught in the

22   Department of Economics and the Department of Management at Texas A&M University in

23   industrial organization, public economics, and econometrics.  *Id.* at ¶ 1.  In her expert report, Dr.

24   Vanderhart calculates CoComelon's impact on Super JoJo video traffic, CoComelon revenue, lost

25   profits damages to Moonbug ($8,087,701, revised to $4,482,308), and unjust enrichment damages

26   to Babybus ($17,350,454).  *Id.* at ¶¶ 11–12; *see also* Docket No. 301-8 (Expert Rebuttal Report of

27   Jennifer Vanderhart ("Vanderhart Rebuttal Report")) at ¶¶ 4–7.

28          Babybus requests that the Court exclude the expert report of Dr. Vanderhart, Moonbug's

United States District Court
Northern District of California

damages expert because her "methodologies for calculating damages—both for actual damages and unjust enrichment—violate fundamental principles of copyright damage law."  Docket No. 302 (Motion to Exclude Opinions of Jennifer Vanderhart ("MTE Vanderhart")) at 1.  Specifically, Babybus challenges Dr. Vanderhart's (1) failure to limit her calculations to Babybus revenues associated with viewers located within the United States, and (2) calculation of viewership and revenue based on all Super JoJo channels instead of only those associated with the accused videos.  *Id.*  Additionally, Babybus challenges Dr. Vanderhart's methodology in calculating "adjusted views" that differs from the viewership data displayed by YouTube for each video.  *Id.*

The Court declines to exclude Dr. Vanderhart's expert testimony for including revenues associated with viewers located outside the United States.  Dr. Vanderhart opines that 16% of CoComelon views are located in the United States:



Vanderhart Report ¶ 54.  In opining that Moonbug suffered actual damages of $4,482,308 and unjust enrichment damages of $17,350,454, Dr. Vanderhart calculated the "lost views" that would have gone to CoComelon but-for Super JoJo, which she then used to calculate licensing and merchandising profits that CoComelon lost.  *Id.* at 3–4.  She did not limit her calculations to the 16% of viewers limited within the United States:

> Q. . . . Of the 32.8 percent of views that went to Super JoJo that you say should have gone to CoComelon, you did an analysis of what percent of those views were within the United States versus outside of the United States?
>
> A. No. That's not the analysis I did.

Stake Decl. Exh. 5 (Deposition Transcript of Dr. Jennifer Vanderhart) at 224:13–18.  This expert

United States District Court
Northern District of California

methodology is reliable and in line with U.S. copyright law.  The parties appear to agree that the

disputed views are for videos uploaded to *YouTube's U.S. servers* and viewed by foreign viewers;

the parties do not dispute videos uploaded to non-YouTube or non-U.S. servers and viewed by

foreign viewers.  *See* P's Opp. to MTE Vanderhart at 10; D's Repl. to MTE Vanderhart at 2.

Moonbug may recover damages globally that stem from predicate, completed infringing acts

committed within the United States, such as when infringing videos are uploaded to YouTube's

U.S. servers.  It is true that—as Babybus argues—"federal copyright law does not apply to

extraterritorial acts of infringement." *Allarcom Pay Television, Ltd. v. Gen. Instrument Corp.*, 69

F.3d 381, 387 (9th Cir. 1995).  But subsequent Ninth Circuit case law clarifies that so long as an

infringing act completely occurred within the U.S., a plaintiff may recover damages flowing from

the extraterritorial exploitation of that act.  *See Los Angeles News Serv. v. Reuters Television Int'l,*

*Ltd.*, 149 F.3d 987, 992 (9th Cir. 1998), *as amended on denial of reh'g and reh'g en banc* (Aug.

