UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MOONBUG ENTERTAINMENT LIMITED, et al.,<br><br>        Plaintiffs,<br><br>    v.<br><br>BABYBUS (FUJIAN) NETWORK TECHNOLOGY CO., LTD, et al.,<br><br>        Defendants. | Case No.  21-cv-06536-EMC<br><br>**ORDER DENYING DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW AND FOR NEW TRIAL**<br><br>Docket No. 651, 652 |

## I.      INTRODUCTION

This is a copyright infringement case tried by a jury which rendered a verdict in the Plaintiffs favor. Plaintiffs Moonbug Entertainment Limited and Treasure Studio, Inc. (collectively, "Moonbug") hold copyrights in the CoComelon franchise, including their works on the CoComelon Nursery Rhymes YouTube Channel.  Defendants Babbu Co., Ltd. and BabyBus (Fujian) Network Technology Co., Ltd. ("BabyBus Tech.") (collectively, "BabyBus") offered a competing YouTube channel under the "Super JoJo" brand.  Moonbug alleged copyright infringement by BabyBus's Super JoJo videos and misrepresentation.  After a 10 day trial, the jury found BabyBus liable for copyright infringement and misrepresentation and awarded a total of $17,718,114.00 in actual damages and lost profits.  Docket No. 579 at 6 (Jury Verdict).

BabyBus filed two post-trial motions on all claims under Federal Rules of Civil Procedure Rule 50(b)—for judgment as a matter of law, and Rule 59(a)—for a new trial.  For the following reasons, the Court denies both motions.

United States District Court
Northern District of California

## II.   **FACTS**

A.   Notice of Copyright Infringement

In 2021, Moonbug sent notice of infringement to BabyBus and YouTube, alleging that their JJ character was being infringed by BabyBus's Super JoJo character ("JoJo").  Docket No. 383-2. Since 2019, BabyBus operated the Super JoJo Nursey Rhymes YouTube channel that featured the infringing Super JoJo character. Trial Exhibit (TE) 116. The JJ character features prominently on Moonbug's CoComelon YouTube channel. Moonbug submitted DMCA takedown notices to YouTube requesting removal of the infringing JoJo videos.  *Id.* In response, BabyBus submitted counternotices to YouTube stating that their videos were noninfringing, which led to the reinstatement of the SuperJoJo channel and various videos. Moonbug then filed a lawsuit against Defendant for copyright infringement of its CoComelon franchise, claiming that the whole Super JoJo series was infringing, including the central JoJo character, his family, art, thumbnails, and at least six videos and thirteen SuperJoJo channels.  Docket No. 307 at 1, 8 (Supp. FAC).  Moonbug accused BabyBus of infringing the following: the JJ character, the JJ family characters, the animal characters, and 39 specific copyrighted works.  Jury Verdict at 2-6.

B.   Pre-Trial Order on Whether the JJ Character is Copyrightable

Prior to trial, the Court determined whether the JJ character, the main character in CoComelon's animated children's show, was copyrightable subject matter.  The Court held that JJ was, reasoning that "although some of JJ's traits (*e.g.* name "JJ") standing alone, may not be unique,] when combined with all of JJ's other physical and conceptual traits, the combination of those elements "crosses the binary threshold of copyrightability."  Docket No. 242 at 15-16 (Order on Summary Judgment).  The jury was therefore instructed that the JJ character was copyrightable—in other words, entitled to copyright protection.  *See* Docket No. 562 at 10 (Jury Instruction).  The Court did not determine whether the family characters and the animal characters were entitled to copyright protection, nor whether SuperJoJo infringed on Moonbug's copyrights.  Those issues remained for trial.

C.    Jury Trial

1.    Factual Copying

In the ten day trial, the jury saw a significant amount of evidence that BabyBus copied CoComelon's JJ character and YouTube videos to create BabyBus' JoJo character and its SuperJoJo YouTube series of videos.  There was both direct and circumstantial evidence that BabyBus had access to CoComelon characters and works and closely considered them.  Mr. Yan explained that BabyBus allowed employees to reference other company's images and other content for inspiration.  *Id.* at 492.  BabyBus witnesses admitted that they looked at CoComelon's JJ when developing JoJo.  TT 731-34, Docket No. 544-1.  BabyBus designer Mr. Xiaohui Chen even conceded that he used JJ when designing JoJo.  TT 1323-24.

In fact, BabyBus presented evidence indicating that their master plan for the Super JoJo videos referenced CoComelon works, and there was an instruction that CoComelons' JJ character should be the "focus of the visuals."  TT 590-91.  Development documents showed that the team made SuperJoJo episodes which were nearly identical or similar to CoComelon. TE 3, 5, 9, 23. BabyBus asserted that its characters were original, but admitted to "some" plagiarism with respect to the frame-by-frame shots:

> YAN: …It was just that in certain frames the JoJo character and the mother character did similar types of moves, and for those there – we admitted that there was some plagiarism.
> …
>
> YAN: In terms of the Yes Yes Vegetable product, pertaining to the frame, frame by frame… in terms of the expression, their pose, their characteristics, those things, yes, there was some plagiarism.  But, however, in terms of the character itself and also in terms of the scenes, in terms of the house, in terms of the living room and the restrooms… Those were all okay because those were all our original creation.

TT 633-34.  The visual appearances of JJ and JoJo were remarkably similar.  Moonbug's expert Fran Krause, a cartoon animator, testified about a substantial number of physical similarities between JJ and JoJo:

> A "round" head with "flattening above the ears".
> "Sculptural clay-like" or "Playdough-like" shaped hair that "doesn't have individual strands of hair."
> Solid shaped eyebrows that are a single color.

> Similarly sized eyes with "flattening on the bottom" and "realistic irises in the middle."
> A "small button nose with no bridge to it."
> A mouth in a "half-moon shape with two small teeth."
> A "onesie that is turquoise and blue."

TT 780.  Krause also explained generally that the facial features are proportioned and arranged similarly.  *Id.*

He described a substantial number of "nonvisual elements" that were similar between JJ and JoJo, including similar personalities:

> The optimism, the happy upbeat personality, the ways that [JJ] interacts with his brother, the ways he interacts with his sister, his mother, his father.

TT 782.  JJ and JoJo also have similar levels of maturity:

> He does not… act like a regular baby but instead acts like a child a few years older than him and does the same types of things, the same types of themes of events and stories that JJ does… going about his daily routines, learning to swim, learning to brush his teeth and comb his hair and wash his face.  All of the regular activities that JJ would do, JoJo is also doing.

TT 783-84.  JJ and JoJo also had the same "idealistic mood," the same "signature celebratory arms-out movement," and the same "acting similarities" in that they shared the same "realistic observed motion… not cartoony and over the top."  TT 783.  The family characters, the parents and brother and sister, also had similar personalities.  TT 783.

The YouTube videos had substantial similarities.  For instance, in both CoComelon's "Yes Yes Vegetables Song" and the SuperJoJo equivalent, JJ and JoJo slap their highchair with two hands and giggle as the mom brings out a tray of food.  TE 1117.  They both repeat "yes, yes, yes" to the mom, followed by expressing desire for the vegetable.  They both turn their empty bowl sideways while looking at the mom to show they finished eating the vegetables, then immediately rub their stomachs in a circular fashion.  They both high-five a plushie after finishing the vegetables, and throw both hands in the air.  They both eat green peas and carrots.  They both encounter trouble eating the vegetable with a utensil, and their face changes from smiling to concerned with furrowed eyebrows and a closed mouth when the food falls out.  They both wear a onesie with teal and yellow colors.

As another example, in CoComelon's "The Bath Song" and the SuperJoJo equivalent, JJ

United States District Court
Northern District of California

1    and JoJo both bring a shark-shaped squeaky toy into the bathtub. TE 1129. They both move the

2    shark across the surface of the bath water in a wave motion. They both have an older brother who

3    jumps into the bath with them. The older brother in both pours bubbles into the bathtub, uses a

4    brush with a long handle to scrub JJ/JoJo, and even sings "wash my [body part] doo doo doo doo

5    doo" to the same musical tune while washing a specific body part. Similarities like these abound

6    across numerous other works that were in evidence.

7         Additionally, Krause testified to these similarities. For example, in comparing

8    CoComelon's "This is the Way" video clip and SuperJoJo's "This is the Way" video clip, Krause

9    explained that the following elements were similar: the quality of the animation, the posing, the

10    camera angle, the background design, the blue and nautical themed tiles in the bathroom, the

11    subject matter. TT 790. In another shot of the same video, he explained that the camera angles,

12    facial expressions, ways of "using the rig and model," backgrounds, lighting, and color design

13    were "very, very similar." TT 791.

14         2.    <u>Protectable Selection and Arrangement</u>

15         At trial, Moonbug presented evidence that the elements that make up the JJ character were

16    protectable in combination under a theory called selection and arrangement theory, and that

17    BabyBus infringed on that protectable combination of elements.

18         Moonbug presented multiple witnesses who testified to the protectable selection and

19    arrangement of CoComelon characters, style, and works, including a CoComelon creative

20    executive (Katie Nahab), two of the original animators (Marvin Lee, Kate White), and a cartoon

21    animation expert (Fran Krause). TT 295-300; 367-68; 397-408; 749-50. The Court permitted this

22    testimony even though it had already found the JJ character was protected because the extrinsic

23    test applied by the jury required comparison of only protected aspects of the works. Moonbug

24    then presented expert testimony that SuperJoJo content infringes on the protectable CoComelon

25    works, detailing the similarities between the JJ and the JoJo characters. TT 774-75. Krause

26    testified that in assessing the similarities, he confined his observation to protectable expression.

27                  Q: Your opinion is that CoComelon contains protectable expression,
              that you filtered out non-protectable expression?

28                  Mr. Krause: Yes.

United States District Court
Northern District of California

1    TT 771.

2         Krause amplified his observations about the combination of elements of protectable

3    expression making up JJ. This included his two front upper teeth, his specific head shape that

4    gives him a "chubby-cheeked appearance," "rosy cheeks," "Playdough bit of hair with a kind of

5    soft smoothness to it almost," a "little button nose," a half-moon shaped smile, extra-large yet

6    realistic eyes, and solid eyebrows. TT 754-56.  He also testified about JJ's particular "wow"

7    gesture with his arms, and that this was not a "stock gesture" of the genre.  TT 760.  Krause

8    concluded that "the combination of all these things" make JJ creative. TT 759.  His protectability

9    analysis focused on combinations of uniquely expressed elements as opposed to any one element

10   in isolation. Krause explained what are unprotectable elements, and said that he filtered them out:

11             So there's some things when you're dealing with a kids show, or any
12             show really, that you can't copy a copyright or protect that particular
               element in itself because there's not that particular -- I talked about
13             creative decisions being protectable. Those elements might not
               really be a creative decision. So, for instance, if you're telling a story
14             that's involving a baby, the fact that that baby is in a crib is not
               something that's protectable. If that baby happened to be in a crib
15             that transformed into a rocket or something like that, maybe it's a
               different story; but just the fact that it's a crib is not protectable and
16             those are the sort of the things that I filtered out.

17   TT 769.  He further explained:

18             So that even if they have an episode that isn't a direct shot-by-shot,
               sequence-by-sequence copy, the character itself is being copied and
19             that is why I would say that even if they're not copying the exact
               sequence of events, they're still copying the protectable expression
20             of the CoComelon original episodes . . . the JJ character and the JJ
               character's relationship to the other members of the family . . .
21             cinematography that's the similar style between the two shows . . .
               the color design, the pacing of the show, the editing.

22   TT 811-12.  The jury was instructed on how to find a protectable selection and arrangement: "A

23   combination of elements that are individually unprotected can collectively be protected expression

24   if those elements are numerous enough and their selection and arrangement original enough that

25   the combination constitutes an original work of authorship."  Jury Instructions at 16.  The

26   instructions further stated:

27             For example, a particular grouping or sequence in which an author
               combines a significant number of unprotectable elements can itself
28             be a protectable element and can help satisfy the extrinsic test.

                                              6

United States District Court
Northern District of California

1

2

3

> Assessing the similarity between two works may require examining similarities between the protected combination of elements of the copyrights work and those of the accused works:  combinations may include characters, relationships between the major characters, animation styles, plot, pace, themes, dialogue, mood, setting, colors, costumes, and sequence of events.

4

*Id.*

5

### 3.   Concession of Infringement

6

BabyBus conceded infringement in part to six CoComelon videos: the Bath Song, the Boo

7

Boo Song, Car Wash Song, Colors Song, Yes Yes Playground, and Yes Yes Vegetables Song.  TT

8

462-63 (Yan testimony).  However, BabyBus witness Mr. Yan maintained that "our character was

9

our own.  It was just that the character were in similar places… and did similar moves and has

10

similar expressions.  That formed similarities per frame.  But in terms of the character itself, the

11

character was ours, was our own."  TT 463.  He maintained non-infringement of the JJ character.

12

Mr. Yan also admitted that they plagiarized thumbnail artwork of 15 CoComelon videos.  TT 492-

13

505.

14

### 4.   Independent Development Theory

15

BabyBus's primary defense at trial was that they independently created JoJo; he was not

16

copied from CoComelon's JJ. (the "independent development theory").[1]  Yan stated that JoJo

17

originated in 2016 from an original BabyBus baby character named DouDou.  TT 674.  DouDou

18

was first featured in a 2016 video called the "Barber" video ("2016 'Barber' DouDou").  TT 576.

19

Yan explained that while JoJo "did not evolve directly from DouDou," "JoJo used some of the

20

inspiration based on DouDou and used some of the common features of DouDou."  TT 674.

21

However, there was no evidence that DouDou images were part of the SuperJoJo development

22

files.  TT 1351, 831-32.  Yan conceded that there were no images of the DouDou character in the

23

SuperJoJo production files.  TT 685.  Kraus testified that he "couldn't find a shred of DouDou

24

25

26

27

28

---

[1] Trial evidence also included an image of DouDou that was created in 2021 to file for copyright registration. TT 676; TE 991.  This image was visually different than the 2016 'Barber' DouDou, including the teeth, the way the ears are connected to the head, and the hairstyle.  TT 684-85. After trial, this Court awarded sanctions against Babybus for making modifications that "appear that they were made to make the DouDou look more like the JoJo character."  Docket No. 628 (Order Granting Sanctions).