25, 1998) (holding that a plaintiff "is entitled to recover damages flowing from exploitation abroad

of the domestic acts of infringement committed by defendants"); *Los Angeles News Serv. v.*

*Reuters Television Int'l (USA) Ltd.*, 340 F.3d 926, 932 (9th Cir. 2003), *as amended on denial of*

*reh'g* (Oct. 7, 2003) (limiting *Reuters* to apply to only extraterritorial unjust enrichment and not

actual damages).  Here, the relevant copyright infringement stems all from actions by Babybus in

the United States: "uploading, marketing, and selling the accused videos and merchandise via

United States vendors and video platforms."  Docket No. 115.  Dr. Vanderhart thus properly

included viewership data flowing from the global exploitation of Babybus' purported copyright

infringement which occurred on a U.S. platform.

The Court declines to exclude Dr. Vanderhart's expert testimony for including total views

across the Super JoJo channel in calculating unjust enrichment.  Babybus argues that inclusion of

all Super JoJo videos ignores the rule of copyright law that actual damages "must be suffered as a

result of the infringement." *Crunchyroll, Inc. v. Pledge*, No. C 11-2334 SBA, 2014 WL 1347492,

at *3 (N.D. Cal. Mar. 31, 2014).  This methodology does not render her expert opinion unreliable

because there are no videos on the Super JoJo channel that fall outside of Moonbug's infringement

claims in this case.  Moonbug alleges that the character Super JoJo infringes CoComelon's JJ—

United States District Court
Northern District of California

1    and Super JoJo features in every video on the Super JoJo channel.  Babybus responds that "this

2    motion is not about infringement, but about accused videos versus non-accused videos," and that

3    damages should be limited to the 368 specific video URL links that Babybus disclosed in response

4    to Moonbug's Appendix 1 to its First Supplemental Response to BabyBus' Interrogatory Number

5    1.  Docket No. 340 (D's Repl. to MTE Vanderhart) at 1.  However, even if only 368 discrete

6    URLs were disclosed, Moonbug's complaint of infringement extends to the entire Super JoJo

7    channels owned by Babybus.  The pinpointed videos are non-exhaustive examples.  *See* Docket

8    No. 307 (Amended Complaint) ¶ 22 ("The Super JoJo channels owned by Defendant BabyBus,

9    and operated by Defendants BabyBus and BabyBus Fujian, *including* the replicated video

10   characters, settings, song titles, lyrics, videos and images in them as catalogued in Exhibits 1–8

11   (collectively the 'Infringing Super JoJo Works') willfully infringe Plaintiffs' rights in the

12   CoComelon Works.") (emphasis added).  Moreover, even if Moonbug is only entitled to damages

13   for some videos—requiring a video-by-video calculation—Dr. Vanderhart testifies that "[i]f only

14   certain videos are found to infringe, I can adjust damages accordingly. If a video has been

15   removed from YouTube and exact revenue information is not available, I can allocate damages

16   based on views of the videos found to infringe as a percent of the total views. *See* Exhibit G-16

17   and Exhibit G-19."  Vanderhart Report at 44 n.165.  As explained in the following paragraph, Dr.

18   Vanderhart's use of the Tubular data in Exhibits G-19 is reasonable because the Tubular dataset

19   was the best available data at the time and available to both parties for inspection; her

20   methodology of allocation is sufficiently reliable because she uses the Tubular data to

21   proportionally calculate Super JoJo viewership.  With a reliable allocation on a video-by-video

22   basis, Moonbug has met its "statutory obligation to demonstrate a causal nexus between the

23   infringement and the profits sought."  *Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 712

24   (9th Cir. 2004)).

25          The Court also declines to exclude Dr. Vanderhart's expert testimony of "adjusted views"

26   simply for being based on Tubular data.  In all her calculations, Dr. Vanderhart used the

27   viewership data from a third party called Tubular to assign views of deleted videos unavailable

28   from Babybus and YouTube data at the time of her expert report.  Stake Decl. Exh. 3.  Dr.