7

anywhere" in any of BabyBus's development files.  TT 831.  He also said that he found it "very, very hard to believe" in the independent development theory.  TT 832.  And as noted above, there was significant evidence that the BabyBus development team extensively viewed the CoComelon videos in developing the SuperJoJo series, and admitted copying several videos.

    5.  <u>Misrepresentation of DMCA counternotification</u>

    BabyBus received over 4,500 takedown notices of infringement under the DMCA on YouTube for various SuperJoJo videos; this eventually led to a temporary account suspension.  TT 506-07.  BabyBus submitted counternotices to reinstate the SuperJoJo channel, asserting that its videos were not infringing and that the videos were removed "as a result of mistake or misidentification."  *Id.* at 507, 517.  BabyBus also asserted in the counternotices that SuperJoJo was independently developed from DouDou.  *Id.* at 670.  Eventually, the SuperJoJo channel and many videos were reinstated.  *Id.* at 519-520.

    As to one particular video, Mr. Yan conceded at trial that he did not have a good faith basis in submitting a counternotification for the SuperJoJo Yes Yes Playground Song:

> Mr. TYZ: … Mr. Yan, you did not have a good-faith basis that the Super JoJo Yes Yes Playground Song was disabled as a result of a mistake or misidentification of the material to be removed or disabled, did you?
>
> Mr. Yan: That's correct.

*Id.* at 527.  Furthermore, BabyBus submitted a counternotice for the Yes Yes Playground Song shortly after conceding that it willfully infringed the CoComelon Yes Yes Playground Song.  *Id.* at 532.

    6.  <u>Damages</u>

    During trial, Moonbug's expert witness Dr. Vanderhart calculated damages in the amount of $19,023,292.  She based her calculations off documents of revenue data between July 2019 and October 2022, and the data was specific to U.S. platforms.  *Id.* at 1054.  The total damages amount of $19,023,292 included both lost profits and unjust profits.  Dr. Vanderhart testified that in her opinion, Moonbug was entitled to both.  *See id.* at 1087.  She calculated $4,482,308 in lost profits of Moonbug, including lost YouTube profits and lost licensing and merchandising profits.  *Id.* at

United States District Court
Northern District of California

1086-87.  She calculated $14,540,983 in Defendants' unjust profits, or unjust enrichment.  *Id.* at 1087.

Alternatively, Dr. Vanderhart explained that a damages award could be based solely on SuperJoJo's total revenues from infringement.  *Id.* at 1088.  Dr. Vanderhart calculated this alternative damage amount of $17,350,454.  *Id.*  She reached this number by looking at documents detailing BabyBus's revenues from their SuperJoJo channels and videos on YouTube, Amazon video, Roku, and Apple Store and Google Play, and combining revenue across all platforms.  TT 1050-51, 1088.

D.    Verdict

The jury deliberated for more than three full days.  TT 1967, 2071.  In that time, the jury submitted questions to the Court and the parties on several issues.  In one question, the jury asked, "is the jury required to examine all the exhibits admitted into evidence, regardless of whether or not the Plaintiff discussed/presented information related to a particular claim in court?" TT 1989.  The Court answered that the jury should consider all evidence in the record, as noted in the instructions.  TT 1995.

The jury then rendered its verdict, and found BabyBus liable for copyright infringement, and misrepresentation under Section 512(f) of the Digital Millennium Copyright Act (DMCA).  Jury Verdict. The jury found that BabyBus infringed the registered copyrights to CoComelon's JJ character, family and animal characters, and 36 out of 39 specific copyrighted works.  *Id.* The jury also found by special verdict that BabyBus's infringing JoJo character was "virtually identical" to CoComelon's JJ character.  *Id.* at 7.  For damages for copyright infringement, the jury awarded Moonbug $4,168,546 in damages suffered by Moonbug, $13,539,568 in Defendants' profits, and $5.85 million in statutory damages.  For damages for copyright misrepresentation under the DMCA, the jury awarded $10,000 in damages.  *Id.* at 6.  The jury found that BabyBus knowingly and materially misrepresented that they did not infringe Plaintiffs' copyright in a DMCA counternotification.  *See id.*

E.    Post-Trial

The Court entered final judgment after Moonbug selected damages and lost profits over

statutory damages.  The total award was $17,718,114.00, with $4,168,546 in damages and $13,539,568 in Defendants' profits.  Docket No. 627 (Order Entry of Final Judgment); Jury Verdict at 6-7.  The Court also issued a permanent injunction against BabyBus.  Docket No. 627. *Id.*  It also issued sanctions against BabyBus for misrepresenting its 2016 Doudou character in its trial briefings as the crux of the independent development theory.  Docket No. 628 (Order Granting Sanctions).

BabyBus now renews its motion for judgment as a matter of law under Rule 50(b), Docket No. 651, after previously moving for judgment as a matter of law under Rule 50(a) after finishing its case-in-chief at trial, Docket No. 537.  BabyBus also filed a motion for new trial under Rule 59(a).  Docket No. 652.  The Court addresses both motions below.

### III.       THE MOTION FOR JUDGEMENT AS A MATTER OF LAW (JMOL)

A.       Legal Standard

Judgment as a matter of law (JMOL) under Federal Rule of Civil Procedure 50(b) is granted "only if, under the governing law, there can be but one reasonable conclusion as to the verdict."  *Winarto v. Toshiba Am. Elecs. Components, Inc.*, 274 F.3d 1276, 1283 (9th Cir. 2001).  When faced with a motion under Rule 50(b), a court "cannot disturb the jury's verdict if it is supported by substantial evidence."  *Lambert v. Ackerley*, 180 F.3d 997, 1012 (9th Cir. 1999).  Substantial evidence means "evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion" from the same evidence.  *Castro v. Cnty. Of Los Angeles*, 833 F.3d 1060, 1066 (9th Cir. 2016) (internal quotation marks omitted).  "Thus, although the court should review the record as a whole, it must disregard evidence favorable to the moving party that the jury is not required to believe, and may not substitute its view of the evidence for that of the jury."  *Reeves v. Sanderson Plumbing Prods. Inc.*, 530 U.S. 133, 150 (2000).  When evaluating such a motion, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence."  *Id.* at 151. Thus, entry of judgment as a matter of law is warranted only "if the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict."  *Castro*, 833 F.3d at 1066 (internal quotation marks

1 omitted).

2 B.  Copyright Infringement

3    BabyBus contends that the jury's finding of copyright infringement and that judgment as a

4 matter of law should be entered in its favor on five grounds: (1) there was not a legally sufficient

5 basis for the jury to find that JJ character was infringed, (2) there was not a legally sufficient basis

6 for the jury to find that the family characters were infringed, (3) there was no legally sufficient

7 basis to find that the video works were infringed, (4) no reasonable juror could have found a

8 protectable selection and arrangement as to both the JJ character and the videos, and (5) no

9 reasonable juror could have found that SuperJoJo thumbnails were infringing. Motion for JMOL

10 at 5-6.

11    1.    Copyrightable Subject Matter

12    The Court must first address the threshold issue of copyrightable subject matter, which is a

13 prerequisite to an infringement action.

14    First, characters must be "originally conceived and presented sufficiently developed to

15 command copyright protection." Nimmer on Copyright, § 2.12.  This Court decided at summary

16 judgment that JJ is a copyright protectable character because of a combination of elements

17 possessed by JJ.  Order on Summary Judgment at 12.  It noted that, *inter alia,* JJ "has physical and

18 conceptual qualities" such as a "distinctive-looking design, with large eyes, a chubby round head,

19 and a small swooping tuft of hair above his forehead," as well as his "signature onesie."  *Id.* at

20 13.  At trial, the Court instructed the jury that JJ was "a sufficiently distinctive character and is

21 therefore afforded copyright protection."  Docket 562 at 10 (Jury Instruction No. 8).

22    However, at summary judgment the Court declined to find JJ's family characters

23 protectable as a matter of law, "because a reasonable jury could arrive at different conclusions on

24 whether JJ's family characters are especially distinctive."  Docket No. 242 at 18 (citing *Direct*

25 *Techs., LLC v. Elec. Arts, Inc.*, 836 F.3d 1059, 1068 (9th Cir. 2016) (where a reasonable jury

26 could conclude differently, leaving it to jury to determine whether derivative work "meets the

27 'low' standard for originality" and merits copyright protection)).  Nor did it address whether the

28 animal characters are afforded copyright protection.  Nevertheless, Defendants do not contest that

United States District Court
Northern District of California

11

the family characters and animal characters are afforded threshold copyright protection at this stage.  The Court therefore assumes the family characters and animal characters are afforded copyright protection for purposes of this motion.

Next, audiovisual works are copyrightable subject matter, subject to certain requirements that are not at issue in the instant motion.[2]  Nimmer on Copyright, § 2.09.  Defendants have not contended otherwise.  Therefore, the audiovisual works are afforded copyright protection.  In sum, Moonbug's JJ character, family characters, animal characters, and video works ("Collective Works") are all afforded copyright protection.

Indeed, the jury was not asked to determine whether JJ's family characters, animal characters, and video works were afforded copyright protection, because the final verdict form did not address these questions.  *See* Jury Verdict.  The verdict form only addressed questions related to copyright infringement and misrepresentation, and Defendants' instant motion challenges the jury's findings according to the verdict form.  The threshold question of protectability is not at issue.

### 2. Plaintiff's Ownership of the Copyrights

"To prevail on a copyright infringement claim, a plaintiff must show that (1) he or she owns the copyright in the infringed work, and (2) the defendant copied protected elements of the copyrighted work." *Williams v. Gaye*, 895 F.3d 1106, 1119 (9th Cir. 2018) (citation omitted).  The first element of ownership is not at issue.  The Court decided at summary judgment that Plaintiffs owned the copyrights in the CoComelon video works.  Order on Summary Judgment at 10.  The jury was so instructed.  Jury Instruction at 10 ("Plaintiffs are the owners of valid copyrights in 42 CoComelon Works at issue in this case.").  Although the Court did not determine whether Moonbug owned valid copyrights in the JJ character, the family characters, or animal characters, Defendants do not contend otherwise.  *See* Motion for JMOL at 23-24.  Defendants effectively

---

[2] Three elements (in addition to the originality and fixation requirements applicable across the board to all copyrightable subject matter) are thus required for an audiovisual work: (1) it must consist of "images;" (2) those images must be "related" and presented in a "series"; and (3) the images must be capable of being shown by a machine or device. *1 Nimmer on Copyright § 2.09*.

United States District Court
Northern District of California

concede that Moonbug owns valid copyrights to JJ, the family characters, and the animal characters.

3. <u>What Elements of Plaintiff's Collective Works Are Protectable Under Copyright Law</u>

The second prong of copyright infringement analysis—whether the defendant copied protected elements of the copyrighted work ("Prong 2")—"contains two separate components: copying and unlawful appropriation." *Skidmore v. Led Zeppelin*, 952 F.3d 1051, 1064 (9th Cir. 2020). They are distinct concepts. *Id.*

a. <u>Factual Copying</u>

Copying can be demonstrated either through direct evidence or by showing that the defendant had access to the plaintiff's work and that the two works share similarities probative of copying. *Corbello v. Valli,* 974 F.3d 965, 974 (9th Cir. 2020). Defendants do not contest that there was sufficient evidence of factual copying in their motion, but to be sure, Defendants had access to both the characters and the video works. Defendants admitted that they copied six CoComelon videos: the Bath Song, the Boo Boo Song, Car Wash Song, Colors Song, Yes Yes Playground, and Yes Yes Vegetables. TT 462:22-463:5. Second, there was indirect evidence of copying because BabyBus creators testified that they looked at CoComelon's JJ when designing and developing JoJo. TT at 731-735. Then, there were similarities probative of copying. Krause testified that Super JoJo episodes "end up with a character with an incredibly similar design, with a similar family makeup, that has the same relationship to all the members of their family, that's being colored and designed and shot and lit in the same way." TT at 810-11. Krause testified as to the many similarities between CoComelon's JJ and BabyBus's JoJo, including that they both have similarly sized and shaped heads, "sculptural clay-like" shaped hair, solid eyebrows, similarly sized eyes, a small button nose. TT 780-81. They both wear a turquoise and blue onesie, have a happy upbeat personality and "happy idealistic mood," and even share the same "signature celebratory arms-out movement." *Id.* at 7892, 783. Krause also testified that he thought BabyBus was copying the family characters as well because of the "similar family makeup, that has the same relationship to all of the members of their family, that's being colored

United States District Court
Northern District of California

1   and designed and shot and lit in the same way." TT 811.

2       Therefore, only the component of whether Defendant engaged in unlawful appropriation

3   of CoComelon's JJ character, works, family and animal characters, and thumbnails (hereafter the

4   "collective works") is at issue in this motion.  *See* Motion for JMOL at 11; *c.f. Sound & Color,*

5   *LLC v. Smith*, No. 2:22-cv-01508-WLH-AS, 2023 U.S. Dist. LEXIS 158043, at *25 (C.D. Cal.

6   Sep. 6, 2023) (discussing only whether Defendants are engaged in unlawful appropriation of a

7   copyrighted musical composition because the motion addresses only unlawful appropriation, not

8   proof of actual copying).

9           b.    <u>Unlawful Appropriation</u>

10      "Proof of unlawful appropriation—that is, *illicit* copying—is necessary because copyright

11  law does not forbid all copying." *Rentmeester v. Nike, Inc.*, 883 F.3d 1111, 1117 (9th Cir. 2018)

12  (emphasis in original).  "[T]he hallmark of 'unlawful appropriation' is that the works share

13  substantial similarities." *Id*.  The Ninth Circuit uses a two-part test —an extrinsic test and an

14  intrinsic test—to determine whether two works are substantially similar.  *Cavalier v. Random*

15  *House, Inc.,* 297 F.3d 815, 822 (9th Cir. 2002).  At trial, the jury was instructed to apply both the

16  extrinsic and intrinsic test to make a finding of unlawful appropriation of the Collective Works.