United States District Court
Northern District of California

1    Vanderhart used the Tubular data to proportionally calculate how many views of the Super JoJo

2    channel were attributable to deleted videos.  *See* Docket No. 150 (Vanderhart Report) (finding that

3    142,135,623 views were for The Boo Boo Song, of 13,287,326,259 total views on the Super JoJo

4    channel, and concluding that 1.1% of 14.5 billion unaccounted views were for The Boo Boo

5    Song).  This underlying data is available for both parties' inspection.  *See* Stake Decl. Exh. G-17

6    (Raw Tubular Data), Exh. G-19 (Adjusted Views).  Babybus argues that Dr. Vanderhart's expert

7    opinion on this simple proportional allocation is unreliable because the underlying views does not

8    match the data later provided by YouTube in 2022.  *See, e.g.*, Exh. G-19 at 604 (showing that

9    video with YouTube ID fU5cYTB92EE has 601,374,404 views per YouTube but 680,400,504

10   "adjusted views").  First, simply because another dataset does not match is not a reason to entirely

11   exclude Dr. Vanderhart's opinion, which utilized the best viewership data available at the time

12   because Babybus did not provide any other data themselves.  *See Gen. Elec. Co. v. Joiner*, 522

13   U.S. 136, 146 (1997) (asserting that the focus of a *Daubert* inquiry must generally be "on

14   principles and methodology, not on the conclusions they generate"); *McCrary v. Elations Co.*

15   *LLC*, No. EDCV-13-00242-JGB (OPx), 2014 WL 12589137, at *15 (C.D. Cal. Dec. 2, 2014) ("An

16   expert opinion is not rendered inadmissible merely because the conclusion reached may not be

17   correct.").  Second, even if she used as much of the YouTube data as possible, Dr. Vanderhart

18   would still need to fill in the gaps of viewership data for deleted videos because the data that

19   YouTube later provided is still incomplete.  *See* Tung Decl. Exh. G (Supp. Vanderhart Report) ¶ 6

20   (Even with this new data, "there are still 13.8 billion or 40% of views unaccounted for on a daily

21   level, by video, out of the total 34.7 billion BabyBus views.").  Dr. Vanderhart's choice to view

22   Tubular's viewership data to allocate views by video and estimate viewership for the deleted

23   videos was sufficiently reliable for purposes of *Daubert*.  Any shortcoming of that methodology is

24   subject to cross-examination.

25          Thus, the Court **DENIES** the motion to exclude the expert testimony of Dr. Vanderhart.

26                              **IV.**      **CONCLUSION**

27          The Court **DENIES** Moonbug's motion to exclude Ms. Denson's opinions.

28          The Court **DENIES** Moonbug's motion exclude Dr. Seiter's opinions regarding the genre

of CoComelon's works and JJ's protectability (subject to a limit set forth herein) but **GRANTS** the motion to exclude Dr. Seiter's opinions as to the specific timing of milestones in child development.

The Court **DENIES** Moonbug's motion to exclude Mr. Tregillis' opinion on damages.

The Court **DENIES** Moonbug's motion to exclude Mr. Saperstein's opinions identifying a genre and opinion that baby characters are interchangeable stock characters (subject to a limit set forth herein).

The Court **DENIES** Babybus' motion to exclude Mr. Krause's opinions on similarities between the works but instructs Mr. Krause not to use the legal terminology "substantially similar," as well as **DENIES** the motion to exclude his opinions on general comparisons between the works and basic factual narrative about the development of CoComelon.  The Court **GRANTS** the motion to exclude Mr. Krause's use of the terminology "total concept and feel" and any speculation on Babybus' state of mind or intent.

The Court **DENIES** Babybus' motion to exclude Dr. Vanderhart's expert testimony for including revenues associated with viewers located outside the United States, including total views across the Super JoJo channel, and using adjusted views based on Tubular data.

This order disposes of Docket Nos. 287, 288, 289, 290, 294, and 302.


**IT IS SO ORDERED**.


Dated: June 21, 2023

_____
EDWARD M. CHEN
United States District Judge