17  Jury Instruction at 16.  BabyBus only contests the application of the extrinsic test in the instant

18  motion, so the Court need not discuss the intrinsic test.

19              i.    <u>Extrinsic Test</u>

20      First, under the extrinsic test, the trier of fact must use "analytic dissection, and, if

21  necessary, expert testimony… [to] determine whether any of the allegedly similar features are

22  protected by copyright."  *Apple Comput., Inc., v. Microsoft Corp.,* 35 F.3d 1435, 1443 (9th Cir.

23  1994).  This is because [a] finding of substantial similarity between two works cannot be based on

24  similarities in unprotectable elements."  *Mattel, Inc. v. MGA Entm't, Inc.,* 616 F.3d 904, 916 (9th

25  Cir. 2010).

26      The extrinsic test requires a three-step analysis.  *Corbello v. Valli*, 974 F.3d 965, 974 (9th

27  Cir. 2020) (citations omitted). First (1), the plaintiff identifies similarities between the copyrighted

28  work and the accused work.  *Id.*  Second (2), of those similarities, the court disregards any that are

based on unprotectable material or authorized use.  *Id.*  "Similarity only as to unprotected aspects of a work does not result in liability for copyright infringement."  *Id.*  Third (3), the court must determine the scope of protection ('thick' or 'thin') to which the remainder is entitled 'as a whole.'"  *Id.*  "If there's only a narrow range of expression (for example, there are only so many ways to paint a red bouncy ball on blank canvas), then copyright protection is 'thin' and a work must be 'virtually identical' to infringe." *Mattel, Inc. v. MGA Entm't, Inc.*, 616 F.3d 904, 914 (9th Cir. 2010).  Otherwise, if the protection is thick, the work need only be "substantially similar" to infringe.

The extrinsic test is an "objective test based on specific expressive elements: the test focuses on articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events in two works." *Kouf v. Walt Disney Pictures & TV,* 16 F.3d 1042, 1045 (9th Cir. 1994) (quotation omitted).   "A court must take care to inquire only whether the protect[able] elements, standing alone, are substantially similar." *Cavalier*, 297 F.3d at 822 (emphasis and quotation omitted).  As examples, the following are elements that are not protected: "Familiar stock scenes and themes that are staples of literature," *id.* at 823, and "Scenes-a-faire, or situations and incidents that flow necessarily or naturally from a basic plot premise." *Id; Benay v. Warner Bros. Entm't, Inc*., 607 F.3d 620, 624-625 (9th Cir. 2010).

The crux of BabyBus's arguments is that the individual elements that make up the JJ character, family, animals, and video works, are unprotectable and therefore should be filtered out under the extrinsic test.  BabyBus asserts that after this step of filtering out, no protectable expression remains in the similarities between CoComelon and SuperJoJo, and therefore a jury could not as a matter of law find copying under the extrinsic test.

BabyBus additonally argues that even if the similarities between JJ and JoJo have protectable expression, JJ is only entitled to "thin" protection.  Thus, JJ and SuperJoJo must be "virtually identical" to satisfy the extrinsic test.  *See* Motion for JMOL at 21.  Indeed, the jury found that two characters were "virtually identical" in question 4 on the verdict form.  Docket 579 at 7 (Jury Verdict).  BabyBus's argument thus fails because the instruction on JJ's level of protection was not prejudicial.  The jury's finding of copyright infringement and that the

1    characters were "virtually identical" still holds even if JJ was only entitled to "thin" protection as

2    opposed to "thick" protection.

3                                    (a)        JJ

4              BabyBus argues that none of JJ's "individual elements" are protectable, and those elements

5    should have been filtered out when the jury conducted the extrinsic test.  Motion at 17.  However,

6    Moonbug argued at trial that the JJ character was protectable because of the selection and

7    arrangement of individual elements, even if those individual elements themselves were

8    unprotectable.

9              As this Court previously held, even if certain allegedly copied elements are not protectable

10   in themselves, a combination of them "can support an infringement claim 'if those elements are

11   numerous enough and their selection and arrangement original enough that their combination

12   constitutes an original work of authorship.'" Docket No. 71 at 16 (Order Denying Motion to

13   Dismiss) (quoting *Malibu Textiles, Inc. v. Label Lane Int'l, Inc.*, 922 F.3d 946, 952 (9th Cir.

14   2019).  Selection and arrangement protect "the particular way in which the artistic elements form a

15   coherent pattern, synthesis, or design." *Id.*  "[T]he principal focus should be on whether the

16   selection, coordination, and arrangement are sufficiently original to merit protection." *Feist Pubs.,*

17   *Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 358 (1991).  "Original, as the term is used in copyright,

18   means only that the work was independently created by the author (as opposed to copied from

19   other works), and that it possesses at least some minimal degree of creativity." *Ets–Hokin v. Skyy*

20   *Spirits, Inc*., 225 F.3d 1068, 1076 (9th Cir. 2000).  However, there must be more than "trivial

21   elements of compilation and arrangement." *United States v. Hamilton*, 583 F.2d 448, 451 (9th Cir.

22   1978).

23             First, there was substantial evidence that allegedly copied elements were "numerous

24   enough."  Kraus testified that he created a list of 121 elements that JJ and JoJo expressed

25   similarly, including for example, a large round head, extra large eyes, two front upper teeth, thin

26   lips on a mouth with a half-moon smile, and a small nose.  TT 865-67.  Additionally, the jury

27   could observe the substantial similarities between the JJ and JoJo characters by watching the

28   YouTube videos in evidence, sufficiently establishing numerosity of the elements which were

16

arranged and combined.

Plaintiff incorrectly argues that the Court found sufficient numerosity as a matter of law at summary judgment applicable under the extrinsic test of misappropriation, where it held, "There is no dispute that the "elements are numerous enough." Order on Summary Judgment at 20. Specifically, JJ has 29 elements and his family has 28. *Id.* at 20-21. That holding pertained to the threshold issue of copyright protection. At trial, the jury was instructed to apply the entire test for protectable selection and arrangement, and could find that "a particular selection and arrangement of otherwise unprotected elements is original enough to be protected if those elements are numerous enough and their selection and arrangement original enough that their combination constitutes an original work of authorship." Docket No. 562 at 12 (Jury Instruction No. 10, Copyright – Subject Matter – Protected and Unprotected Matter (17 U.S.C. § 102)). While not decided by the Court as a matter of law, the evidence as to numerosity of copied elements at trial was substantial and sufficient to support the jury's verdict.

Second, the evidence at trial showed that the JJ character had a protectable selection and arrangement in those elements. While Mr. Kraus stated that those 121 elements, in and of themselves, were not protectable, TT 866, he explained that it was the "combination of those elements and how they're used" that makes the entire JJ character protectable expression. *Id.* at 866-67. He provided examples, including the combinations of his two front upper teeth, his specific head shape that gives him a "chubby-cheeked appearance," "rosy cheeks," "Playdough bit of hair with a kind of soft smoothness to it almost," a "little button nose," a half-moon shaped smile, extra-large yet realistic eyes, and solid eyebrows. *Id.* at 754-56. He also testified about JJ's particular "wow" gesture with his arms, and that this was not a "stock gesture" of the genre. *Id.* at 760; *see also id.* at 408 (testimony of CoComelon animator Kate White about JJ's signature "wow" move). Krause explained that "the combination of all these things" make JJ creative. TT 759.

The jury was instructed on how to find a protectable selection arrangement: "A combination of elements that are individually unprotected can collectively be protected expression if those elements are numerous enough and their selection and arrangement original enough that

the combination constitutes an original work of authorship."  Jury Instructions at 16.  The

instructions add:

> For example, a particular grouping or sequence in which an author
> combines a significant number of unprotectable elements can itself
> be a protectable element and can help satisfy the extrinsic test.
> Assessing the similarity between two works may require examining
> similarities between the protected combination of elements of the
> copyright[ed] work and those of the accused works:  combinations
> may include characters, relationships between the major characters,
> animation styles, plot, pace, themes, dialogue, mood, setting, colors,
> costumes, and sequence of events.

*Id.*  Further, Moonbug's closing also summarized the selection and arrangement arguments.  TT

1857, 1862, 1866 (closing argument).  Defendants argue that Moonbug did not explicitly use the

words "selection and arrangement" in closing.  But Defendants' cite to *Skidmore as Tr. For Randy*

*Craig Wolfe Tr. V. Led Zeppelin,* 952 F.3d 1051, 1074 (9th Cir. 2020) is inapposite; in *Skidmore,*

the court noted that the plaintiff's failure to use the words "selection" or "arrangement" was not

dispositive.  Also in *Skidmore,* the plaintiff never argued a selection and arrangement theory but

rather only asserted "random similarities scattered throughout the works."  *Id.* at 1074-75.  In

contrast here, Moonbug presented ample evidence supporting a protectable selection and

arrangement theory despite not using the precise magic words "selection and arrangement" at trial,

and the jury instructions did use those words.  The evidence was therefore substantial to support a

protectable selection and arrangement of JJ.

Finally, there was substantial evidence that the protectible selection and arrangement of

elements in Moonbug's JJ character were substantially similar to elements combined in

BabyBus's JoJo character:

> Q:…So what are the similarities that you see when comparing
> the JoJo character with the protectable JJ character?
>
> Mr. Krause: Sure. So both of the characters have similarly sized and
> shaped head, a round head with a bit of a flattening above the ears.
>
> Both characters have hair that's kind of a sculptural clay-like shape
> that doesn't have individual strands of hair, kind of in a bit of a
> Playdough-like shape.
>
> Both characters have solid -- solid shapes for eyebrows that are a
> single color.

18

> Both characters have the similarly sized eyes with a bit of a
> flattening on the bottom with realistic irises in the middle.
>
> Both characters have a small button nose with no bridge to
> it, a mouth that's a half-moon shape with two small teeth.
>
> Both characters have a onesie that is turquoise and blue
> in design…
> …
> And, in general, facial features that are proportioned and arranged in
> a similar arrangement.

TT 780-81.  And there was more. In addition to visual similarities, Krause also testified as to conceptual similarities:

> The optimism, the happy upbeat personality, the ways that he
> interacts with his brother, the ways he interacts with his sister, his
> mother, his father, all of those interactions were copied in frame-by-
> frame copy animation but also in the other episodes of Super JoJo as
> they kind of established that character with their early episodes and
> they continued that character out.

*Id.* at 782.  JJ and JoJo also had similar levels of maturity:

> …with the Super JoJo character, you know, he also sleeps in a crib.
> He also looks like a baby. He also does not often wear a diaper or
> drink from a bottle or act like a regular baby but instead acts like a
> child a few years older than him and does the same types of things,
> the same types of themes of events and stories that JJ does.

*Id.*  Both characters had a "happy idealistic mood" and even shared the same "signature celebratory arms-out movement" and general realistic style of motion. *Id.* at 783. In his opinion, JJ and JoJo were the same character.  *Id.* at 790.

In sum, there was substantial evidence of the similarities between the characters even after unprotected individual elements were filtered out.

<div align="center">(b)    <u>Family Characters</u></div>

Next, BabyBus argues that no reasonable juror could have found infringement of JJ's family characters, because no evidence showed unlawful appropriation as to protectable elements of the family characters.  Motion for JMOL at 23.  Just as with JJ, here too, evidence at trial showed that the family characters had a protectable selection and arrangement.  *See Malibu Textiles, Inc. v. Label Lane Int'l, Inc.,* 922 F.3d 946, 952 (9th Cir. 2019).

First as to numerosity, evidence at trial showed a significant number of elements in the family characters: the various physical elements of their features were apparent, as well as

1    conceptual elements of how the family makeup—mom, dad, brother, sister—interact with JJ, and

2    each family member's unique personality.  TT 782, 815, 762 (mom is clever, dad is goofy, brother

3    and sister are patient).

4         Next, there was substantial evidence of the originality of the family characters.  Kraus

5    testified that each family member has a distinct look, role, and unique relationship with JJ.  He

6    described the demeanor and personalities of the family characters and how they relate to JJ.  TT

7    760-762.  He described the relationship between JJ and his entire family, and that the relationship

8    between the family and JJ:

9           So JJ's mom is very clever in her solutions to get JJ to learn the
            different thing for that particular episode. JJ's dad a bit on the goofy
10          side often almost functions as one of the bigger kids in that equation.
            And JJ's brother and sister incredibly patient for an older brother and
11          sister, unusually so, which is why I kind of mention that as one of
            the specific characteristics of the show, and very much connected
12          with what JJ does in every single episode.

13   TT 812:8-12.  He concluded that "it's that kind of combination in connection that forms the show

14   that tells the specific stories that they're telling."  TT 762.  In contrast to the unprotectable "cocky

15   kid" and "older mentor" characters in *Campbell v. Walt Disney Co.,* 718 F. Supp. 2d 1108, 1115

16   (N.D. Cal. 2010), here, the family members together have a distinct relationship to JJ (looking at

17   the original arrangement or combination of elements) that a juror could find protectable based on

18   Krause's expert testimony.

19        Finally, Krause testified that the two works had a "similar family makeup, that has the

20   same relationship to all of the members of their family, that's being colored and designed and shot

21   and lit in the same way."  TT 811.  He further stated that he felt that BabyBus copied the

22   composition of the family, including the mother, father, older brother, and older sister.  *Id.* at 815.

23   While he also later stated that he didn't think BabyBus copied the physical designs of the

24   characters, he noted that the style is "very similar" and that he believed the relationships that the

25   family characters had with JJ copied protectable expression.  *Id.* at 827.  Thus, there was evidence

26   at trial that there were similarities in the family characters when looking at the protectable

27   elements of JJ's family characters, which especially included the family character relationships

28   and interactions with JJ.  In the final analysis, there was substantial evidence that both JJ and JoJo

had a mother and father, older brother and sister, and a pet dog named Bingo, and that the relationships among them, particularly with JJ or JoJo were remarkably similar.

<div align="center">(c) <u>Animal Characters</u></div>

As an initial matter, BabyBus sufficiently preserved this issue in its Rule 50(a) motion because it argued that a reasonable jury could not find infringement of the unmentioned Animal Characters copyright.  Docket No. 537 at 13 (Rule 50(a) Motion for Judgment as a Matter of Law).  In the prior motion, BabyBus stated, "Krause did not so much as mention the Animal Character copyright, let alone what aspects of it are protectable or infringed."  This is sufficient to preserve the issue despite Plaintiff's argument that BabyBus only mentioned it in one passing sentence.

BabyBus argues that Mr. Kraus did not testify as to the animals, as well as that Moonbug did not present explicit evidence of protectable elements in the animals and did not demonstrate substantial similarities of those elements.  Motion for JMOL at 24.  However, evidence at trial supports the jury's finding of infringement under the extrinsic test.  The jury had evidence of the CoComelon copyrighted animal artwork and copyrighted videos that featured the animals, TT 1150, 1172, 1232, 1233, and were able to compare them to the accused SuperJoJo videos that featured copied animals.  There was ample trial evidence to compare CoComelon's wolf, elephant, and duck characters to the wolf, elephant, and duck characters in SuperJoJo videos.  *C.f., e.g.,* TE 1232, 1233 with TE 378 (Elephant stuffie in Super JoJo's Yes Yes Vegetables), 685 (Mama duck & duckling in Super JoJo's "JoJo and the Little Ducks"), 759 (Wolf in Super JoJo's "The Wolf and Seven Baby Sheep").  Moonbug's closing argument also included an example comparison whereby Moonbug showed how Super JoJo's wolf character infringed on CoComelon's wolf character.  TT 1872, 1854.  During closing argument, Moonbug also explained how the jury could find infringement, including infringement of the animal characters.  TT 1854.  Most importantly, the jury instructions explained how to apply the extrinsic test, including how to filter out unprotectable elements:

> There are three steps within this test: (1) In the first step of the Extrinsic Test, you must identify similarities between each disputed copyrighted work and the accused work(s).

(2) In the second step of the Extrinsic Test, you must filter out all the similarities you identified in Step (1) that are based on elements in Plaintiffs' copyrighted works which are not protected under copyright law.
…
(3) In the third step of the Extrinsic Test, once you filter out any similarities that arise from elements in Plaintiffs' works that are not protected in step (2), you must then determine whether the protected elements (or combination of elements) in the asserted copyrighted works of Plaintiff are substantially similar to any of the accused works of Defendant.

Docket No. 562 at 17 (Jury Instructions).

The trial evidence showing substantial similarities between the animal characters, together with the instruction on how to apply the extrinsic test, enabled the jury to properly render a verdict on this issue.

(d)     Video Copyrights

Evidence at trial supports also the jury's finding of infringement of Moonbug's video works under a protectable selection and arrangement theory.  At trial, Moonbug provided substantial evidence of protectable selection and arrangement in the copyrighted CoComelon video works.  Multiple Moonbug witnesses testified to the combination of expressed elements that make up CoComelon style and works.  CoComelon creative executive Katie Nahab testified about how CoComelon style integrates JJ-focused family interactions, painting-inspired color and set design, "light" and "bouncy" animation, and close integration between the music and the episode. TT 295, 297-99, 300.  CoComelon animator Marvin Lee testified about how the specific and creative way CoComelon integrates character animation, audio, and camera angles in storytelling, and described specific details.  TT 367-68; 362-380.  CoComelon animator Kate White also testified to specific creative choices of camera angles and movement.  TT 397, 403.  Krause's testimony also provided evidence of protectable selection and arrangement in the video works because he specifically conducted a protectability analysis. He explained that his analysis looked at combinations of uniquely expressed elements, including the family dynamics, animation style, themes, moods, color design, pacing and setting, and cinematography, as opposed to any one element in isolation.  TT 748-68.  He explained that "there's a lot of elements to think about as far as what makes a show a show and what makes a show recognizably a show… when we're

1    thinking of CoComelon… All of those different elements are what makes a show recognizable."

2    TT 751-52.  He explained what are unprotectable elements, and that he "filtered out non-

3    protectable expression" to find that CoComelon contains protectable expression:

> So there's some things when you're dealing with a kids show, or any
> show really, that you can't copy a copyright or protect that particular
> element in itself because there's not that particular -- I talked about
> creative decisions being protectable. Those elements might not
> really be a creative decision. So, for instance, if you're telling a story
> that's involving a baby, the fact that that baby is in a crib is not
> something that's protectable. If that baby happened to be in a crib
> that transformed into a rocket or something like that, maybe it's a
> different story; but just the fact that it's a crib is not protectable and
> those are the sort of the things that I filtered out.

9

10   TT 769-71.  The evidence was therefore substantial to support a protectable selection and

11   arrangement of CoComelon video works.

12           Next, there was evidence that there were substantial similarities between the protectable

13   elements in the CoComelon video works.  Krause testified about how protectable selection and

14   arrangement in CoComelon video works shows up in Super JoJo works:

> So that even if they have an episode that isn't a direct shot-by-shot,
> sequence-by-sequence copy… that is why I would say that even if
> they're not copying the exact sequence of events, they're still
> copying the protectable expression of the CoComelon original
> episodes . . . the JJ character and the JJ character's relationship to
> the other members of the family . . . cinematography that's the
> similar style between the two shows . . . the color design, the pacing
> of the show, the editing.

19   TT 811-12.  As an example, when comparing CoComelon's "This is the Way" and SuperJoJo's

20   equivalent, Krause explained that the following elements were similar: the quality of the

21   animation, the posing, the camera angle, the background design, the blue and nautical themed tiles

22   in the bathroom, the subject matter.  *Id.* at 790.  In another shot of the same video, he explained

23   that the camera angles, facial expressions, ways of "using the rig and model," backgrounds,

24   lighting, and color design were "very, very similar."  *Id.* at 791.  And there is much more. *See e.g.,*

25   *id.* at 794-812 (comparing similarities in plot, subject matter, mood, style, design, sequence of

26   events, in the Doctor Checkup song, the Swimming Song, Rock-a-Bye Baby).  Kraus explained

27   that Defendants' SuperJoJo episodes "end up with a character with an incredibly similar design,

28   with a similar family makeup, that has the same relationship to all the members of their family,

23

United States District Court
Northern District of California

that's being colored and designed and shot and lit in the same way." *Id.* at 810-11.  He concluded that all Super JoJo episodes copy protectable expression in "the way the JJ character is shown and portrayed and animated and moving, the relationship between the JJ character and his entire family and the relationship between the family and the JJ character, and then particular ways that they are expressing the visual aspects of the CoComelon show." TT 812.  As to the specific visual aspects of the CoComelon video works that were protectable selection and arrangement that SuperJoJo infringed, Krause gave specific examples of "the themes, the moods, the color, the design, the pacing and setting, the animation style, the cinematography, the way it interacts with songs." TT 812.  Krause's expert testimony that the CoComelon video works were infringing was unrebutted. Given the evidence, a jury could reasonably find that the copyrighted CoComelon works had protectable selection and arrangement and that BabyBus's SuperJoJo video works were infringing.

Further, the jury had before it the YouTube videos in evidence.  The similarities between some were uncanny. In CoComelon's "Yes Yes Vegetables Song" and the SuperJoJo song of the same name, JJ and JoJo slap their highchair with two hands and giggle as the mom brings out a tray of food.  They both repeat "yes, yes, yes" to the mom, followed by expressing desire for the vegetable.  They both turn their empty bowl sideways while looking at the mom to show they finished eating the vegetables, then immediately rub their stomachs in a circular fashion.  They both high-five a plushie after finishing the vegetables, and throw both hands in the air.  They both eat green peas and carrots.  They both encounter trouble eating the vegetable with a utensil, and their face changes from smiling to concerned with furrowed eyebrows and a closed mouth when the food falls out.  They both wear a onesie with teal and yellow colors.

In CoComelon's "The Bath Song" and the SuperJoJo song of the same name, JJ and JoJo both bring a shark-shaped squeaky toy into the bathtub.  They both move the shark across the surface of the bath water in a wave motion.  They both have an older brother who jumps into the bath with them.  The older brother in both pours bubbles into the bathtub, uses a brush with a long handle to scrub JJ/JoJo, and even sings "wash my [body part] doo doo doo doo doo" to the same musical tune while washing a specific body part.  BabyBus conceded willfull infringement of

24

these CoComelon videos. *See* TT 462-463.  Similarities like these abound across numerous other YouTube videos.  The ample testimonial and video evidence was substantial enough to support the jury's finding of infringement, which included satisfying the extrinsic test on which the jury was instructed.

BabyBus argues that individual elements of the works, such as generic plot and sequence, staple themes for young children, ordinary dialogue, natural "happy" mood, common story settings, and broad style elements, are unprotectable.  Motion at 25-30.  But again, substantial evidence showed that the video works had protectable selection and arrangement in the expression of combined elements across numerous video works.  Furthermore, the jury had evidence that BabyBus copied CoComelon and even admitted to copying and infringement of a number of the works at issue.

BabyBus argues that Moonbug only has 42 individual copyrights, not a single collective copyright, and therefore cannot argue a single selection and arrangement theory that applies to all disputed videos.  Motion at 31, citing *Idema v. Dreamworks, Inc.,* 162 F. Supp. 2d 1129, 1144 n.31 (C.D. Cal. 2001) ("each work must be judged against any allegedly infringing work *on its own,* not as part of some larger whole claimed by Plaintiffs").  However, a protectable selection and arrangement can underlie an entire series of works.  *See Paramount Pictures Corp. v. Axanar Prods.,* 2016 U.S. Dist. LEXIS 71651 at *16-17 (C.D. Cal. 2016) (finding that Star Trek copyrighted works can have a protectable selection and arrangement because they contain elements that, when combined with one another, "form the entire Star Trek franchise of television series and films.").  In any event, the jury had before it each of the alleged infringed works of Moonbug and each of the alleged infringing videos of BabyBus, and the jury's question during deliberation (and the Court's response) indicates the jury looked at all the works.  *See* TT 1974, 1996-1997.  .  The jury could have properly found each copyrighted video (for which it rendered a verdict in Moonbug's favor) was infringed by at least one (not necessarily all) of BabyBus' accused videos, and could properly have considered protectable selection and arrangements in rendering its findings.

1

(e)     Thumbnail Images

2      Evidence at trial also supports the jury's finding of infringement because of the substantial

3   similarities between the protectable elements between the CoComelon and the SuperJoJo

4   thumbnail images.  Mr. Yan testified about the process of creating thumbnail artwork for a video

5   based on the underlying episode. TT 501.  He also explained that one designer looked on

6   YouTube for similar artworks to use for inspiration. *Id.* at 501-02.

7      First, BabyBus admitted to plagiarizing fifteen thumbnails for the infringing videos. TT

8   492-505 (*e.g.,* Q: … did BabyBus copy CoComelon's copyrighted Doctor Checkup Song

9   episode? Mr. Yan: In term of the thumbnail, if you are talking about the thumbnail in terms of the

10  layout and expression and moves or – in this thumbnail, I believe that there had been plagiarizing

11  and infringement." *Id.* at 492.).  Then, Mr. Yan conceded multiple times that there were

12  similarities in the visual elements of the thumbnails:

13             By looking at the picture of the images, in terms of the shape of the
               shadow and in terms of the character, those were different.
14             However, in terms of the movement and the expression of the child
               or the children, yes, there was some similarity.
15
    *Id.* at 492-93 (comparing CoComelon and SuperJoJo's Doctor Checkup Song).
16
               There were similarities in terms of relevant elements, such as the
17             composition of the art of this thumbnail…

18  *Id.* at 499 (comparing CoComelon and SuperJoJo's Beach Song).

19             In terms of the thumbnails, the – the art composition and expression
               were similar.
20
    *Id.* at 538 (comparing CoComelon and SuperJoJo's Winter Song).
21
               In terms of the art composition of this thumbnail, indeed there were
22             many similarities.

23  *Id.* at 540 (comparing CoComelon's Rock-a-bye Baby and SuperJoJo's Baby Baby Time to

24  Sleep). As before, the "relevant elements" such as art composition and expression depicted in the

25  thumbnails can be protectable based on the selection and arrangement of various elements.

26      Contrary to BabyBus's argument, the copying was more than *de minimis. See* Motion at

27  32.  There was evidence of a virtually identical depiction of the protectable CoComelon character

28  JJ by the thumbnail images; such substantial similiarity greatly exceeds the "simple, minimal and

United States District Court
Northern District of California

insignificant" three-note musical sequence that was *de minimis* copying in *Newton v. Diamond,* 388 F.3d 1189, 1195 (9th Cir. 2004). Therefore, the evidence was sufficient to find substantial similarities of protectable elements in the thumbnails, thus satisfying the extrinsic test on which the jury was instructed.

<div align="center">ii.   <u>Intrinsic Test</u></div>

Finally, once plaintiff succeeds on extrinsic analysis test, the analysis moves on to the intrinsic test. "The 'intrinsic test' is a subjective comparison that focuses on 'whether the ordinary, reasonable audience' would find the works substantially similar in the 'total concept and feel of the works.'" *Benay v. Warner Bros. Entm't, Inc.,* 607 F.3d 620, 624 (quoting *Kouf*, 16 F.3d at 1045). "Both tests must be satisfied for works to be deemed substantially similar." *Funky Films, Inc. v. Time Warner Entm't Co.*, 462 F.3d 1072, 1077 (9th Cir. 2006). BabyBus does not contest this issue, so the Court need not address this step of the test. The Court notes, however, that the substantially similar characters and videos in terms of their total concept and feel, fully support the jury's finding that the intrinsic test was met.

## C.   DCMA Misrepresentation

BabyBus also argues that no reasonable juror could have found copyright misrepresentation. Motion at 6. Section 512 of the Copyright Act creates liability for any person who knowingly and materially misrepresents, via a notification, "that material or activity is infringing" or, via a counter notification, "that material or activity was removed or disabled by mistake or misidentification." 4 Nimmer on Copyright § 12B.08. Under Section 512(f), "Knowingly" means that a party actually knew, should have known if it acted with reasonable care or diligence, or would have had no substantial doubt had it been acting in good faith, that it was making misrepresentations. *Online Policy Group v. Diebold, Inc.,* 337 F. Supp. 2d 1195, 1204 (N.D. Cal. 2004).

There is substantial evidence that Moonbug "knowingly" made a misrepresentation in a counter DMCA notification. Mr. Yan first testified that at the time they sent the DMCA counternotification letter, they believed that all of the works were "our own creation." TT 523. He explained, "based on our understanding at the time with regard to this video at the time we did

<div style="writing-mode: vertical-rl">United States District Court<br>Northern District of California</div>

not think it was infringing the copyright." TT 508.  But Mr. Yan then testified that shortly after BabyBus conceded to willfully infringing the Yes Yes Playground Song, it submitted a counternotification for a compilation that contained an infringing video.  TT at 532.  Mr. Yan then explained that they overlooked this particular infringing video when filing counternotifications, because they received and responded to so many DMCA letters.  TT at 536.  While Mr. Yan believed the misrepresentation was a mistake, and not that he had "actually knew" of the misrepresentation, the evidence shows BabyBus should have known it was making a misrepresentation. It failed to act with reasonable care or diligence in responding to the DMCA letters.  *See Online Policy Group,* 337 F. Supp. 2d at 1204. Mr. Yan even admitted that "we overlooked this one because… we received so many take-down notices, and this one was because of the workload got missed."  TT at 536.  Had BabyBus taken the time to respond to the notices with reasonable care, it would have noted that it had conceded infringement instead of denying infringement.  Moreover, the evidence is also adequate to support a finding of willful misrepresentation even if "it is also possible to draw a contrary conclusion from the same evidence."  *See Castro,* 833 F.3d 1060, 1066 (9th Cir. 2016).  The jury reasonably concluded that Mr. Yan's denial of actual knowledge was not credible under the circumstances.  The evidence does not only permit "one reasonable conclusion… that is contrary to the jury's verdict." *Castro*, 833 F.3d at 1066.

B.     D.   Damages

Lastly, BabyBus contests the jury's finding of damages.  BabyBus argues that (1) no reasonable juror could have awarded copyright infringement damages, and (2) no reasonable juror could have found copyright misrepresentation damages under 17 U.S.C. § 512(f).  Motion at 6.

Moonbug argues that BabyBus did not preserve the issue of damages consistent with Fed. R. Civ P. 50: A party cannot raise arguments in its post-trial motion for judgment as a matter of law under Rule 50(b) that it did not raise in its pre-verdict Rule 50(a) motion.  *Freund v. Nycomed Amersham*, 347 F.3d 752, 761 (9th Cir 2003) (citing Advisory Comm. Notes to the 1991 Amendments, Fed. R. Civ. P. 50 ("A post trial motion for judgment can be granted only on grounds advanced in the pre-verdict motion.")).  However, BabyBus did raise both the issues of

copyright infringement damages and misrepresentation damages in its pre-verdict Rule 50(a) motion.  Docket No. 537 at 32.  The Court therefore addresses the merits of the issue.

### 1.  Copyright infringement damages

There is substantial evidence supporting the jury's award for copyright infringement damages because Moonbug provided unrebutted expert testimony as to the damages calculation, and the jury's award was reasonably within the range of the testimony.  Dr. Vanderhart explained her damages calculation, which she based off of US revenue data between July 2019 and October 2022.  TT 1054.  She calculated a total damages amount of $19,023,292, which included $4,482,308 in lost profits and $14,540,983 in unjust enrichment.  In her opinion, Moonbug was entitled to both.  *See* TT 1087.  Alternatively, a damages award could be based solely on SuperJoJo's total revenues from infringement, which Dr. Vanderhart calculated as $17,350,454.  She reached this number by looking at documents detailing BabyBus's revenues from their SuperJoJo channels and videos on YouTube, Amazon video, Roku, and Apple Store and Google Play.  TT 1050-51.  Moonbug also clarified to the jury that there were two damages calculation options.  The first amount of $19,023,292 was "a combination of plaintiffs' damages and defendants' profits."  *Id.* at 1088-89.  The second amount of $17,350,454 was "just the revenues."  *Id.* at 1089.

The jury awarded a total of $17,718,114.00 in actual damages and lost profits.  Docket No. 579 at 6 (Jury Verdict).  Defendants argue that there is no legally sufficient evidentiary basis to support the jury's finding because the jury found less than the total damages of $19,023,292 to which Dr. Vanderhart testified.  *See* Motion at 3.  But the fact that the jury's finding of $17.7 million fell between the two measures of damages presented by Dr. Vanderhart—$19 million and $17.4 million—did not render the award baseless.  It is within the province of the jury to award less than all of what the plaintiff seeks.  And here the damages awarded was well within the range suggested by Moonbug's expert.  Nothing suggests the jury engaged in ""[e]xcessively speculative."  *See Jarvis v. K2 Inc.,* 486 F.3d 526, 534 (9th Cir. 2007).  *See Bigelow v. RKO Radio Pictures, Inc.,* 327 U.S. 251, 264 (1946) ("the jury may make a just and reasonable estimate of the damage based on relevant data" and is "allowed to act on probable and inferential as well as

(upon) direct and positive proof.").  Nor does BabyBus point to any authority showing that a jury's award of damages less than the requested amount cannot be sustained as a matter of law.  Case law typically involves the inverse where the jury awards far *more* than justified by the evidence.  To accept BabyBus' argument here would mean that any jury award that is less than the plaintiff's requested damages would be suspect.  Defendants cite no case law supporting such a proposition.  The evidence here did not permit "only one reasonable conclusion… that is contrary to the jury's verdict."  *Castro*, 833 F.3d at 1066.

### 2.  § 512(f) damages

BabyBus argues that the $10,000 in nominal damages for Moonbug's misrepresentation claim is in error because Moonbug only requested a dollar in nominal damages, and nominal damages should be a minimal amount.  At closing, Moonbug said for misrepresentation damages, "What we're asking for is a message. Just a dollar."  TT 1886.

Section 512(f) provides for the recovery of "any damages, including costs and attorneys['] fees, incurred by the alleged infringer . . . who is injured by such misrepresentation, as the result of the service provider relying upon such misrepresentation in removing or disabling access to the material or activity claimed to be infringing . . . ."  17 U.S.C. § 512(f).  A plaintiff may seek recovery of nominal damages "due to an unquantifiable harm suffered as a result of [a Section 512(f)] violation."  *Lenz v. Universal Music Corp.,* 815 F.3d 1145, 1156 (9th Cir. 2016).  In general, nominal damages are intended to recognize a plaintiff's legal injury when no actual monetary damages may be discerned. *See Magnett v. Pelletier,* 488 F.2d 33, 35 (1st Cir. 1973).  The amount of nominal damages that may be awarded is not limited to $1, but should be minimal. *Id.*

Here, the evidence permits the reasonable conclusion that BabyBus's copyright misrepresentation resulted in an "unquantifiable harm."  Mr. Lin testified that an infringing video was available to the public for three days after submitting a counternotification.  TT at 1484.  Mr. Benoy testified that infringing content on YouTube dilutes the CoComelon audience share.  TT at 968.  The evidence at trial showed how this dilution could result in a loss of revenue.  *See* 470 (Yan testimony); 1062-68 (Vanderhart testimony).  Dr. Vanderhart, however, did not give expert

United States District Court
Northern District of California

1    testimony about the actual damages amount resulting from BabyBus's § 512(f) violation. Thus,

2    the harm was "unquantifiable." *See Lenz,* 815 F.3d at 1156.

3         Additionally, at least one court has sustained a nominal damages award where it could be

4    inferred that the jury intended the award to be compensatory.  In *Auwood v. Harry Brandt Booking*

5    *Office, Inc.,* 850 F.2d 884 (2d Cir. 1988), the trial court reduced the jury's award of $75,000 in

6    nominal damages to $1.  *Id.* at 888.  The court based its reduction on its interpretation that the jury

7    found no actual compensatory damages, and thus the award was purely nominal.  *Id.* The Second

8    Circuit disagreed, finding that the significant size of the jury's award suggested it was

9    compensatory.  *Id.* at 890.  Additionally, the jury instructions on nominal damages was

10   "undoubtedly incomplete and confusing" and failed to specify that such damages were typically

11   symbolic and often amount to $1.  *Id.*  Despite the confusing jury instructions, a new trial was not

12   warranted, and the court reinstated the jury's award of $75,000.  *Id.* at 890, 894.

13        Similarly, here, the jury's award of $10,000 in nominal damages is appropriate because

14   the fact that the misrepresentation resulted in "unquantifiable harm," and there was a basis to

15   suggest that the jury intended the award to be compensatory. And like *Auwood,* here, the jury

16   instructions was not prescriptive. The jury was instructed on only actual damages for

17   misrepresentation.  Jury Instructions at 27.  The verdict form only listed "Plaintiffs' Damages" for

18   misrepresentation.  Jury Verdict at 6. Therefore, the jury's award of $10,000 instead of the

19   requested $1, suggests that the award was compensatory and permissible under *Auwood*.

20                          **IV.      MOTION FOR NEW TRIAL**

21        BabyBus makes four arguments as to why the Court should grant a new trial: (1) the jury

22   instructions were in error, (2) the jury's verdict was irreconcilable, (3) trial testimony was

23   improper and prejudicial, and (4) the jury's awards for damages are unsupported by sufficient

24   evidence and contrary to law.  Motion at 652.  BabyBus claims these issues prejudiced their case

25   and prevented a fair trial, warranting a new trial under Rule 59(a) of the Federal Rules of Civil

26   Procedure.

27   A.      Legal Standard

28        Under Federal Rule of Civil Procedure 59(a)(1), a court "may, on motion, grant a new trial

United States District Court
Northern District of California

on all or some of the issues." Fed. R. Civ. P. 59(a).  A trial court may grant a new trial, "even though the verdict is supported by substantial evidence, if the verdict is contrary to the clear weight of the evidence, or is based upon evidence which is false, or to prevent, in the sound discretion of the trial court, a miscarriage of justice."  *United States v. 4.0 Acres of Land*, 175 F.3d 1133, 1139 (9th Cir. 1999).  In considering a Rule 59(a) motion, the court "is not required to view the trial evidence in the light most favorable to the verdict.  Instead, the district court can weigh the evidence and assess the credibility of the witnesses."  *Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd.*, 762 F.3d 829, 842 (9th Cir. 2014).

The decision to grant a new trial falls within the sound discretion of the trial court.  *Kode v. Carlson*, 596 F.3d 608, 611 (9th Cir. 2010).  However, a court should not grant a new trial unless it is "left with the definite and firm conviction that a mistake has been committed."  *Landes Constr. Co. v. Royal Bank of Can.*, 833 F.2d 1365, 1372 (9th Cir. 1987) (internal quotations omitted).  [Add language regarding miscarriage of justice]  A trial court's determination that the verdict is not against the clear weight of the evidence is upheld unless there is an "*absolute absence of evidence* to support the jury's verdict."  *Hung Lam v. City of San Jose*, 869 F.3d 1077, 1084 (9th Cir. 2017) (internal quotation marks omitted) (emphasis in original).

B.     Jury Instructions

"Jury instructions must fairly and adequately cover the issues presented, must correctly state the law, and must not be misleading." *White v. Ford Motor Co.,* 312 F.3d 998, 1012 (9th Cir. 2002). A deficient jury instruction warrants a new trial. *Murphy v. City of Long Beach,* 914 F.2d 183, 187 (9th Cir. 1990). A new trial is not warranted, however, if the deficient jury instruction did not prejudice the moving party. *See Cheffins v. Stewart,* 825 F.3d 588, 596 (9th Cir. 2016); *Crowley v. Epicept Corp.,* 883 F.3d 739, 750 (9th Cir. 2018). "In evaluating jury instructions, prejudicial error results when, looking to the instructions as a whole, the substance of the applicable law was [not] fairly and correctly covered." *Swinton v. Potomac Corp.*, 270 F.3d 794, 802 (9th Cir. 2001).

The movant must have made an appropriate objection, stating the grounds for the objection with particularity, before the commencement of jury deliberations.  Fed. R. Civ. P. 51 ("No party

may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict...."); *Philippine Nat'l Oil Co. v. Garrett Corp.,* 724 F.2d 803, 807 (9th Cir.1984); *Deland v. Old Republic Life Ins. Co.,* 758 F.2d 1331, 1337 (9th Cir. 1985) (doctrine of invited error applicable in context of civil jury trial).

BabyBus argues that Jury Instructions 8, 10, and 14 were in error.  Motion at 10.  Jury Instruction No. 8 reads:

> Jury Instruction No. 8
> COPYRIGHT — SUBJECT MATTER — GENERALLY (17 U.S.C. § 102)
>
> Plaintiffs are the owners of valid copyrights in 42 CoComelon Works at issue in this case.  The CoComelon Works involved in this trial are known as:
> 1. pictorial works or graphic works, such as two- and three-dimensional works of fine, graphic or applied art;
> 2. character works, such as characters in comic books, cartoons, movies, or television shows;
> 3. audiovisual works, such as cartoons or television shows in which a series of related images convey an impression of motion when shown in succession; and
> 4. sound recordings, which are works that result from fixation of a series of musical, spoken, or other sounds.
> Copyright protection in a work extends not only to the work as a whole, but also to sufficiently distinctive elements contained within the work. Characters in comic books, television or motion pictures can be afforded copyright protection if the character satisfies a three-part test, which provides that the character: (1) must generally have physical as well as conceptual qualities; (2) must be sufficiently delineated to be recognizable as the same character whenever it appears by displaying consistent, identifiable character traits and attributes, although it need not have a consistent appearance; and (3) must be especially distinctive and contain some unique elements of expression.
> You are instructed that the Court has determined that the character JJ, the main character of the CoComelon works, is a sufficiently distinctive character and is therefore afforded copyright protection.

Docket No. 562 at 10 (Jury Instructions). Jury Instruction No. 10 reads:

> Jury Instruction No. 10
> COPYRIGHT — SUBJECT MATTER — PROTECTED AND UNPROTECTED MATTER (17 U.S.C. § 102)
>
> One of the first issues you will determine is whether individual elements or combination of elements in Moonbug's works are protectable under copyright law.  Copyright protection does not necessarily extend to all the elements of a copyrighted

United States District Court
Northern District of California

work. Only the particular expression of an idea can be copyrighted and protected. Elements to which copyright protection extends are called "protected matter," and other elements are "unprotected matter." Unprotected matter is not entitled to copyright protection and may be copied by another. They include:

1. A portion of the work that is not original to the author;

2. A portion of the work that was in the public domain at the time of creation by the author;

3. An underlying idea, concept, objective fact, or actual event themselves, expressed or described in a work; and

4. Elements that are merely standard, stock, or common to a particular subject matter or medium.

You may find that aspects of Plaintiffs' copyrighted works are protected or not protected. You may also find that a particular selection and arrangement of otherwise unprotected elements is original enough to be protected if those elements are numerous enough and their selection and arrangement are original enough that their combination constitutes an original work of authorship. Mere trivial variations in compilation and arrangement or compilations and arrangements that are an age-old practice, firmly rooted in tradition, and so commonplace that it has come to be expected as a matter of course are not sufficiently original under copyright law to qualify for protection.

*Id.* at 12. Jury Instruction No. 14 reads:

<div align="center">

Jury Instruction No. 14
COPYRIGHT — UNLAWFUL APPROPRIATION — EXTRINSIC TEST; INTRINSIC TEST

</div>

Now I will explain what "unlawful appropriation" is. To determine unlawful appropriation,  you must determine for each of the copyrighted works whether each of Defendants' videos share the necessary degree of similarity; the similarity test contains an extrinsic and intrinsic portion that the Court will explain in instructions momentarily.  To show unlawful appropriation, you must apply both of the two separate tests.

a. Extrinsic Test

The first test is an "Extrinsic Test."  The "extrinsic test" is an objective comparison of specific expressive elements.  There are three steps within this test:

(1) In the first step of the Extrinsic Test, you must identify similarities between each disputed copyrighted work and the accused work(s).

(2) In the second step of the Extrinsic Test, you must filter out all the similarities you identified in Step (1) that are based on elements in Plaintiffs' copyrighted works which are not protected under copyright law.

Protected elements can include plot, themes, dialogue, mood, setting, pace, characters, sequence of events, and other expressive elements that are original to Plaintiffs.

Unprotected elements can include stock or standard concepts, characters, plot, themes, dialogue, mood, setting, pace, colors, animation style, sequence of events, music, and any other features that are commonly used or firmly rooted in the tradition of the genre to which the works belong, as well as other material that is part of the public domain or not

<div align="center">34</div>

United States District Court
Northern District of California

original to the Plaintiffs.

A combination of elements that are individually unprotected can collectively be protected expression if those elements are numerous enough and their selection and arrangement original enough that the combination constitutes an original work of authorship. For example, a particular grouping or sequence in which an author combines a significant number of unprotectable elements can itself be a protectable element and can help satisfy the extrinsic test. Assessing the similarity between two works may require examining similarities between the protected combination of elements of the copyrights work and those of the accused works:  combinations may include characters, relationships between the major characters, animation styles, plot, pace, themes, dialogue, mood, setting, colors, costumes, and sequence of events.

(3) In the third step of the Extrinsic Test, once you filter out any similarities that arise from elements in Plaintiffs' works that are not protected in step (2), you must then determine whether the protected elements (or combination of elements) in the asserted copyrighted works of Plaintiff are substantially similar to any of the accused works of Defendant.

For each copyrighted work, if you find that Plaintiffs have failed to show sufficient similarity to satisfy the Extrinsic Test, then you do not need to consider the intrinsic test and your verdict should be for Defendants.  If you do find that Plaintiffs have shown sufficient similarity to satisfy the Extrinsic Test, then you go onto the Intrinsic Test.

b. Intrinsic Test

The second test is a subjective one, called the Intrinsic Test. The Intrinsic Test asks whether an ordinary, reasonable observer would find the "total concept and feel" of the works to be substantially similar to the asserted copyrighted works. Here, you should not take into account the testimony of the expert witnesses. You should not dissect isolated elements of each work to the exclusion of the other elements, combinations of elements, or expressions. Duplication or near identity is not necessary to satisfy the Intrinsic Test.

You must apply both tests. For each copyrighted work, if you determine that Plaintiffs have shown substantial under both the Extrinsic Test and the Intrinsic Test, your verdict should be for the Plaintiffs as to that work.

*Id.* at 16-17.  BabyBus generally argues that these three instructions misinformed the jury about how to assess copyright infringement, and "failed to adequately protect" the "fundamental principle" that ideas are not protectable. They cite to the case *Skidmore v. Led Zeppelin,* 952 F.3d 1051, 1069 (9th Cir. 2020), which held that ideas must "remain forever the common property of artistic mankind" because they are the "building blocks [that] belong in the public domain and cannot be exclusively appropriated by any particular author."  They argue that CoComelon's copyrighted characters and works are unprotectable elements.

Moonbug makes four arguments in response.  First, the invited error doctrine prohibits BabyBus from making this argument because BabyBus proposed the instructions.  Second, none of the elements were unprotectable and could not be excluded in applying the extrinsic test.  Third, the jury instructions fairly explained protectable and unprotectable elements to the jury. And fourth, no prejudice resulted.  Opposition at 9-10.  The Court first addresses the invited error argument, and then the remaining arguments as they relate to Jury Instruction Nos. 8, 10 and 14.

### 1.   Invited Error

As an initial matter, BabyBus's challenge to the Court's final instructions, which excluded portions of BabyBus's proposed instructions, cannot be invited error.  It is true that a portion of BabyBus's proposed instructions were in the final instructions, including the following:

> Unprotected elements can include stock or standard concepts, characters, plot, themes, dialogue, mood, setting, pace, colors, animation style, sequence of events, music, and any other features that are commonly used or firmly rooted in the tradition of the genre to which the works belong, as well as other material that is part of the public domain."

Docket No. 336 at 93 (Defendants' Proposed Version of Extrinsic Test Instruction); Docket No.652 at 16 (Final Jury Instructions).  However, BabyBus proposed additional instructions that were not in the final instructions, including specific examples of unprotectable elements such as "'[the name] JJ,' JJ's two front upper teeth, and the wholesome and idealistic nature of a family including the ways in which the family relates."  Docket No. 336 at 96.  BabyBus also made a proposal including specific examples of unprotectable content, as opposed to general categories, in its objections to the jury instructions, Docket No. 468 and in its Court-ordered further briefing on jury instructions.  Docket No. 554 at 27-32.  The Court ultimately did not include specific examples or a specific list of unprotectable elements, despite BabyBus's multiple requests. Therefore, BabyBus did not invite error as to any of its challenges to the jury instructions here.

### 2.   Jury Instruction No. 8

BabyBus argues that it was erroneous to instruct the jury that JJ was a "sufficiently distinctive character" because JJ's sporadic use of the arms-up "wow" gesture was not a distinctive trait worthy of protection.  Motion for New Trial at 13-14.

The Court did not err in instructing the jury that the JJ character was copyrightable subject matter because to this threshold issue of copyrightability, characters can achieve copyrightability irrespective of whether separate elements such as the "sporadic use of the arms-up 'wow' gesture" are protectable or not.  *See* Motion for New Trial at 13-14.  Courts have previously held that main characters in film and television achieve copyrightability if they are sufficiently developed and finely drawn so as to cross the line from "idea" to "expression."  *See Filmvideo Releasing Corp. v. Hastings,* 509 F. Supp. 60 (S.D.N.Y. 1981), *aff'd in part, rev'd on other grounds*, 668 F.2d 91 (2d Cir. 1981) ("Hopalong Cassidy" character protected by copyright); *Metro-Goldwyn-Mayer, Inc. v. American Honda Motor Co.,* 900 F. Supp. 1287, 1295–1297 (C.D. Cal. 1995) ("James Bond" character protected by copyright).  Here, in contrast with Defendants' sole focus on JJ's "wow" gesture, the Court additionally considered JJ's "blond twirl," and "signature onesie," among other traits, and most importantly found that JJ was "especially distinctive when his unique and distinctive elements are *combined* with other traits.  Docket 242 at 15-16.  The Court further explained, "Although some of JJ's traits (*e.g.,* name "JJ"), standing alone, may not be unique, the combination of those with a few unique traits crosses the binary threshold of copyrightability."  *Id.* at 15-16.  Thus, the Court correctly found that JJ's traits, in combination, create a sufficiently distinctive character that is entitled to copyright protection as a threshold matter.

BabyBus also argues that this instruction was highly prejudicial because it was likely to confuse jurors to think that any element regarding JJ was protectable and that *any* similarity constituted infringement.  Motion for New Trial at 13.  But this argument is not persuasive.  First, nowhere in Jury Instruction No. 8 does it say that any element regarding JJ was protectable.  To the contrary, the instruction said that a character must contain "some unique elements of expression," implying a distinction between unique elements and generic unprotectable elements.  Second, Jury Instruction No. 8 does not instruct the jury on finding similarities between CoComelon and BabyBus works and characters, because it only instructs on the threshold issue of how to determine whether a work or character is afforded copyright protection in the first place.  Specifically, Jury Instruction No. 8 guided the jury on how to determine whether the CoComelon video works, family characters, animal characters, and thumbnails are afforded copyright

37

United States District Court
Northern District of California

protection.  This analysis precedes the separate analysis of whether similarities constitute infringement.  Thus, Jury Instruction No. 8 did not suggest that "any similarity" between JJ and JoJo "constituted infringement."

3.   Jury Instruction No. 14

Jury Instruction No. 14's function was to instruct the jury on how to apply the steps of the extrinsic test for unlawful appropriation.  First, the jury must identify similarities between elements in the CoComelon and SuperJoJo characters and works.  Second, the jury must filter out all of the identified similarities in the copyrighted work which copyright law does not protect, such as "stock or standard concepts," "features that are commonly used or firmly rooted in the tradition of the genre," or material in the public domain, among others.  However, crucially, copyright law can protect some of these similarities that otherwise would be filtered out, if they appear collectively in a combination that is numerous and original enough to be original, i.e., a protectable selection and arrangement. Third and finally, the jury must determine whether the protected elements in the copyrighted work are "substantially similar" to those in the allegedly infringing work.[3]

a.   Unprotected Elements

First, BabyBus argues that the Court caused prejudicial error by failing to identify the specific unprotectable elements in CoComelon characters and works in its jury instructions on the extrinsic test.  Motion at 10.  BabyBus cites *Dream Games of Arizona, Inc., v. PC Onsite,* 561 F.3d 983, 988 (9th Cir. 2009), in which the Ninth Circuit "require[s] that the unprotected elements be identified to the jury."

---

[3] As part of the third step of the extrinsic test, the Court was required to determine whether a copyrighted work is entitled to "thick" (or "broad") or "thin" protection. Docket No. 575 at 3 (Order on Thick-Thin Determination in Scope of Protection In Extrinsic Test).  There, the Court explained, "This determination drives whether the jury, in order to find the extrinsic test satisfied, must find the protectable elements of the works to be "virtually identical" or "substantially similar" to the copyrighted work. *See Desire, LLC v. Manna Textiles, Inc.*, 986 F.3d 1253, 1261 (9th Cir.), *cert. denied*, 142 S. Ct. 343, 211 L. Ed. 2d 183 (2021) ("[T]he district court must determine the scope of a work's copyright protection in the first instance.")." *Id.* And further, "The Court determined that the copyrighted works—the baby character JJ and the other works—were entitled to 'thick' protection. *Id.* at *2-3. The Court so instructed the jury to determine whether the copyrighted works and accused works were 'substantially similar.'" *Id.* at *2-3.

In *Skidmore v. Led Zeppelin,* 952 F.3d 1051 (9th Cir. 2020), the Ninth Circuit found that the jury instructions adequately instructed the jury on the extrinsic test because they explained that the jury needed to determine whether "any… musical elements that are original to "Taurus" by Spirit also appear in "Stairway to Heaven" by Led Zeppelin, so as to make the songs substantially similar. *Id.* at 1076-77.  The jury was also instructed on what constitutes an original work and how taking original copyrighted material in "significant" amounts constituted infringement. *Id.* at 1076-77.  Further, despite not including an instruction on selection and arrangement, the lower court "as a whole, fairly and adequately" instructed the jury on the extrinsic test. *Id.* at 1076.

In *Harper House, Inc. v. Thomas Nelson, Inc.,* 889 F.2d 197 (9th Cir. 1989), the jury instruction on the extrinsic test was deficient because it only instructed the jury on how to compare the works as a whole, which may have led the jury to compare unprotectable elements (as opposed to either protectable elements or a protectable selection and arrangement of unprotectable elements). *Id.* at 206-208. There, the jury rendered a verdict for Harper House, who sued Nelson for producing and selling a file organizer that was substantially similar to their own organizers. *Id.* at 198-201.  Jury Instruction No. 9 invited the jury to consider the works as a whole:

> You should ask yourself whether the ordinary reasonable person would find the total impact and effect of Defendants' work substantially similar to Plaintiff's work. . . .
> In comparing Plaintiff's and Defendants' organizers to determine whether there has been copyright infringement, you must consider and compare the contents of each of the works as a whole. That is, you must not simply focus on isolated elements of each work to the exclusion of the other elements, combination of elements and expressions therein.

*Id.* at 206.  The court also refused to give two of defendants' proposed instructions, the first of which would have listed specific unprotectable material:

> Blank forms which are designed for the recording of information are not copyrightable. If you find that Plaintiff's organizers contain forms meant to record information such as graph paper, diary forms, address forms, expense forms and the like, such forms are excluded from copyright protection. Likewise, many of the forms which were referred to contained common property such as calendars, time zones, telephone area codes, measuring rulers, calorie counter charts, and check registers. Such common property is not copyrightable.

*Id.* The second proposed instruction would have explained how to find a protectable selection and

arrangement of elements as follows:

> One basis upon which Plaintiff claims copyright protection for its organizer is as a compilation. Under the copyright laws, a compilation is a work resulting from a process of selecting, bringing together, organizing, and arranging previously existing material from other sources, regardless of whether the individual items in the material have been or ever could have been subject to copyright. Such selection or arrangement may in itself constitute an original contribution of authorship and should be protectable against appropriation under copyright principles.

*Id.* The Ninth Circuit held that the trial court's jury instructions were inadequate and constituted error requiring a new trial on copyright infringement. *Id.* at 208. Jury Instruction No. 9's "highly subjective 'total impact and effect' test" was insufficient, especially given the district court's rejection of the proposed instruction on unprotectable elements of organizers. *Id.* at 207. Though the jury was instructed to limit its review to protectable material, "this caution was of little value" because they were not specifically told that "blank forms, common property, or utilitarian aspects of useful items are not protectable." *Id.* at 207-208. The court reasoned that the jury may have found that defendants infringed Harper House's copyright based upon the direct copying of such unprotected material, as opposed to copying of the selection, coordination, or arrangement of Harper House's organizers. *Id.* at 208.

Unlike the "misleading" instruction in *Harper House* that only explained how to assess the "total impact and effect" of the infringing work, here, the jury was instructed on each step of the extrinsic test, i.e. how "to filter out any similarities that arise from elements in Plaintiffs' works that are not protected" and then determine "whether the protected elements (or combination of elements), are substantially similar" to any of the allegedly infringing works. *Id.* at 16-17. The jury was also instructed on the kinds of things that are unprotected. The instruction explained:

> Unprotected elements can include stock or standard concepts, characters, plot, themes, dialogue, mood, setting, pace, colors, animation style, sequence of events, music, and any other features that are commonly used or firmly rooted in the tradition of the genre to which the works belong, as well as other material that is part of the public domain or not original to the Plaintiffs.

Docket No. 562 at 16 (Jury Instruction No. 14, Copyright—Unlawful Appropriation—Extrinsic Test; Intrinsic Test). And unlike *Harper House,* the jury was instructed on protectable

United States District Court
Northern District of California

selection and arrangement of unprotected elements:

> A combination of elements that are individually unprotected can collectively be protected expression if those elements are numerous enough and their selection and arrangement original enough that the combination constitutes an original work of authorship.

Docket No. 562 at 16-17. Therefore, the jury instructions were sufficient because they provided the jury with general examples of unprotected elements and protected elements, instructed the jury of each step of the extrinsic test, and instructed on how the selection and arrangement of otherwise unprotected elements can be protected.

In *Dream Games of Arizona., Inc. v. PC Onsite,* 561 F.3d 983 (9th Cir. 2009), the jury instructions were sufficient because they identified unprotectable elements, even though they did not identify protectable elements.  *Id.* at 989.  There, the video game company Dream Games, who owned the copyrighted "Fast Action Bingo" video game sued one of its game licensors.  *Id.* at 986-87.  The jury trial evidence included screen displays of Fast Action Bingo.  *Id.* at 987, 989. The jury instructions identified the specific unprotectable elements of Fast Action Bingo such as: "Functions such as 'Add user,' 'Games Menu and 'Done'" and "Bingo cards, called numbers (often printed on balls), a key describing winning patterns and corresponding prizes, and the player's balance and winnings."  *Id.* at 989.  However, the jury instructions did not list the specific protectable elements.  *Id.* at 989.  The trial court's failure to include specific protectable elements was not in error, because "Consideration of the whole work is proper...as long as 'the *unprotectable* elements [are] identified.'" (citing *Apple Computer, Inc. v. Microsoft Corp.,* 35 F.3d 1435, 1446 (1994)).  It concluded that "No case law or legal theory requires that "protectable" elements be identified as well."  *Dream Games,* 561 F.3d at 989; *see also Apple Computer, Inc., v. Microsoft Corp.,* 35 F.3d 1435, 1446 (9th Cir. 1994).

Ninth Circuit caselaw does not hold that jury instructions must invariably identify *specific* unprotectable elements of a copyrighted work under the extrinsic test. In fact, *Skidmore's* relatively simplified jury instruction on whether "any... musical elements that are original to Taurus... also appear in Stairway to Heaven" was sufficient to find substantial similarity under the extrinsic test.  *Skidmore,* 952 F.3d at 1076-77.  And *Dream Games's* jury instruction requirement

that "the *unprotectable* elements [are] identified" is a partial quote from *Apple Computer,* which in full states that at the extrinsic test stage, "the unprotectable elements have to be identified, or filtered" before then at the intrinsic test stage the works can be considered as a whole. *Apple Computer,* 35 F.3d at 1446.  *Apple Computer* involved the application of the extrinsic test by the court, not the adequacy of jury instructions.   Thus while these holdings affirm the general principle that at the extrinsic test stage, unprotectable elements must be identified and filtered out while the remaining protectable elements must be substantially similar, they hold a uniform requirement as to the specifics of jury instructions.

At most, these cases teach that when the jury (as opposed to the court) is tasked with applying the extrinsic test, courts must provide sufficient guidance in how to filter out unprotected elements from protected elements.  There is no absolute requirement that the court present an exhaustive list of specific unprotected elements to the jury; instead, what constitutes sufficient guidance must be assessed on a case-by-case.  Courts can establish criteria to determine what is unprotected or protected.  Here, the jury instructions provided adequate guidance to filter what is unprotected, and gave categorical examples of unprotectable elements.  Docket No. 562 at 16 (Jury Instruction No. 14, Copyright—Unlawful Appropriation—Extrinsic Test; Intrinsic Test). While specific examples may be useful, they are not essential in every case.  This is especially true here, where requiring that the Court list every specific unprotectable elements would be an impossible task because the number of unprotected elements is almost limitless.  Krause testified that he had a list of at least 121 unprotectable elements. TT 866.  Identifying particular selections and arrangements of those unprotectable elements which would not qualify as protected would become even more unwieldly given the multiplicity of permutations.

BabyBus's cite to *Mattel, Inc. v. MGA Entertainment, Inc.,* 616 F.3d 904 (9th Cir. 2010) is inapposite, because the court never held that jury instruction must specifically identify unprotectable elements.  Mattel, the maker of Barbie dolls, sued MGA Entertainment for copyright ownership over the Bratz dolls.  The Bratz dolls were developed by a former Mattel employee, who created the original sketches when he worked at Mattel.  *Id.* at 907-08.  The jury returned a general verdict for Mattel, but the trial court made its own infringement findings because it found

42

the verdict unclear as to which Bratz dolls were infringing.  *Id.* at 911.  It then found that the vast majority of Bratz dolls were substantially similar to Mattel's original doll sketches, and entered an injunction against MGA Entertainment.  *Id.* at 914.  The Ninth Circuit held that the trial court made a "significant" error by failing to filter out all of the unprotectable elements of the original doll sketches in the infringement analysis.  *Id.* at 916.  While the trial court identified some unprotectable elements such as the human resemblance, human features such as hair, head, and two eyes, human clothes and accessories, age, race, ethnicity, and "standard features," it failed to identify other additional unprotectable elements: the dolls' "particularized, synergistic compilation and expression of the human form and anatomy that expresses a unique style and conveys a distinct look or attitude," and dolls that expressed an "aggressive, contemporary, youthful style."  *Id.* at 916.  The court explained that "fashion dolls with a bratty look or attitude, or dolls sporting trendy clothing –these are all unprotectable ideas." *Id.*  Thus, what was problematic was the trial court's application of the extrinsic test; it did not fully account for unprotected elements in applying the filtering test.  The circuit court thus remanded on the issue of whether the Bratz dolls are substantially similar to the original sketches "disregarding similarities in unprotectable ideas," *inter alia.  Id.* at 917.  It was following the circuit's remand upon retrial that the district court (perhaps acting in an abundance of caution) offered jury instructions which included a comprehensive list of specific unprotectable elements.  *Mattel Inc. v. MGA Entertainment, Inc.,* 2011 WL 1560340 (C.D. Cal. 2011) (Instrs. 47, 48) (Docket 554-1).  *Mattel* is not dispositive here.

While the trial court's list of unprotectable elements was missing several key elements, the court never required a jury instruction to identify specific unprotectable element of the copyrighted sketches.  In contrast to *Mattel* where the court chose to conduct its own infringement analysis, here, the infringement analysis is within the sole province of the jury—with sufficient guidance from the Court.  And while Defendants point out that the district court changed the jury instructions to identify specific unprotectable elements on remand, the Ninth Circuit never required it to do so.

Furthermore, here, both parties in fact presented substantial evidence at trial of

43

unprotectable elements in CoComelon characters and works.  As noted above, Krause testified and

conceded that over a hundred specific elements of JJ were not protectable on cross-examination:

> Q. But large rounded heads, extra large eyes, two front upper teeth,
> thin lips on a mouth with a half-moon smile, those are elements that
> are common to the genre; yes?
> A: If you're asking just about the elements, I would say that those
> elements are appearing around in the genre; but if you're asking
> about specifically how those elements are creatively expressed by
> the JJ and JoJo characters, then I'd say that that's not true.
> Q. And let me ask you a question about elements while we're talking
> about that. You had a list of 121 elements; yes?
> A. As far as I know, yeah.
> Q. And those elements in and of themselves, they're not protectable;
> yes?
> A. Oh, yeah.
> Q. Pardon me?
> A. I was agreeing with you.
> Q. In and of themselves they're just ideas; yes?
> A. Yeah, those are concepts.

TT 866.  The jury was well aware of the distinction between protectable and unprotectable

elements and in view of the trial evidence, was sufficiently guided by the instruction on the matter.

More importantly, the focus of the trial was not on whether specific elements, such as a

baby's round head, were protected.  Plaintiff conceded many if not most of the individual elements

were not protected.  Rather, the focus was on whether the *combination* of otherwise unprotected

elements, such as character features, video plots, camera angles, lighting, etc., were numerous and

original enough to be protectable under the selection and arrangement theory.  Hence, listing

specific examples of specific unprotected elements would not have been helpful to the jury.  The

Court's instructions on the extrinsic test, and specifically on unprotectable elements, protectable

elements, and, in particular, the selection and arrangement theory provided adequate guidance to

the jury for finding copyright infringement under the circumstances of this case.

In any event, any failure to explicitly list specific unprotectable elements in the

CoComelon copyrights did not prejudice BabyBus.  As noted above, Krause testified and

conceded that many (121) individual elements of JJ were not protectable, such as a large rounded

head, extra large eyes, two front upper teeth, and thin lips on a mouth with a half-moon smile.  TT

866.  Kraus further conceded that they were just unprotected ideas and concepts.  *Id.*  Therefore,

the jury well understood there were many unprotectable elements.  The key issue pertained to their

United States District Court
Northern District of California

*arrangement and combination*.   The failure to list specific unprotected elements (already conceded by Plaintiffs) was inconsequential.

Finally, Moonbug's repeated assertion that the Court previously found the JJ character protectable as a matter of law is not relevant here because that finding only pertained to the threshold issue of copyrightable subject matter.  *See* Opposition at 13.  Here at the extrinsic test analysis, whether the JJ character comprises of protectable elements or a selection and arrangement of unprotectable elements properly was an issue for the jury.

b.   Scenes a Faire Instruction

The jury instruction on unprotected elements incorporated the scenes a faire doctrine in copyright law, which refers to "incidents, characters or settings which are as a practical matter indispensable, or at least standard, in the treatment of a given topic."  Nimmer on Copyright, § 13.03.  For example, one court has commented that "the public domain would have a scant selection if stock settings such as the movie theatre, the kitchen, Las Vegas, a church picnic or a club were subject to copyright protection."  *Scott-Blanton v. Universal City Studios Prods. LLLP*, 539 F. Supp. 2d 191, 201 (D.D.C. 2008), *aff'd*, 308 Fed. Appx. 452 (D.C. Cir. 2009)).  BabyBus argues that this scenes a faire instruction failed to explicitly state that unprotectable elements can be ones "that naturally flow from, or are naturally associated with, basic ideas or premises."  Motion at 16.  For example, the depiction of toddlers engaging in relatable moments, such as brushing teeth or taking a bath, flows naturally from the idea of relatable preschooler programming.  *Id.*

However, this proposed instruction would have added little, if anything, to the instructions already given on unprotected elements.  A juror could just as likely find that BabyBus's examples of a toddler brushing their teeth or taking a bath are "stock or standard concepts" that are "commonly used" under the scenes a fair instruction as they would under BabyBus's proposed additional instruction.  BabyBus has not shown otherwise.  Therefore, no prejudice resulted.

c.   Selection and Arrangement Instruction

BabyBus argues that the instruction on "selection and arrangement" was improper, and that the jury should have been instructed that the collection of random similarities scattered in works is

not a protectable selection and arrangement. Motion at 17.  The Court disagrees.

There was no evidence at trial that suggested elements composing Moonbug's "selection and arrangement" theory were "random similarities scattered in works."  To the contrary, Moonbug's evidence strongly supported an intentional combination of elements of artistic expression that were intrinsic to the JJ character across all CoComelon works.  CoComelon creative executive Katie Nahab described JJ as "extremely curious and filled with wonder" TT 288, 292, and how JJ acts "a little bit above his experience level," TT 347.  Krause also testified about how elements of JJ's character were uncharacteristic for babies his age, as he acts a few years older than he is.  TT 751.  Krause explained "It's all of these elements, but how they're creatively expressed, how the artists that are designing JJ have chosen to make all of these little I think of them as decisions" TT 757.  Krause also testified about JJ's "wow" move and how it is the movement he connects the most with JJ, TT 760;  CoComelon animator and director Katelyn White described JJ's "Wow" movement of throwing his arms in the air as a "favorite go-to move" that the animators used.  TT 403.  There is nothing random or scattered about these elements, which Plaintiffs set forth as evidence under the protectable selection and arrangement theory.  These were deliberately chosen.

Moonbug's evidence also strongly supported the same as to the CoComelon video works.  As noted previously in the Motion for Judgment as a Matter of Law section, Moonbug witnesses testified to the combination of expressed elements that make up CoComelon style and works.  *See e.g.* TT 295-300 (CoComelon creative executive Katie Nahab testifying about how CoComelon style integrates JJ-focused family interactions, painting-inspired color and set design, "light" and "bouncy" animation, and close integration between the music and the episode);  TT 362-380 (CoComelon animator Marvin Lee testifying about how the specific and creative way CoComelon integrates character animation, audio, and camera angles in storytelling, and described specific details); TT 397 (CoComelon animator Kate White testifying to the specific creative choices of camera angles and movement);  TT 790-91 (Krause identifying the following similar elements in CoComelon's "This is the Way" and SuperJoJo's equivalent: the quality of the animation, the posing, the camera angle, the background design, the blue and nautical themed tiles in the

46

United States District Court
Northern District of California

1    bathroom, the subject matter; the camera angles, facial expressions, ways of "using the rig and

2    model," backgrounds, lighting, and color design were "very, very similar." ); TT 794-812

3    (comparing similarities in plot, subject matter, mood, style, design, sequence of events, in the

4    Doctor Checkup song, the Swimming Song, Rock-a-Bye Baby).  Therefore, the giving of

5    BabyBus's preferred instruction would not have affected the outcome.

6         BabyBus also argues that the selection and arrangement instructions were improper

7    because it implied that the first person to come up with an arrangement will be able to protect it,

8    and that it failed to explain that it does not extend to arrangements that are "utterly conventional."

9    Mot. at 17-18 (citing *Gray,* 28 F. 4th at 101).  The Court also disagrees.  First, no evidence at trial

10   related to "the first person to come up with an arrangement," making BabyBus's point irrelevant.

11   Second, the instructions adequately stated the law on selection and arrangement theory.  It states

12   that protectable selection and arrangement does not extend to arrangements that are "so

13   commonplace that it has come to be expected as a matter of course."  Docket No. 562 at 12.  This

14   is a sufficient instruction on protectable selection and arrangement.

15            d.     <u>Thick/Thin Determination</u>

16        Finally, BabyBus argues that the correct standard in Jury Instruction No. 14 was not

17   "substantial similarity" but rather "virtually identical." Motion for New Trial at 18.  The Court

18   previously explained its reasoning for applying the "substantial similarity" standard for Jury

19   Instruction No. 14.  *See* Docket No. 575 (Order on Thick-Thin Determination In Scope of

20   Protection in Extrinsic Test).  There, the Court found that the JJ character was entitled to "thick"

21   protection, explaining:

22             Even considering the range of animated babies that would align with
23             the commercial, family-friendly nature of the CoComelon brand,
          there are a wide array of possible babies that would likely appeal to
24             toddlers and parents. Moonbug's copyrighted JJ animated character
          is thus entitled to broad protection against accused works that are
25             substantially similar to the copyrighted work.

   *Id.* at 8.

26        Given the Court's reasoning in its Order, BabyBus's argument that the Court erred in

27   instructing the jury to apply the "substantial similarity" rather than the "virtually identical"

28

                         47

standard is unpersuasive.  BabyBus also failed to bring this challenge in a timely motion for reconsideration to the Order, *see* Fed. R. Civ. Pro. 59(e), and now improperly attempts to raise it here.

Moreover, in an abundance of caution, the Court propounded a special verdict interrogatory which specifically asked the jury to determine, if it found infringement, whether CoComelon's JJ was "virtually identical" to BabyBus's JoJo.  The jury found that JJ was "virtually identical" to JoJo.  Docket No.579 at 4 (Jury Verdict).  Therefore, the jury instruction was correct, and even if there was error on the issue of thick versus thin protection, such error was harmless in view of the jury's specific finding.

4.    Jury Instruction No. 10

BabyBus's challenges to Jury Instruction No. 14 also apply to Jury Instruction No. 10, because the latter also included instructions on protectable and unprotectable elements, scenes a faire, and selection and arrangement, but as it relates to the threshold issue of copyrightable subject matter.  BabyBus does not make any additional arguments that are specific to Jury Instruction No. 10.  Therefore, for the same reasons as stated above, the Court did not cause prejudicial error with its instructions on protectable and unprotectable elements, scenes a faire, or selection and arrangement.

C.    Jury Verdict

Fed. R. Civ. Pro. 49 governs general and special verdicts.  *See* 4 Federal Litigation Guide § 45.35.  One alternative to a general verdict under Rule 49 is a general verdict accompanied by answers to special interrogatories.  Fed. R. Civ. P. 49(b).  A trial court may submit written interrogatories to the jury for consideration, along with a general verdict form.  *Id.*  In such a case, the jury will return both a general verdict or nonliability or liability of damages, and answers to each of the individual interrogatories.  *Id.*  Here, the jury verdict was precisely so: a general verdict accompanied by answers to special interrogatories.  The general verdict portion included a finding on copyright infringement as to each of 42 copyrighted works, as well as copyright misrepresentation, and damages.  It then included the following special interrogatory: "If above in Question 1, you find the JJ character was infringed, do you also find that the JoJo character was

United States District Court
Northern District of California

not only substantially similar but also virtually identical to the JJ character?"  *Id.* at 7.  Specifically with respect to the general verdict, a general verdict that is facially inconsistent and reflects confusion on the part of the jury is substantial grounds for a new trial.  *Hopkins v. Coen,* 431 F.2d 1055, 1059–1060 (6th Cir. 1970), *see also E.F. Hutton & Co. v. Arnebergh,* 775 F.2d 1061, 1064 (9th Cir. 1985) (citing *Hopkins,* 431 F.2d at 1059).

Here, BabyBus contends that the general verdict was inconsistent because the jury found that the JJ character and family characters were infringed, but found the Soccer Song was not infringed even though it contains the JJ character and family characters.  Motion for New Trial at 21.  But this verdict has plausible explanations.  For one, a copyright for an individual character or family characters is distinct from a copyright for a music video that contains those characters.  The copyright to the JJ character is for the character only.  In contrast, the Soccer Song's copyright looks at a broader range of elements, including narrative, plot, theme, setting, etc. in combination. A juror could find that JJ as a specific character was infringed, but that the Soccer Song was not "substantially similar" as a whole to allegedly infringing works.  *See* Nimmer on Copyright, § 13.03, *see e.g. Parker v. Dufresne,* 781 F. Supp. 2d 379, 384-85 (W.D. La. 2011) (finding similarity between two works that dramatized actual murders in that they described crumb-carrying ants in the dumpster where the bodies were stashed; the similarity was probative but did not rise to the level of substantiality).

Furthermore, the Court also reviewed the videos in evidence of both the copyrighted CoComelon works and the allegedly infringing SuperJoJo works and finds no inconsistency in the jury verdict.  First, many SuperJoJo videos shared more than just similarities in character with CoComelon works; they shared similarities in narrative, plot, theme, setting, mood, and colors.  For example, CoComelon's "Yes Yes Vegetables Song," and "Bath Song" are similar in many of these ways to SuperJoJo's equivalent videos as detailed earlier.  In contrast, CoComelon's "Soccer Song" is not as similar to any of SuperJoJo's works.  Hence the jury could rationally have found other videos infringed but not the "Soccer Song."  The other two CoComelon works that the jury found were not infringed, the Happy Shapes Song, and the No No Play Safe Song, are like the Soccer Song in that no SuperJoJo work shares significant similarities to them beyond the character

similarities. Docket No. 579 at 6.  For example, in the CoComelon No No Play Safe Song, JJ refuses to wear his helmet, elbow pads, knee pads and wrist pads before getting on his bicycle, refuses to wear a life vest on a boat, and refuses to wear a seatbelt in a car.  In contrast, in the BabyBus equivalent, JoJo is excited to wear his helmet and elbow and knee pads before getting on his bicycle and the end shows him biking away.  TE 0384. While in those videos the copyrights for individual characters and family characters could be infringed given that JJ was "virtually identical" to JoJo, that does not automatically mean that the copyrights for the video works and songs as a whole were infringed.  The verdict is not contrary to the "clear weight of the evidence" nor results in a "miscarriage of justice" *see States v. 4.0 Acres of Land*, 175 F.3d 1133, 1139 (9th Cir. 1999).

D.      Trial Testimony

    BabyBus argues that Moonbug's witnesses gave false and misleading testimony about CoComelon's protected expression.  Motion for New Trial at 26.  Specifically, Moonbug witness Katie Nahab improperly testified about a "bee theme" kitchen because the kitchen only appeared in newer videos that were not at issue in this action.  *Id.* at 26-27; TT 296-98.  Then, Krause invoked that testimony in describing examples of CoComelon protectable expression such as its "muted" color designs and background.  *Id.;* TT 766-67.

    First, Moonbug witnesses, including Nahab and Krause repeatedly testified as to the general style of CoComelon works, not just to specific styles in videos that were not in evidence. Nahab generally described the animation style of CoComelon as "bouncy in the sense that it's upbeat, it's energetic, it's joyful." TT 297.  She generally testified that the show's colors are "vibrant and saturated" and have "high contrast."  *Id.*  Then, she generally described the backgrounds as "a little bit more muted" so characters could "pop" against them, and then used the "bee theme" as an example:

> In our backgrounds we want to keep it a little bit more muted. We want to have those opportunities for the characters to pop against them, but the backgrounds are still -- I mean, they're still really beautiful and they're well thought out. JJ's kitchen has this bee theme that kind of comes through in the backsplash and little hints here and there. We have a lot of fun designing them.

> And so, anyway, so characters are really the foreground, background is the environment and using color and design to highlight our characters.

TT 297.  Because witnesses clearly testified regarding the general color designs and style of the CoComelon works, there was no prejudicial effect of specific invocation of the "bee theme" kitchen as an example.

BabyBus also argues that Krause offered "improper, speculative opinions" about BabyBus's independent development defense.  Motion at 27.  In the Court's pretrial rulings, the Court prohibited Krause from offering opinions on BabyBus' employees' intent, motives, or state of mind, noting such were more properly the province of the jury.  Docket No. 407 at 27-28.  A copyright expert may not offer opinions on a corporation's intent or statement of mind.  *Id.*; *see Stanley v. Novartis Pharms. Corp.,* 2014 WL 12573393, at *6 (C.D. Cal. May 6, 2014).  At trial, Krause testified that he thought it was "very, very hard to believe" and that he found it "weird" for BabyBus "to concede that a video is copied … but that the character somehow isn't copied."  TT 832, 819.  Contrary to BabyBus's argument, Krause was expressing his own factual opinion that does not speak to BabyBus's intent, motives, or state of mind.  BabyBus also points to the following testimony from Krause:

> And so in the first few episodes when you're working on a show, a lot of thinking and the creation of the characters gets done in that. Now, when those few episodes end up being copies of someone else's show, you're kind of skipping the part where you're actually creating your own character and instead copying what somebody else had created and made into their own character.

*Id.* at 784.  But again, this does not improperly opine on BabyBus' employees' state of mind.  Rather, Krause describes the general creation process and copying process from his own experience working on shows.  *See id.* at 783.

Finally, BabyBus argues that Krause offered improper and prejudicial opinion on the intrinsic test, which is in the exclusive province of the jury. Motion for New Trial at 29; *see* Docket No. 562 at 17 (Jury Instructions).  Krause opined that Super JoJo copied the "look and feel" of the show.  TT 813-814.  The Court denied BabyBus's request to strike the answer, saying that Krause was referring to his "factual view," not his "legal determination."  *Id.* at 814.  The Court's reasoning is sound, as Krause's factual opinion was not an improper application of the

1  intrinsic test, and there is no evidence suggesting otherwise.  Further, Krause did not offer expert

2  testimony about the intrinsic test or his opinion on the application of the test.  Moreover, Jury

3  Instruction No. 14's instruction on the intrinsic test explicitly said "Here, you should not take into

4  account the testimony of expert witnesses."  Docket No. 562 at 17 (Jury Instructions).  In any

5  event, any error was not prejudicial given the totality of the evidence at trial.

6  E.   <u>Damages</u>

7       BabyBus argues that the jury's damages award was speculative because it was lower than

8  the full damages estimate.  Here, Moonbug's expert Dr. Vanderhart testified to a total of $19

9  million in damages from infringement between July 2019 and October 2022.  TT 1164.  Dr.

10  Vanderhart broke down the damages to $4,482,000 in lost profits and $14,540,000 in unjust

11  enrichment.  TT 1086-1089.  BabyBus did not present any rebuttal evidence.

12       A "jury award must be upheld if it is supported by substantial evidence." *Polar Bear

13  *Prods., Inc. v. Timex Corp.,* 384 F.3d 700, 708 (9th Cir.2004).  "Where a jury awards damages in

14  a lump sum, as is the case with the actual damages award, we generally do not disturb the damages

15  award unless the resulting award exceeds the amount sustainable by evidence in the record." *Id.* at

16  710.  Generally, courts have granted a new trial or remittitur when the jury finds a damages

17  amount that is excessively more than the evidence shows.  *See, e.g., Whalen v. Phoenix Indem.

18  Co.,* 220 F.2d 78 (5th Cir. 1955) (award of general damages grossly excessive); *Plumbers &

19  Steamfitters Union, Local No. 598 v. Dillion,* 255 F.2d 820, 824 (9th Cir. 1958) (judgment vacated

20  because damages were "grossly excessive"); *Nodak Oil Co. v. Mobil Oil Corp*., 533 F.2d 401 (8th

21  Cir. 1976) (the court properly granted a conditional new trial since where the actual damages were

22  $700, a punitive damages award of $100,000 was shocking).

23       Here, the jury awarded damages that were *less* than the maximum for which there was

24  evidence: $17.7 million, instead of the total $19 million that Dr. Vanderhart testified to.  Jury

25  Verdict at 6.  As noted above, BabyBus does not provide any authority to show a new trial is

26  warranted when the jury finds a damages amount that is *less* than the evidence shows.  $17.7

27  million as opposed to $19 million is not "[e]xcessively speculative" enough to require rejection.

28  *See Jarvis v. K2 Inc.,* 486 F.3d 526, 534 (9th Cir. 2007); *Bigelow v. RKO Radio Pictures, Inc.,* 327

U.S. 251, 264 ("the jury may make a just and reasonable estimate of the damage based on relevant data" and is "allowed to act on probable and inferential as well as (upon) direct and positive proof."). Under BabyBus' theory, any jury award for less than that sought by the plaintiff, the calculation of which is not tied to specific evidence, would be suspect. Therefore, the Court does not disturb the damages award.

### V.    <u>CONCLUSION</u>

The Court DENIES BabyBus's Renewed Motion for Judgment as a Matter of Law and Motion for New Trial.

This Order disposes of Docket Nos. 651, 652.

**IT IS SO ORDERED**.

Dated:  May 15, 2024

_____
EDWARD M. CHEN
United States District Judge